# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAKE LIVELY, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual,<br><br>        Defendants. | Civ. Action No. 1:24-cv-10049-LJL (Consolidated for pretrial purposes with 1:25-cv-00449-LJL) rel. 1:25-cv-00779-LJL |
| WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, JENNIFER ABEL, an individual, and STEVE SAROWITZ, an individual,<br><br>        Plaintiffs,<br><br>v.<br><br>BLAKE LIVELY, an individual, RYAN REYNOLDS, an individual, LESLIE SLOANE, an individual, VISION PR, INC., a New York corporation, and THE NEW YORK TIMES COMPANY, a New York corporation,<br><br>        Defendants. | |

## CONSOLIDATED PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CONSOLIDATED DEFENDANT BLAKE LIVELY'S MOTION TO DISMISS THE AMENDED COMPLAINT, FOR ATTORNEYS' FEES AND COSTS, AND TO STRIKE EXHIBIT A

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL STANDARD AND FACTUAL BACKGROUND ................................. 3

III.    ARGUMENT ....................................................................................................... 3

        A.      The FAC States a Claim for Defamation Against Lively ....................... 3

                1.      The FAC Identifies Specific and Unprivileged Defamatory Statements ........ 4

                        a.  Lively Is Liable for Statements Made by the Sloane Parties
                            and Reynolds Under the Principles of Agency and the
                            Doctrine of *Respondeat Superior* ......................................... 4

                        b. Lively Made Defamatory Statements Herself ..................... 10

                2.      The Wayfarer Parties' Defamation Claim Is Timely .................... 11

                3.      The Defamatory Statements Are Not Privileged ........................... 11

                4.      The Litigation Privilege Does Not Apply ..................................... 12

                5.      The Sexual Harassment Privilege Does Not Apply ..................... 14

                        a.  Lively's Defamatory Statements Were Made with Malice
                            and Without a Reasonable Basis in Fact ............................... 14

                        b. Section 47.1 Does Not Apply to Defamatory Statements
                            Made by the Sloane Parties or Reynolds on Lively's Behalf ............. 18

                6.      The Fair Report Privilege Does Not Apply ................................... 19

                7.      The FAC Alleges that Lively Acted with Actual Malice ............. 20

        B.      The Wayfarer Parties Have Adequately Pleaded a Claim for Civil Extortion ..... 23

        C.      The FAC Pleads a Claim for False Light Invasion of Privacy ............ 25

        D.      The FAC Adequately Pleads Tortious Interference Claims Against Lively ........ 27

                1.      The FAC States a Claim for Intentional Interference with
                        Contractual Relations ................................................................... 28

                2.      Alternatively, the FAC States a Claim for Intentional Interference
                        with Prospective Economic Advantage ........................................ 30

        E.      Lively Is Liable for Her Direct Actions as Well as by Conspiracy ..................... 31

F.    The FAC States a Claim for Breach of Implied Covenant of Good
Faith and Fair Dealing ........................................................................................ 32

G.    Even If the Motion Is Granted, Fees and Damages Cannot Be Awarded............. 32

IV.    CONCLUSION.......................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*J'Aire Corp. v. Gregory*,
24 Cal. 3d 799 (1979) ...................................................................................................31

*Action Apartment Assn., Inc. v. City of Santa Monica*,
41 Cal. 4th 1232 (2007) ...........................................................................................13, 14

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) ...................................................................................................31

*Axia Fin., LLC v. Mason McDuffie Mortg. Co.*,
2023 WL 7280443 (N.D. Cal. Sept. 20, 2023) .......................................................31

*Bates v. Campbell*,
213 Cal. 438 ....................................................................................................................4

*Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*,
229 F. 3d 1135 (2d Cir. 2000) .....................................................................................34

*BE & K Const. Co. v. N.L.R.B.*,
536 U.S. 516 (2002) ................................................................................................34, 35

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013) ........................................................................22

*Brady v. NYP Holdings, Inc.*,
2022 WL 992631 (S.D.N.Y. Mar. 31, 2022) ............................................................33

*Buck v. Zwelling*,
272 A.D.2d 895 (4th Dep't 2000) ................................................................................5

*Burrill v. Nair*,
217 Cal. App. 4th 357 (2013) ......................................................................................21

*C.R. v. Tenet Healthcare Corp.*,
169 Cal. App. 4th 1094 (2009) ......................................................................................9

*Contento v. Mitchell*,
28 Cal. App. 3d 356 (1972) ...........................................................................................4

*Cosmonova. LLC v. BioFilm, Inc.*,
2025 WL 319249 (S.D. Cal. Jan. 28, 2025) ..............................................................29

*CT Espresso LLC v. Lavazza Premium Coffees Corp.*,
2022 WL 17156759 (S.D.N.Y. Nov. 22, 2022) ........................................................34

*Delfino v. Agilent Technologies, Inc.*,
   145 Cal. App. 4th 790 (2006) ...................................................................................9

*Della Panna v. Toyota Motor Sales, U.S.A., Inc.*,
   11 Cal. 4th 376 (1995) ...........................................................................................30

*Dickinson v. Cosby*,
   37 Cal. App. 5th 1138 (2019) .......................................................................8, 10, 13

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ...............................................................................................34

*Eads v. Marks*,
   39 Cal. 2d 807 (1952) ............................................................................................31

*Eisenberg v. Alameda Newspapers*,
   74 Cal. App. 4th 1359 (1999) ................................................................................26

*Garland Connect, LLC v. Wells Fargo Bank*,
   2023 WL 5523936 (Cal. Ct. App. Aug. 28, 2023)...................................................29

*Gates v. Bank of America*,
   120 Cal. App. 2d 571 (1953) .................................................................................10

*GetFugu, Inc. v. Patton Boggs LLP*,
   220 Cal. App. 4th 141 (2013) ................................................................................13

*Gottwald v. Sebert*,
   148 N.Y.S.3d 37 (1st Dep't 2021) *aff'd as modified*, 40 N.Y.3d 240 (2023) ...........5

*Hagendorf v. Brown*,
   699 F.2d 478 (9th Cir. 1983), *amended*, 707 F.2d 1018 (9th Cir. 1983)................12

*Harte-Hanks Communications. Inc. v. Connaughton*,
   491 U.S. 657 (1989)...............................................................................................21

*Hawran v. Hixson*,
   209 Cal. App. 4th 256 (2012) ..................................................................................4

*Healthsmart Pac., Inc. v. Kabateck*,
   7 Cal. App. 5th 416 (2016), *as modified* (Jan. 10, 2017)........................................19

*Heitkoetter v. Doem*,
   2023 WL 2563647 (E.D. Cal. Mar. 17, 2023) .......................................................25

*Baral v. Schnitt*,
   1 Cal. 5th 376 (2016) .............................................................................................21

*Muddy Waters, LLC v. Superior Court*,
   62 Cal. App. 5th 905 (2021) ....................................................................................4

*Ixchel Pharma LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130 (2020) ...............................................................................29, 30

*Khadavi v. Stalgi, Inc.*,
  2021 WL 929099 (C.D. Cal. 2021)..........................................................................24

*Leah McSweeney v. Andy Cohen, et al.*,
  No. 24-CV-01503 (LJL), 2025 WL 966022 (S.D.N.Y. Mar. 31, 2025) ..........................22, 33

*Let Voters Decide, LLC v. Comm. for Recall of Dist. Att'y George Gascon*,
  2022 WL 18278611 (C.D. Cal. 2022).......................................................................24

*Lluberes v. Uncommon Productions, LLC*,
  663 F.3d 6 (1st Cir. 2011)..........................................................................................23

*Madanes v. Madanes*,
  981 F. Supp. 241 (S.D.N.Y. 1997)............................................................................31

*Mahan v. Roc Nation, LLC*,
  2015 WL 1782095 (S.D.N.Y. Apr. 15, 2015), *aff'd,* 634 F. App'x 329 (2d Cir.
  2016) .........................................................................................................................12

*Mary M. v. City of Los* Angeles,
  54 Cal. 3d 202 (1991) .................................................................................................7

*Matson v. Dvorak*,
  40 Cal. App. 4th 539 (1995) ........................................................................................5

*McLachlan v. Bell*,
  261 F. 3d 908 (9th Cir. 2021) ......................................................................................7

*Miller v. Bonta*,
  646 F. Supp. 3d 1218 (S.D. Cal. 2022)......................................................................35

*Mine Workers v. Pennington*,
  381 U.S. 657 (1965).....................................................................................................34

*Monex Deposit Co. v. Gilliam*,
  666 F. Supp. 2d 1135 (C.D. Cal. 2009) .....................................................................25

*Newberry v. Fiberglass Structural Eng'g, Inc.*,
  2007 WL 2477376 (W.D. Wash. Aug. 28, 2007), *aff'd,* 298 F. App'x 615,
  2008 WL 4817106 (9th Cir. 2008) .............................................................................11

*Newberry v. Fiberglass Structural Eng'g, Inc.*,
  2007 WL 445450 (W.D. Wash. Feb 6, 2007)............................................................11

*Okun v. Superior Court*,
  29 Cal. 3d 442 (1981) ................................................................................................26

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
　151 Cal. App. 4th 688 (2007) ...................................................................4

*Paglia & Associates Construction, Inc. v. Hamilton*,
　98 Cal. App. 5th 318 (2023) ...................................................................13

*Panah v. State of California Dep't of Corr. & Rehab.*,
　2015 WL 4274207 (N.D. Cal. July 14, 2015)..........................................32

*Peredia v. HR Mobile Services, Inc.*,
　25 Cal. App. 5th 680 (2018) .....................................................................6

*Price v. Operating Engineers Local Union No. 3*,
　195 Cal. App. 4th 962 (2011) .................................................................26

*Rakestraw v. Rodrigues*,
　8 Cal. 3d 67 (1972) .....................................................................9, 10, 28

*Reader's Digest Ass'n v. Superior Court*,
　37 Cal. 3d 244 (1984) ........................................................................21, 23

*Reese v. Barton Healthcare Systems*,
　693 F. Supp. 2d 1170 (E.D. Cal. 2010)......................................................6

*Rivera v. National R.R. Passenger Corp.*,
　331 F. 3d 1074 (9th Cir. 2003) ..............................................................6, 7

*Rothman v. Jackson*,
　49 Cal. App. 4th 1134 (1996) .................................................................13

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*,
　48 Cal. 3d 341 (1989) ...............................................................................6

*Shively v. Bozanich*,
　31 Cal. 4th 1230 (2003), *as modified* (Dec. 22, 2003)...............................5

*Silberg v. Anderson*,
　50 Cal. 3d 205 (1990), *as modified* (Mar. 12, 1990) ..............................12

*Skidmore v. Regents of Univ. of California*,
　2021 WL 843195 (N.D. Cal. Mar. 5, 2021)..............................................26

*Sky Billards, Inc. v. WolVol, Inc.*,
　2016 WL 7479426 (C.D. Cal. Feb. 22, 2016)............................................31

*Smith v. Maldonado*,
　72 Cal. App. 4th 637 (1999) .....................................................................3

*Soil Retention Products, Inc. v. Brentwood Industries, Inc.*,
　521 F. Supp. 3d 929 (S.D. Cal. 2021).................................................29, 30

*Sosa v. DIRECTV, Inc.*,
    437 F. 3d 923 (9th Cir. 2006) ................................................14

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)................................................23

*TaiMed Biologics, Inc. v. Numoda Corp.*,
    2011 WL 1630041 (N.D. Cal. 2011) ................................24

*Thomas v. Regents of U. of California*,
    97 Cal. App. 5th 587 (2023) ................................8, 9

*Townsend v. McDonnell*,
    2019 WL 7882085 (C.D. Cal. Dec. 12, 2019) ................26

*Tran v. Eat Club, Inc.*,
    2020 WL 4812634 (Cal. Ct. App. Aug. 18, 2020)................24

*Villanazul v. City of Los Angeles*,
    37 Cal. 2d 718 (1951) ................................................6

*York v. Ass'n of the Bar of the City of N.Y.*,
    286 F. 3d 122 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002)................33

*Youst v. Longo*,
    43 Cal. 3d 64 (1987) ................................................30

**Statutes**

Fed. R. Civ. P. 10 ................................................3

Fed. R. Civ. P. 11 ................................................33

Fed. R. Civ. P. 12 ................................................*passim*

Fed. R. Civ. P. 15 ................................................27

Cal. Civ. Code § 44 ................................................3

Cal. Civ. Code § 45 ................................................3, 4

Cal. Civ. Code § 46 ................................................3, 4

Cal. Civ. Code § 47................................................12, 19

Cal. Civ. Code § 47.1 ................................................*passim*

Cal. Civ. Code § 48a ................................................4

Cal. Civ. Code § 2295 ................................................5

Cal. Civ. Code § 2307 ..................................................................................................8

Cal. Civ. Code § 2316 ..................................................................................................6

Cal. Civ. Code § 2343 ..........................................................................................5, 6, 28

**Other Authorities**

Cal. Code Regs., tit. 2, § 11008 ...................................................................................6

Restatement (Third) of Agency (2006) ..................................................................9, 10

Consolidated Plaintiffs Wayfarer Studios LLC ("Wayfarer"), Justin Baldoni ("Baldoni"), Jamey Heath ("Heath"), It Ends With Us Movie LLC ("IEWU"), Melissa Nathan ("Nathan"), Jennifer Abel ("Abel"), and Steve Sarowitz ("Sarowitz") (collectively, the "Wayfarer Parties") respectfully submit this memorandum of law in opposition to Consolidated Defendant Blake Lively's ("Lively") motion to dismiss the Amended Complaint for failure to state a claim; for attorneys' fees, costs, damages, and punitive damages; and to strike Exhibit A of the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) and (f), and California Civil Code Section 47.1 (the "Motion").

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The First Amended Complaint ("FAC") contains hundreds of pages rife with factual detail about Lively's calculated efforts first to extort and manipulate the Wayfarer Parties into ceding total control over the film *It Ends With Us* (the "Film") and then to defame and scapegoat them when her plan backfired. Nonetheless, Lively refuses to accept responsibility for the trail of untold destruction she left in her wake. But she goes further still: Lively asks this Court not only to dismiss the FAC, but also to award her attorneys' fees, costs, and ***treble and punitive damages*** for the Wayfarer Parties' constitutionally protected act of petitioning the court for redress of their grievances. In essence, Lively asks the Court to find that she is immune from *any* culpability for her wrongful acts, and instead it is the *Wayfarer Parties* who must be punished for daring to exercise their constitutional right to seek a remedy from the Court for her lies.

The Motion must be denied. The FAC specifically alleges abundant facts in support of the Wayfarer Parties' claims against Lively, based both on her own direct actions and on those of her co-conspirators and agents. The Wayfarer Parties have pleaded allegations against Lively sufficient to defeat dismissal, and Lively's arguments often border on frivolous. In particular,

1

Lively's argument that California Civil Code section 47.1 immunizes her from liability would require the Court to determine as a matter of law that she acted *alone* and *without malice* and that she had a *reasonable basis for her claims*—in other words, to make findings of disputed fact not apparent on the face of the pleadings, which flies in the face of the well-established rules governing motions brought under Rule 12(b)(6). When the Court assumes the truth of the facts set forth in the FAC, as it must in ruling on this Motion, the only possible result is a denial of the Motion in full.

Regardless, any technical defects or instances of inartful pleading in the FAC can be readily cured by amendment, which is freely allowed, and the Wayfarer Parties are every day obtaining further facts to plead in support of each of their claims against Lively. Furthermore, the Wayfarer Parties can amend their complaint to more fully incorporate the allegations of Exhibit A into the body of the complaint, mooting the motion to strike.

Finally, even in the extremely unlikely event that the Court determines that dismissal without leave to amend is appropriate, Lively is still not entitled to the award of fees, costs, treble damages, and punitive damages that she seeks. The draconian, one-sided sanctions that Lively demands under Cal. Civ. Code § 47.1(b) are, in a matter of first impression, barred by the *Noerr-Pennington* doctrine, which precludes the imposition of liability for the exercise of rights protected by the Petition Clause of the First Amendment. The First Amendment protects the right to "petition the Government for a redress of grievances"; in other words, the Constitution safeguards Americans' right to ask the government to take action, such as by bringing legal claims. The *Noerr-Pennington* doctrine bars courts from punishing litigants for bringing good-faith claims, including through the imposition of harsh penalties like the treble damages award Lively seeks here. Because the Wayfarer Parties have brought good-faith claims against Lively that are neither objectively baseless nor subjectively brought for improper purposes, the First Amendment protects them from

being punished for the act of seeking relief from this Court.

In short, the Motion must be denied or, at most, granted *with leave to amend*. In no event, on this Motion or ***at any stage of this proceeding***, will the First Amendment permit the extreme and unconstitutional award of fees, costs, and treble and punitive damages Lively demands.

## II.    LEGAL STANDARD AND FACTUAL BACKGROUND

Pursuant to Federal Rule of Civil Procedure 10(c), the Wayfarer Parties incorporate by reference their allegations in the FAC (Dkt. No. 50) and the recitations of legal standards and factual backgrounds in their oppositions to the Rule 12(b)(6) motions of Consolidated Defendants Leslie Sloane and Vision PR, Inc. (together, the "Sloane Parties") (Dkt. No. 121), The New York Times Company ("NYT") (Dkt. No. 127), and Ryan Reynolds ("Reynolds") (Dkt. No. 160). Lively and the Wayfarer Parties agree that California law applies to their claims. Mot. at 10-11.

## III.    ARGUMENT

### A.    The FAC States a Claim for Defamation Against Lively[1]

Under California law, "[d]efamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999). Defamation may consist of either libel or slander. Cal. Civ. Code § 44. Libel is defined as "a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45. Slander is a "false and unprivileged publication, orally uttered . . . ." Cal. Civ. Code § 46.

Where the defamation is clear without the need for any explanation, it is considered

---

[1] Lively incorporates by reference the arguments made by other parties that the FAC contains impermissible group pleading. Mot. at 11 n.14. In response, the Wayfarer Parties incorporate their responsive arguments from their oppositions to the motions to dismiss of the Sloane Parties, the NYT, and Reynolds, and reiterate that any defect can easily be cured by amendment.

defamation per se, and damages are presumed. *Contento v. Mitchell*, 28 Cal. App. 3d 356, 358 (1972) ("[I]n an action for damages based on language defamatory per se, damage to the plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages.") The definition of libel per se "is very broad and has been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation." *Bates v. Campbell*, 213 Cal. 438, 441(1931). A statement will qualify as slander per se if it charges the commission of crime or tends to directly injure a plaintiff with respect to the plaintiff's profession, trade, or business by imputing something that has a natural tendency to lessen profits. Cal. Civ. Code § 46. Where the defamation is not per se, and some explanation is needed to show why the statement was defamatory, the plaintiff is required to allege and prove that he or she suffered special damages, such as harm to reputation, shame, or economic damages. Cal. Civ. Code §§ 45, 48a.

### 1. The FAC Identifies Specific and Unprivileged Defamatory Statements

Lively's contention that the Wayfarer Parties fail to allege specific defamatory statements made by her fails for two reasons. First, Lively is liable as the principal for the statements made by her agents, the Sloane Parties and Reynolds. Second, Lively herself is alleged to have made defamatory statements.

### a. Lively Is Liable for Statements Made by the Sloane Parties and Reynolds Under the Principles of Agency and the Doctrine of *Respondeat Superior*

It is well settled that, under California law, "[o]ne who takes a responsible part in a publication of defamatory material may be held liable for the publication." *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 712 (2007) *abrogation on other grounds recognized in Muddy Waters, LLC v. Superior Court*, 62 Cal. App. 5th 905, 924 (2021)  (citing *Osmond v. EWAP, Inc.*, 153 Cal. App. 3d 842, 852 (1984)); *Hawran v. Hixson*, 209 Cal. App. 4th

256, 275-76 (2012) (same); *Shively v. Bozanich*, 31 Cal. 4th 1230, 1245 (2003), *as modified* (Dec. 22, 2003); *Matson v. Dvorak*, 40 Cal. App. 4th 539, 548-49 (1995). New York law is in accord: "A person authorizing others to speak on their behalf can be held vicariously liable for defamatory statements made by its agents." *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 46 (1st Dep't 2021) *aff'd as modified*, 40 N.Y.3d 240 (2023) (citing *National Puerto Rican Day Parade, Inc. v. Casa Publs. Inc.*, 79 A.D.3d 592, 594-95 (1st Dep't 2010)); *see also Buck v. Zwelling*, 272 A.D.2d 895, 895 (4th Dep't 2000) (employer may be liable for employees' intentional torts, including defamation).

As alleged in the FAC, Lively defamed the Wayfarer Parties on her own behalf and through her agents, the Sloane Parties and Reynolds. *See* Cal. Civ. Code § 2295 ("An agent is one who represents another, called the principal, in dealings with third person."); FAC ¶¶ 8, 14, 15, 17, 187, 190, 192-94, 282. Indeed, "the actual smear campaign was orchestrated by Sloane, at Lively's direction." FAC ¶ 194. At all relevant times, the Sloane Parties were engaged by Lively to serve as her public relations representatives and manage her dealings with the media. FAC ¶¶ 8, 14-15, 187-94, 232-33, 282, 298. Lively and the Sloane Parties stood in an agency relationship, with Lively as the principal and the Sloane Parties as her agents. At all relevant times, Reynolds, too, was in an agency relationship with Lively, representing her in dealings with WME and others and acting as her "representative" in dealings with Wayfarer and Sony. FAC ¶¶ 8, 14, 16, 18, 128, 130, 133, 162, 164, 176, 250, 253-55. The Sloane Parties and Reynolds acted as Lively's "henchmen" in carrying out the vicious scheme to usurp the Film franchise and destroy the Wayfarer Parties, with the former leveraging media connections and the latter leveraging entertainment industry connections. As alleged, Lively acted with and through them.

Under the principles of agency, Lively is liable for defamation by the Sloane Parties and Reynolds. In California, a principal is liable to third parties for acts undertaken by her agents in the course of such agency that are "wrongful in their nature." *See* Cal. Civ. Code § 2343(3). As

used in Cal. Civ. Code § 2343, acts are wrongful "when they constitute an independent tort," such as defamation. *Peredia v. HR Mobile Services, Inc.*, 25 Cal. App. 5th 680, 693 (2018). The Sloane Parties made defamatory statements as agents of Lively, their principal, squarely within the course and scope of their agency. Indeed, communicating with the press on Lively's behalf is exactly what they were hired to do. Thus, the Sloane Parties acted with actual authority, or authority that the "principal [Lively] intentionally confer[ed] upon the agent [Sloane], or intentionally, or by want of ordinary care, allow[ed] [Sloane] to believe h[er]self to possess." Cal. Civ. Code § 2316.

As the Sloane Parties' employer, Lively is also liable for their statements under the doctrine of *respondeat superior*.[2] Under the doctrine of *respondeat superior*, "an employer may be held liable for a defamatory statement made by its employees." *Reese v. Barton Healthcare Systems*, 693 F. Supp. 2d 1170, 1191 (E.D. Cal. 2010) (quoting *Kelly v. General Telephone Co.*, 136 Cal. App. 3d 278, 284 (1982)) (citing *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 411 (1976)); *see also Rivera v. National R.R. Passenger Corp.*, 331 F. 3d 1074, 1080 (9th Cir. 2003)) (noting that a corporation "may be held liable for defamatory statements made by its employees under the doctrine of respondeat superior.") "*Respondeat superior* liability is triggered if the defamation occurred within the scope of the employee's employment," even if the principal is not aware of the statement and the statement was not made for the benefit of the principal. *Rivera*, 331 F. 3d at 1080. Statements are made within the scope of employment if such statements are "those that may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer."

---

[2] Given the degree of control Lively is alleged to have exercised over the Sloane Parties, they clearly stand in an employment relationship under California law, regardless of how the engagement was styled. *See, e.g., S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341, 349 (1989) ("The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced.") "The essential characteristic of an employment relationship is the right to control and direct the activities of the person rendering service, or the manner and method in which the work is performed." *Villanazul v. City of Los Angeles*, 37 Cal. 2d 718, 721 (1951); *see also* Cal. Code Regs., tit. 2, § 11008(c) ("Any individual under the direction and control of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written.") In addition, the determination of employment status is a question of fact. *Borello*, 48 Cal. 3d at 349.

*Id.* (holding that corporation could be liable for statements made by the plaintiff's supervisors and co-workers about the plaintiff's falsification of a timecard and alleged threats made); *see McLachlan v. Bell*, 261 F. 3d 908, 912 (9th Cir. 2021) (holding that employees' defamatory statements made at work about work-related matters were within the scope of their employment for purposes of *respondeat superior* under California law); *Mary M. v. City of Los* Angeles, 54 Cal. 3d 202, 209 (1991) (finding that an action is within the scope of employment "when in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.") (citations and internal quotation marks omitted).

As alleged in the FAC, the Sloane Parties made a series of defamatory statements about the Wayfarer Parties within the scope of their employment/agency. As to Baldoni, the FAC alleges that the Sloane Parties made statements to third parties, including without limitation to the NYT and other news outlets, to the effect that Baldoni is a "sexual predator" who sexually assaulted Lively (FAC ¶¶ 8, 193, 282), and that Baldoni "retaliated against Lively and others for reporting the alleged sexual misconduct including by propagating false and misleading narratives about Lively for the purpose of damaging her image and reputation." FAC ¶ 325. The Sloane Parties also made other false statements in response to media inquiries concerning Lively's wrongful accumulation of power over the production, the means by which she did so (i.e., false accusations of sexual misconduct), and the resulting turmoil. FAC ¶¶ 189-90.

Although not in an employment relationship, Reynolds, too, was acting as Lively's agent when he defamed the Wayfarer Parties. As alleged, on at least two occasions, Reynolds stated to executives at WME—Baldoni and Wayfarer's talent agency—that Baldoni is a sexual predator. FAC ¶¶ 8, 162; FAC Ex. A at 99-100. Reynolds knew, as the jury will know, that an accusation of this kind renders the target *persona non grata*. By referring to Baldoni as a "sexual predator,"

Reynolds attempted to render untenable any continued ties between WME and Baldoni. With the Sloane Parties, who made similar defamatory statements to the press, Reynolds was part of the campaign to destroy Baldoni's reputation and career. FAC ¶¶ 8, 14, 18, 273, 296, 330.

As to the other Wayfarer Parties, the FAC alleges that Lively and/or her agents or co-conspirators made statements to third parties, including the NYT and other news outlets, to the effect that the Wayfarer Parties engaged in, permitted, and/or failed to prevent sexually inappropriate conduct toward Lively and others and retaliated against Lively for reporting the alleged sexual misconduct, including by propagating false and misleading narratives about Lively for the purpose of damaging her image and reputation. FAC ¶¶ 273-74, 276, 325. As alleged, Lively and the others told the NYT "a false and damning story about an insidious PR sabotage operation deployed as revenge for sexual harassment complaints, with the knowledge and intent that the newspaper would publish the false story[.]" FAC ¶ 273; *id.* ¶ 276 (the Sloane Parties propounded a false "smear campaign" narrative designed to destroy the Wayfarer Parties).

For the purposes of this Motion, the bottom line is that the FAC alleges that Lively orchestrated, participated in, and directed her agents to carry out a defamation campaign designed to ruin the reputations and careers of the Wayfarer Parties. Construing the allegations in the FAC as true, "there is sufficient evidence that [Lively] took a responsible part in publishing each of the allegedly defamatory statements by approving or authorizing them prior to publication." *Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1156 (2019) (citing *Overstock.com*, 151 Cal. App. 4th at 712).

Although the Wayfarer Parties submit that Lively personally approved or authorized the defamatory statements made by the Sloane Parties and Reynolds, Lively is liable regardless because she ratified them after the fact. In California, ratification is a well-established doctrine for assigning vicarious liability to a principal for torts, even where those torts are outside of the scope of the agency relationship. *See* Cal. Civ. Code § 2307; *Thomas v. Regents of U. of California*, 97

Cal. App. 5th 587, 618 (2023) ("The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery.") (quoting *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1110 (2009)). "An employer's 'failure to investigate or respond to charges that an employee has committed an intentional tort' . . . may be evidence of ratification' by the employer." *Thomas*, 97 Cal. App. 5th at 649 (quoting *Samantha B. v. Aurora Vista Del Mar, LLC*, 77 Cal. App. 5th 85, 109 (2022)); *see also Thomas*, 169 Cal. App. 4th at 1111 ("[R]atification may occur when an employer learns of misconduct and fails to discharge an agent or employee.") "Whether an employer has ratified an [agent's] conduct is generally a factual question." *Id.* at 1110.

"Ratification is the voluntary election by a person to adopt in some manner as [her] own an act which was purportedly done on [her] behalf by another person, the effect of which, . . . is to treat the act as if originally authorized by [her] . . . A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is inconsistent with any reasonable intention on h[er] part, other than that [s]he intended approving and adopting it." *Rakestraw v. Rodrigues*, 8 Cal. 3d 67, 73 (1972) (internal citations and quotation marks omitted). "[T]he effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act." *Id.*; *see* Restatement (Third) of Agency, § 4.02 (2006) ("ratification retroactively creates the effects of actual authority"). A principal's failure to discharge an agent after learning of her wrongful acts may show ratification. *See, e.g., Delfino v. Agilent Technologies, Inc.*, 145 Cal. App. 4th 790, 810 (2006).

Here, the Wayfarer Parties have alleged that Lively fabricated her claims of sexual misconduct and knew or had reason to know that there was no "untraceable" smear campaign. Assuming the truth of these allegations—as the Court must for purposes of a 12(b)(6) motion—it

follows that Lively knew the statements of the Sloane Parties and Reynolds, which stated the opposite, contained falsehoods. *Dickinson*, 37 Cal. App. 5th at 1158. Given that the Sloane Parties were Lively's public relations representatives and Reynolds her husband, business partner, and designated representative, it is reasonable to infer—and the FAC alleges—that they were speaking on her behalf or with her authorization. Not only did Lively not immediately terminate the agency relationships or retract or clarify their statements, she doubled and tripled down, ratifying them and making them her own.

In such circumstances, the effect is as if Lively had approved or authorized the statements at the time the Sloane Parties and Reynolds made them. Restatement (Third) of Agency, § 7.03 ("A principal is subject to direct liability to a third party harmed by an agent's conduct when . . . the principal ratifies the agent's conduct[.]") Further, in addition to authorizing an agent's otherwise unauthorized act, ratification may result in the creation of an agency relationship where none previously existed. *See Rakestraw*, 8 Cal. 3d at 73. Finally, as previously discussed, Lively engaged in "confirmatory conduct," which suggests ratification. Such "confirmatory conduct" is not necessary, however, because a principal may ratify acts through "conduct inconsistent with disapproval." *Gates v. Bank of America*, 120 Cal. App. 2d 571, 576 (1953).

### b.    Lively Made Defamatory Statements Herself

Separate and apart from the actions of her agents, Lively made defamatory statements about the Wayfarer Parties in her individual capacity. Specifically, the FAC alleges that Lively told the NYT that the Wayfarer Parties engaged in, permitted, and/or failed to prevent sexual misconduct and orchestrated a "smear campaign" in retaliation for Lively's purportedly protected disclosure thereof. FAC ¶¶ 257, 266-67, 272, 274-75. Lively also falsely claimed to the NYT that "the Wayfarer Parties' agreement to the 17-point letter was proof positive that sexual harassment was endemic on the Film's set" (FAC ¶ 270) and that "the Wayfarer Parties had responded to

Lively's complaints about purported sexual harassment by plotting to destroy her reputation." FAC ¶ 272. In short, Lively told the NYT "a false and damning story about an insidious PR sabotage operation deployed as revenge for sexual harassment complaints, with the knowledge and intent that the newspaper would publish that false story[.]" FAC ¶ 273. The fabrications made by Lively are further detailed below and exhaustively outlined in the FAC.

### 2.    The Wayfarer Parties' Defamation Claim Is Timely

Lively's statute of limitations argument is meritless. Specifically, Lively contends that the defamation claim is time-barred under California and New York law by a one-year statute of limitations. Mot. at 13-14. A review of the FAC makes clear, however, that the *earliest* statements at issue are those of Reynolds in *July 2024*. Although Lively implausibly argues that the defamation claim arises from the "17-point list" presented to Wayfarer in or around November 2023, that is wrong. Although certain of the Wayfarer Parties' claims implicate the 17-point list and Lively's conduct during production, the defamation claim arises from statements made between July 2024 and December 2024. The instant action is, therefore, timely.

### 3.    The Defamatory Statements Are Not Privileged

Lively also argues that the Wayfarer Parties' defamation claim fails because the statements at issue are protected by three overlapping privileges: the litigation privilege, the so-called sexual harassment privilege, and the fair report privilege. Mot. at 15-21. But as detailed below, none of the three privileges insulate Lively, not only as a legal matter but as a factual one as well.[3]

---

[3] The cases cited by Lively in support of her request for dismissal with prejudice do not help her. In *Newberry v. Fiberglass Structural Eng'g, Inc.*, 2007 WL 445450, at *1 (W.D. Wash. Feb 6, 2007), the plaintiff filed suit for defamation against an expert witness who had consulted about the plaintiff's alleged negligence with an engineering company embroiled in separate pending litigation with the plaintiff. *Id.* at *1. As a threshold matter, the statements in question were made in the context of and in relation to pre-existing litigation, placing such statements squarely in the cross-hairs of the litigation privilege. *Id.* at *3. Here, by contrast, Lively's statements and those of her agents and co-conspirators were made prior to any litigation between the parties and without any relation thereto. Moreover, while the court dismissed the complaint on a 12(b)(6) motion, it did so *without prejudice and with leave to amend*. *Id.* at *7. While the court later granted summary judgment in the defendant's favor, it could not—and did not—definitively resolve the privilege issue based solely on the pleadings; further factual development was necessary. *See Newberry v. Fiberglass Structural Eng'g, Inc.*, 2007 WL 2477376, at *6 (W.D. Wash. Aug. 28, 2007), *aff'd,* 298 F. App'x 615,

### 4.    The Litigation Privilege Does Not Apply

The litigation privilege, codified in Cal. Civ. Code § 47(b), provides that a "publication or broadcast" made as part of a "judicial proceeding" is privileged. "[T]he privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990), *as modified* (Mar. 12, 1990). The principal purpose of the litigation privilege "is to afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Id.* at 213. A communication protected by the privilege must be "in furtherance of the objects of the litigation." *Id.* at 219. "[The] communication [must] be connected with, or have some logical relation to, the action . . . ." *Id.* at 219-20.

Lively's litigation privilege argument is predicated on the false premise that the statements at issue were made in legal pleadings or as part of a legal proceeding. Mot. at 16-17. But that is simply not the case. The Wayfarer Parties' defamation claim against Lively arises from her statements and those of her agents to the media, WME executives, and others from July-December 2024. The FAC does not seek to hold Lively liable for (even otherwise defamatory) statements actually made in the CRD Complaint or lawsuit.

For the litigation privilege to apply, the "logical relation" between the communicative act

---

2008 WL 4817106 (9th Cir. 2008). Also distinguishable is *Hagendorf v. Brown*, 699 F.2d 478 (9th Cir. 1983), *amended,* 707 F.2d 1018, (9th Cir. 1983). *Hagendorf* involved a defamation lawsuit based on a demand letter sent by the defendant's attorney to the plaintiff and his publisher asserting that the plaintiff's article infringed on the defendant's copyright and seeking a retraction, an acknowledgment of authorship, and compensation. *Id.* at 479. A demand letter made in anticipation of a copyright infringement suit in an effort to settle the claim is clearly "related to an action and made to achieve the object of [such action]." *Id.* at 480. That distinguishes the demand letter from the statements of Lively and her agents to the press and other third parties, which were not made in furtherance of legitimate litigation goals. These facts and circumstances also materially distinguish this case from *Mahan v. Roc Nation, LLC*, 2015 WL 1782095, at *2 (S.D.N.Y. Apr. 15, 2015), *aff'd,* 634 F. App'x 329 (2d Cir. 2016), in which the plaintiff asserted various tort claims arising from statements made by the defendants to the LAPD, resulting in what the plaintiff claimed was a "sham" proceeding. *Id.* at *2. Because the statements were made to the police, the *Mahan* court could readily apply the litigation privilege based on the pleadings. Here, the statements were made to the press and various third parties—not law enforcement and not in relation to any judicial proceeding.

and the litigation must be a "*functional* connection[.]" *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1146 (1996). This has been interpreted by California courts to mean that the communication "must function as a necessary or useful step in the litigation process and must serve its purposes." *Id.* Thus, while such acts as filing a lawsuit or (in many cases) sending a demand letter are protected, ***communicating with the public or the press is not, even where it advances the litigation by rallying the masses***. Indeed, the litigation privilege does not protect "litigating in the press." *See Rothman*, 49 Cal. App. 4th at 1149; *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 153-54 (2013); *Dickinson*, 17 Cal. App. 5th at 281 n.11. "Such an extension would not serve the purposes of the privilege; indeed, it would serve no purpose but to provide immunity to those who would inflict upon our system of justice the damage which litigating in the press generally causes: poisoning of jury pools and bringing disrepute upon both the judiciary and the bar." *Rothman*, 49 Cal. 4th at 1149. In *Paglia & Associates Construction, Inc. v. Hamilton*, 98 Cal. App. 5th 318, 325 (2023), for example, the court observed that the defendant's online posts—while related to an ongoing proceeding—were mere (unprotected) "public denunciations of [the plaintiff]."

Furthermore, even though certain pre-litigation activity is protected by the litigation privilege (albeit not Lively's), such protections only apply when "litigation is seriously considered[.]" *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1251 (2007). While Lively is likely to point to her now-pending lawsuit in response, the Wayfarer Parties allege—and maintain—that Lively "never intended to file a civil lawsuit, which would have triggered the Wayfarer Parties' right to discovery[.]" FAC ¶ 4. Lively *did not* ask the CRD to investigate Wayfarer; she requested a right-to-sue and then did not sue for weeks. *Id.* As alleged in the FAC, Lively's pre-litigation communications, therefore, did not relate "to litigation that [was] being] contemplated in good faith[.]" *Action Apartment Ass'n*, 41 Cal. 4th at 1251. And although Lively may contest the Wayfarer Parties' assertion, "[w]hether a prelitigation communication

13

relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact." *Id.* Thus, Lively's litigation privilege argument cannot be considered on this Motion.

### 5.    The Sexual Harassment Privilege Does Not Apply

Section 47.1 of the California Civil Code, or what Lively calls the "sexual harassment privilege," protects "[a] communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination[.]" Cal. Civ. Code § 47.1(a).[4]

#### a.    Lively's Defamatory Statements Were Made with Malice and Without a Reasonable Basis in Fact

As stated above, Civil Code Section 47.1 applies only to communications made "without malice[.]" Cal. Civ. Code § 47.1(a). Subsection (c) further provides that "[t]his section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination[.]" Cal. Civ. Code § 47.1(c). Those requirements—that the communications be made without malice and with a reasonable basis in fact—are why Lively's arguments fall flat. As alleged in the FAC, Lively fabricated her allegations of sexual harassment, either wholesale or by exaggerating benign (and not harassing) interactions in a concerted, malicious effort to seize control of the Film and later to restore her reputation after a well-publicized series of marketing missteps that sullied her reputation.

Specifically, Lively was hired to play the lead role of Lily Bloom. FAC ¶ 27. As part of the subsequent negotiations, Lively was granted an executive producer credit, a ceremonial title often given to talent of Lively's stature. *Id.* ¶ 27. However, Wayfarer and Sony refused to agree to

---

[4] Section 47.1, which took effect on January 1, 2024, has not been addressed in a single published or unpublished judicial decision. Thus, the Court's treatment of the statute will be a matter of first impression. Section 47.1's mandatory award of treble and punitive damages is, in fact, almost certainly unconstitutional under the *Noerr-Pennington* doctrine as violative of the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I; *Sosa v. DIRECTV, Inc.*, 437 F. 3d 923, 929 (9th Cir. 2006). Under the *Noerr-Pennington* doctrine, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa*, 437 F. 3d at 929 (citing *Empress LLC v. City & County of S.F.*, 419 F. 3d 1052, 1056 (9th Cir. 2005)). By imposing a statutory penalty on plaintiffs for unsuccessfully bringing certain types of lawsuits even when they do so in good faith, Section 47.1 appears to flatly violate the *Noerr-Pennington* immunity doctrine. *See infra* Section III.G.

give Lively a true producer credit because "such a title would not accurately reflect the role she was asked to play[.]" *Id.* "Wayfarer did not request or require that Lively contribute to the Film in any capacity beyond her roles as actor and executive producer." *Id.* Although, at the beginning of the production, it appeared that Lively and Baldoni would have a "positive, collaborative creative partnership[,]" (FAC ¶ 28), Lively had other intentions. In an interview with Forbes in 2022 (three months before she was cast as Lily), Lively admitted, although not to Wayfarer or Sony, that she needs to have "authorship in order to feel fulfilled[,]" which producers and directors often perceive as a "rug pull" because they hired her to be an actress.[5]

As alleged in the FAC, that is exactly what happened on the set of *It Ends With Us*. "Almost immediately, Lively began inserting herself into the production process in intrusive ways well beyond the scope of her contractual entitlements." FAC ¶ 31. Lively's intrusions started with the wardrobe, then extended to re-writing the script, which happened "daily" and significantly disrupted the "carefully planned production schedule" and "placed significant stress on the production crew" and "financial strain on Wayfarer." FAC ¶ 43. Although Lively's "pattern of domineering interference caused unending interruptions to the production process, leading to entirely unnecessary stress, chaos, and delays[,]" (FAC ¶ 62), Lively and Baldoni had a somewhat warm relationship during this early period of production. FAC ¶¶ 55-62. However, production was halted through the Summer of 2023 due to the WGA and SAG-AFTRA strikes.

The dynamic began to change during the strikes, when Lively began inserting herself into

---

[5] Just a few months prior to her casting as Lily, Lively outlined her *modus operandi* during the 2022 Forbes Power Women's Summit: "[W]hen I was younger in my career I would sort of shape myself to the version of myself I thought that they wanted . . . or **when I showed up on a set, I knew that they just wanted me to show up and look cute and stand on a little pink sticker where I'm supposed to go and say what I'm supposed to say. But I also knew that like that wasn't fulfilling for me—that I wanted to be part of the storytelling . . .**. And **sometimes I would have people who really resented me that because they were like, 'we just hired you to be an actor.' . . . I wouldn't reveal that I actually need to have authorship in order to feel fulfilled. So, I think that for them, sometimes that might have felt like a rug pull because you're like, you're trying to assert yourself into something that we didn't hire you to.**" *See* https://www.forbes.com/video/6312607947112/blake-lively-taking-the-entrepreneurial-stage--2022-forbes-power-womens-summit/ (emphasis added.)

the editing process. During the strike, Baldoni began editing the footage shot in the first phase of production. FAC ¶ 66. Lively's involvement took on a more insistent and manipulative tone. FAC ¶ 68. Lively began demanding access to the "dailies"—raw footage—as well as early cuts of scenes. *Id.* For those in the film industry, such a request by an actor is highly inappropriate and unorthodox because it intrudes on the domain of the director. *Id.* Baldoni and the Film's editors feared that Lively's incremental demands "would turn into a complete takeover[.]" FAC ¶ 69.

After the SAG-AFTRA strike ended on November 9, 2023, Baldoni, Wayfarer, and Sony were eager to resume production. That same day, however, Lively's lawyers blindsided them with a "17-point list of non-negotiable conditions that must be met before Lively would return to work." FAC ¶ 75. The list was "drafted for the apparent purpose of insinuating or outright claiming that Baldoni, Heath, and others had engaged in sexually inappropriate conduct during filming." *Id.* However, "[n]othing could be further from the truth." *Id.* When Wayfarer and Sony attempted to revise the document to make it factually accurate, Lively's counsel responded that the list was "not open for negotiation." FAC ¶ 76. Wayfarer was forced to sign the document as-is, "despite the falsity of its insinuations[,]" lest they "lose millions of dollars, cost hundreds of people their jobs after they had been out of work for months, and destroy their relationship with Sony." FAC ¶ 77. Notwithstanding the insinuations, however, the demands themselves "were agreeable; indeed, some were already in place." *Id.* Regardless, as alleged in the FAC, Lively used the 17-point list to extort the Wayfarer Parties (and Sony) into giving her editing rights (FAC ¶¶ 133-39), allowing her to create her own cut of the Film (FAC ¶¶ 140-47), removing Baldoni from all marketing and promotional materials (FAC ¶¶ 147-49, 158, 161, 163), "sponsoring" Lively for a *p.g.a* mark (which the Wayfarer Parties characterized as extortion in real-time) (FAC ¶¶ 152-57; FAC Ex. A at 92-93), and excluding Baldoni from the premiere (FAC ¶¶ 166-71), among other ruthless demands. To the extent Wayfarer assented to these demands, they did so staring down the barrel

of a gun. In the FAC, the Wayfarer Parties dismantle, point by point, the insinuations in the 17-point list. *See* FAC ¶¶ 79-123. As outlined in the Wayfarer Parties' pleading—over a collective 391 pages, including Exhibit A—Lively fabricated, materially mischaracterized, or grossly exaggerated all of the allegations she made in her CRD Complaint and federal lawsuit.

- Lively falsely claimed there was no intimacy coordinator when Lively was aware that one was engaged six weeks before filming began (although Lively refused to meet with her in pre-production, forcing Baldoni to personally relay the coordinator's suggestions about the mechanics of intimate scenes). FAC ¶¶ 79-81, 85-88; FAC Ex. A at 9-10.

- Lively falsely claimed that certain of the Wayfarer Parties insisted on being around her when she was undressed or breast-feeding when, in fact, Lively openly breastfed on-set and no one ever entered her (guarded) trailer without advance permission. The FAC includes a text message from Lively to Baldoni (from *after* the events she later recast as sexual harassment) inviting him to her trailer while pumping breastmilk. FAC ¶¶ 104-05; FAC Ex. A at 25.

- Lively falsely claimed that she was forced to be nearly naked during the filming of a birthing scene when, in fact, she was wearing black briefs, a hospital gown, and a pregnancy suit, and only her legs showed. FAC ¶¶ 83-84, 119-121; FAC Ex. A at 27-28.

- Lively falsely claimed that Wayfarer hired a random friend of Baldoni's to play the gynecologist when, in fact, the actor is a Shakespearean-trained professional with an MFA in Acting from UCLA. FAC ¶ 119; FAC Ex. A at 27-28.

- Lively falsely claimed she was shown "porn" by Jamey Heath when, in fact, in relation to the filming of a birthing scene, Lively was shown a single, non-pornographic clip from a video of Heath's own son's home-birth. FAC ¶ 101; FAC Ex. A at 29-30.

- Lively falsely claimed that Baldoni harassed her during the filming of a purportedly

17

soundless slow-dancing scene, an allegation definitively disproven by raw footage with sound that Lively apparently did not realize existed. FAC ¶¶ 89-90; FAC Ex. A at 30-31.

- Lively falsely claimed that Baldoni "fat-shamed" her when, in fact, he privately inquired with her personal trainer about her weight to prepare for a lifting scene due to his long history of back problems. Lively also falsely claimed that there was no such scene, but the relevant portion of the script is excerpted in the FAC. FAC ¶¶ 46-50; FAC Ex. A at 6-7.

- Lively falsely claimed that Baldoni admitted to committing sexual assault when, in fact, he disclosed that he had been the victim of sexual assault. FAC Ex. A at 155-56.

The foregoing are ***representative examples*** and do not come close to capturing the full scope of Lively's fabrications. Suffice it to say, the FAC alleges in the strongest possible terms that the accusations made by Lively concerning sexual harassment and retaliation ***are false and that Lively knows and always knew they were false***. For the purposes of a Rule 12(b)(6) motion, it is enough that the Wayfarer Parties allege, in factually grounded and non-conclusory terms, that Lively acted with malice and made her accusations without a reasonable basis in fact. The sharp factual disputes between the Wayfarer Parties and Lively preclude a ruling on purely legal grounds.

### b. Section 47.1 Does Not Apply to Defamatory Statements Made by the Sloane Parties or Reynolds on Lively's Behalf

Furthermore, Section 47.1, by its plain language, does not apply to the defamatory statements made on her behalf by her co-conspirators and agents, the Sloane Parties and Reynolds. For the purposes of Section 47.1, "communication" is defined as "factual information related to an incident of sexual assault, harassment, or discrimination **experienced by the individual making the communication**[.]" Cal. Civ. Code § 47.1(d) (emphasis added.) Thus, the Sloane Parties' and Reynolds' statements fall into an entirely different category than Lively's own statements. Although not entitled to protection for the reasons discussed above, Lively's statements bear markers of baseline eligibility to the extent they relate to Lively's own experiences.

In contrast, the statements of the Sloane Parties and Reynolds—which also purport to relate to the experiences of Lively—were not made, as the statute requires, "by the individual" alleged to have experienced "an incident of sexual assault, harassment, or discrimination[.]" *Id.* Section 47.1 does not extend to—and, in fact, is expressly drafted to exclude—third-party communications. Given their lack of protection under Section 47.1, it is not necessary to separately analyze "malice" or "reasonableness," although the Sloane Parties' and Reynolds' statements fail on both counts.

### 6.    The Fair Report Privilege Does Not Apply

The fair report privilege renders privileged "a fair and true report in, or a communication to, a public journal, of (A) a judicial . . . proceeding, . . . or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued." Cal. Civ. Code § 47(d)(1). As Lively acknowledges, the fair report privilege "is typically invoked by news media defendants" in connection with publications concerning judicial proceedings. *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 431 (2016), *as modified* (Jan. 10, 2017). However, the privilege "also protects those who communicate information *to the media*." *Id.*

But the fair report privilege, by definition, only applies to communications relating to an official proceeding, so Lively is forced to re-characterize the allegations against her beyond recognition. In Lively's telling, the defamation claim is based on her "leaking" the already-filed CRD Complaint to the NYT, which subsequently published a "fair and true report" on its contents. This account diverges sharply from what is actually alleged in the FAC. As alleged, Lively, Reynolds, and the Sloane Parties started working with the NYT months before the CRD Complaint was filed. FAC ¶¶ 4, 36, 86, 256-69; FAC Ex. A at 157-68. Indeed, the NYT apparently started working on its story—fed by Lively and her co-conspirators—as early as October 2024. FAC ¶ 268. Lively did not file her CRD Complaint until December 20, 2024. FAC ¶ 263; FAC Ex. A at 157. The crux of the FAC is that Lively worked hand-in-glove with the NYT throughout the Fall

19

of 2024, feeding its reporters defamatory statements and coordinating closely with them to ensure the end result would amount to a "kill shot" to the Wayfarer Parties' reputations and careers. This had nothing whatsoever to do with any then-ongoing judicial proceeding. When the NYT finally "dropped" its bombshell, multi-thousand-word feature nearly simultaneously with Lively's request for a right-to-sue notice (and its legally pointless sham attachment plainly aimed at the public), it was after months of secret collaboration during which Lively and her co-conspirators made false and defamatory statements about the Wayfarer Parties. FAC ¶¶ 4, 17, 96, 263-69. At the time they were made, these statements bore no relation to any judicial proceedings, and they are therefore ineligible for the protections of a privilege predicated on the pendency of such proceedings. FAC ¶ 269. The fair report privilege does not protect Lively.

Nor does Lively address the defamatory statements made to those other than the NYT. These include those made by her agents and co-conspirators, Reynolds and the Sloane Parties, in the Summer of 2024. FAC ¶¶ 8, 162, 189-90, 193, 282, 325; FAC Ex. A at 99-100. As alleged, in or around August 2024, the Sloane Parties made defamatory statements to the Daily Mail and other outlets to the effect that Baldoni is a "sexual predator" who "sexually assaulted" Lively. FAC ¶¶ 8, 193, 282. Reynolds, on at least two occasions in or around July 2024, made statements to executives at WME to the effect that Baldoni is a "sexual predator" and that WME was "in business with a sexual predator." FAC ¶¶ 8, 162; FAC Ex. A at 99-100. These statements are even more attenuated from any judicial proceeding than those made to the NYT, and they were made at Lively's direction as part of a conspiracy to destroy the reputations and careers of the Wayfarer Parties.

### 7. The FAC Alleges that Lively Acted with Actual Malice

As a matter of constitutional law, if the person defamed is a public figure, he must prove by clear and convincing evidence that the statement at issue was made with "actual malice," i.e.,

"with knowledge that it was false or with reckless disregard of whether it was false or not." *Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d 244, 256 (1984) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 285-86 (1964). The Supreme Court has explained that, while "the concept of 'reckless disregard' cannot be fully encompassed in one infallible definition . . . the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication." *Harte-Hanks Communications. Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).

There is compelling evidence that Lively fabricated her accusations, was aware they were probably false, or at least entertained serious doubts as to their truth. *See Burrill v. Nair*, 217 Cal. App. 4th 357, 390 (2013) *disapproved on other grounds in Baral v. Schnitt*, 1 Cal. 5th 376, 396 & n.11 (2016). Lively's bald assertion that she believed her statements about the Wayfarer Parties, which is at odds with the allegations in the FAC, carries little weight and is easily rebutted. Lively's mere professions of good faith are not persuasive, especially where other mitigating factors are present. *See Reader's Digest*, 37 Cal. 3d at 257. "Defendants cannot 'automatically insure a favorable verdict by testifying that [s]he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith." *Id.* Actual malice may be proved by circumstantial evidence. *See id.* at 257; *Burrill*, 217 Cal. App. 4th at 390; *Annette F.*, 119 Cal. App. 4th at 1167. Factors such as failure to investigate, anger and hostility, and reliance on unreliable or biased sources will create the inference that Lively had serious doubts regarding the truth of her statements. *See Burrill*, 217 Cal. App. 4th at 390. Moreover, malice will be inferred if the defendant fabricates her story, it is the product of her imagination, or is based wholly on unverified information. *See id.* Lively's motive for making the statements and whether she did so to harm the Wayfarer Parties are also relevant. *See id.* at 395-96.

As to the allegations of sexual harassment, Lively clearly knew they were false at the time

she made them because she was describing her own purported experiences. As outlined above and exhaustively detailed in the FAC, Lively was not sexually harassed on the set of the Film, and she grossly mischaracterized or outright fabricated the events in question, even in sworn legal documents. Lively and her co-conspirators engaged in a coordinated campaign to exaggerate benign interactions in service of a false narrative that Lively had been sexually harassed. FAC ¶ 17.[6] They did so to instill terror in the Wayfarer Parties and leverage it to accumulate power. FAC ¶¶ 17, 175-78; *see Biro v. Conde Nast*, 963 F. Supp. 2d 255, 277 (S.D.N.Y. 2013) (citing *Kipper v. NYP Holdings Co., Inc.*, 12 N.Y.3d 348, 355 n.4 (2009)) (motive to defame plaintiff is probative of actual malice). This accumulation of power depended upon the ability to conjure and exploit ruinous allegations. FAC ¶ 296. The allegations were never true, and Lively knew it full well. FAC ¶¶ 8, 17, 328. Lively's insistence she believed her allegations is—in addition to not being properly before the Court on this Motion—belied by the allegations in the FAC, the surrounding facts and circumstances, and the evidence already presented by the Wayfarer Parties. At a minimum, Lively makes factual contentions properly reserved for the jury.

Lively also knew that the "smear campaign" narrative was false or acted with reckless disregard for its truth. With her co-conspirators/agents, Lively got hold of communications between the Wayfarer Parties from Stephanie Jones that disproved the claim that the Wayfarer Parties had orchestrated a smear campaign. FAC ¶¶ 272-78, 283-87. Given that she had these materials, Lively either knew that the narrative she and her agents later publicized was false or, at best, disregarded such evidence. It also would have been clear to Lively—a longtime Hollywood fixture and the wife of a marketing company owner—that her negative publicity was precipitated by a series of off-putting public appearances and her puzzling decision to hawk liquor and hair

---

[6] *See, e.g., Leah McSweeney v. Andy Cohen, et al.*, No. 24-CV-01503 (LJL), 2025 WL 966022, at *33-34 (S.D.N.Y. Mar. 31, 2025) (Liman, J.)

products while promoting a film about domestic violence. FAC ¶¶ 179-87, 279. The fantastical notion that the backlash was caused by an "untraceable" smear campaign is "so inherently improbable that only a reckless person would have put [the claim] in circulation." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Taken collectively, the allegations in the FAC are more than sufficient to create an inference that Lively acted with "actual malice." That is enough at this juncture, even as the Wayfarer Parties look forward to gathering more evidence and proving their case at trial.

Finally, while the FAC satisfies the Wayfarer Parties' pleading burden under an actual malice standard, it is important to note that six of the seven Wayfarer Parties are not public figures (i.e., Heath, Sarowitz, Abel, Nathan, IEWU, and Wayfarer). "[T]he mere involvement of a person in a matter which the media deem to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action." *Reader's Digest*, 37 Cal. 3d at 254 (citing *Time, Inc. v. Firestone*, 424 U.S. 448, 453-54 (1976)); *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 18-19 (1st Cir. 2011) (defending oneself publicly does not forfeit status as private figure). Because the FAC satisfies the burden of actual malice as to all the Wayfarer Parties, it is unnecessary to analyze the lesser standards.

## B.    The Wayfarer Parties Have Adequately Pleaded a Claim for Civil Extortion

As an initial matter, Lively claims that the FAC "does not identify a single 'threat'" made by Lively, but that is facially false. The FAC recounts in detail an instance in which Lively and Reynolds demanded that the Wayfarer Parties issue a humiliating and false statement taking blame for Lively's press woes or else "the gloves would come off" as well as making "an express threat that [Lively and Reynolds] themselves would attack Wayfarer in the press if Wayfarer refused." FAC ¶¶ 16, 250-56. Furthermore, the FAC alleges that Lively obtained first a producer credit and then the coveted *p.g.a.* mark by threatening and coercing the Wayfarer Parties into granting her

the credit and writing a letter of support for that mark, an act that Jamey Heath expressly recognized even at the time as extortion. FAC ¶¶ 152-58. These allegations alone are sufficient to defeat Lively's motion to dismiss the Wayfarer Parties' claim for civil extortion.

Like her husband, Lively claims that California courts have not recognized a tort of civil extortion. But one of the very cases she cites belies that argument. In *Tran v. Eat Club, Inc.*, 2020 WL 4812634 (Cal. Ct. App. Aug. 18, 2020),[7] the California Court of Appeal stated: "We assume that *there is a cause of action for damages based on economic duress*, which some litigants have alternatively denominated '***civil extortion***.'" *Id.* at *18 (emphasis added.)

Alternatively, Lively claims the tort is limited only to extorting money through threats of prosecution but points to no authority that California courts so limit the claim. Under California law, "the exact contours of this common law tort are not so strictly defined." *TaiMed Biologics, Inc. v. Numoda Corp.*, 2011 WL 1630041, at *5 (N.D. Cal. 2011). Contrary to Lively's assertion, courts recognize that California's civil extortion claim is based on the law of criminal extortion. *See, e.g.*, *Khadavi v. Stalgi, Inc.*, 2021 WL 929099, at *6 (C.D. Cal. 2021). Courts applying California law hold a civil extortion claim will *not* lie only where obtaining money was the aim, to the exclusion of "other consideration." *Khadavi*, 2021 WL 929099, at *6 ("Extortion is the obtaining of property or other consideration from another, with his or her consent, . . . induced by a wrongful use of force or fear[.]") (quoting Cal. Penal Code § 518). Nor must extortion threaten prosecution to be actionable. *Let Voters Decide, LLC v. Comm. for Recall of Dist. Att'y George Gascon*, 2022 WL 18278611, at *4 (C.D. Cal. 2022) ("Extortion is the threat to accuse another of a crime or 'expose, or impute to him . . . any deformity, disgrace or crime' . . . [T]he Court is unaware of any case holding that there must be a threat of litigation in order to state a plausible

---

[7] Notably, *Tran* is unpublished and therefore nonprecedential under California law; to the extent that Lively maintains that *Tran* shows that California law does not recognize a civil extortion claim, California courts themselves would not recognize *Tran* as binding precedent.

claim for civil extortion under *Twombly* and *Iqbal*.") (quoting *Flatley v. Mauro*, 39 Cal. 4th 299, 332 n.16 (2006)). Lively further claims that she cannot have engaged in extortion because she did not obtain anything of value from the Wayfarer Parties by means of threats. As set forth above, this is untrue; at a minimum, she threatened her way into the valuable producer credit and *p.g.a.* mark. FAC ¶¶ 152-58. But even were that not the case, California law "proscribes extortion notwithstanding that the defendant ultimately obtained no money or property by means of his extortionate threats." *Monex Deposit Co. v. Gilliam*, 666 F. Supp. 2d 1135, 1137 (C.D. Cal. 2009). Here, the Wayfarer Parties have alleged facts sufficient to state a claim for civil extortion based at least on the demand by Reynolds and Lively that the Wayfarer Parties issue a self-destructive statement taking blame for Lively's press woes or else "the gloves would come off" and they "would attack Wayfarer in the press." FAC ¶¶ 250-56. The FAC thus alleges that Lively (as well as her husband) expressly demanded "consideration" and, if the Wayfarer Parties refused, threatened their "business or property interests." *Monex Deposit Co.*, 666 F. Supp. 2d at 1136 (quoting *Leeper v. Beltrami*, 53 Cal. 2d 195, 203 (1959)). To the extent that the Wayfarer Parties' factual allegations do not suffice, the Court should grant leave to amend.

## C. The FAC Pleads a Claim for False Light Invasion of Privacy

Under California law, the false light claim is not duplicative of the defamation claim.[8] The cases that Lively cites for this proposition are inapposite. In *Heitkoetter v. Doem*, 2023 WL 2563647 (E.D. Cal. Mar. 17, 2023), the defamation and false light claims were both based on "precisely the same facts." *Id.* at *2. Here, by contrast, the Wayfarer Parties allege not only that Lively conspired to defame them by means of false and harmful statements, but also that Lively and others conspired to place the Wayfarer Parties in a false light by means of false statements *and*

---

[8] The Wayfarer Parties incorporate the arguments and authorities in their other oppositions to motions to dismiss. (Dkt. Nos. 121, 127, 160.)

distorting factual statements beyond recognition into falsehoods. FAC ¶¶ 162, 274-82. California law has long recognized that the torts of false light and defamation are distinct claims with related, but separate, elements. *See, e.g.*, *Price v. Operating Engineers Local Union No. 3*, 195 Cal. App. 4th 962, 970 (2011) ("False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.") California courts do not dismiss false light claims as merely duplicative of defamation claims, but determine whether a false light claim "stands or falls" based on "whether it meets the same requirements as the defamation cause of action." *Eisenberg v. Alameda Newspapers*, 74 Cal. App. 4th 1359, 1385 (1999). Any overlap in the claims for false light and defamation is not a reason to dismiss the false light claim; it just means the claims will likely rise or fall together before the jury. *See Eisenberg*, 74 Cal. App. 4th at 1385; *Jones*, 2021 WL 6496822, at *5. The second case Lively cites on this point confirms this rule. *See Townsend v. McDonnell*, 2019 WL 7882085, at *10 (C.D. Cal. Dec. 12, 2019) ("the false light claim . . . stands or falls on whether it meets the same requirements as the defamation [claim].") (quoting *Eisenberg*, 74 Cal. App. 4th at 1385 n.13).

To the extent that there are any defects in the Wayfarer Parties' false light claim, the defects can readily be cured by amendment. Courts applying California law readily grant leave to amend claims for false light. *See, e.g.*, *Skidmore v. Regents of Univ. of California*, 2021 WL 843195, at *2 (N.D. Cal. Mar. 5, 2021) (granting leave to amend false light claim even in the face of California's stringent anti-SLAPP law). Of course, because the actions of Lively and her co-conspirators were carefully concealed, "[l]ess particularity is required when it appears that defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues sufficient to enable preparation of a defense." *Okun v. Superior Court*, 29 Cal. 3d 442, 458 (1981).

The Court should grant leave to amend to the extent it is not inclined to deny the Motion in its entirety. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.")

### D.    The FAC Adequately Pleads Tortious Interference Claims Against Lively

The FAC pleads a claim against Lively for tortious interference with Wayfarer's and Baldoni's relationships with WME, a preeminent talent agency in Hollywood. FAC ¶ 16. WME is the same agency that represents Lively and Reynolds. *Id.* Accordingly, Lively knows and understands as well as anyone that Wayfarer and Baldoni's relationships with WME were contractual in nature, and that their terms consisted of WME procuring film and entertainment projects for Baldoni and Wayfarer in return for percentage commissions of their clients' earnings. *Id.* For the same reasons set forth in opposition to Reynolds' motion to dismiss this cause of action (Dkt. No. 160), Lively's Motion should be denied, or leave to amend should be granted to cure any pleading deficiencies.

The FAC alleges that Lively (and Reynolds), who are "two of the most powerful stars in the world," (FAC ¶ 18), "demanded through their talent agency, which also represented Wayfarer and Baldoni, that the Wayfarer Parties *publicly apologize* for so-called 'mistakes' during production . . . or else the 'gloves would come off.'" FAC ¶ 16. When those coercive demands were refused, the FAC alleges that "the gloves came off," (FAC ¶ 256), and Lively (with Reynolds and Sloane) defamed Baldoni and Wayfarer to destroy their reputations and livelihoods. FAC ¶ 17. Finally, the FAC alleges Lively's threats and demands "induc[ed] WME to cease performing under its contract with the Wayfarer Parties." FAC ¶ 350. Because talent agents are typically paid a percentage of their clients' earnings, it can be inferred from these allegations that WME would fear its own economic harm from attacks on Baldoni and Wayfarer, and would be coerced to "drop" Baldoni and Wayfarer to maintain more profitable relationships with much bigger stars

such as Lively and Reynolds, who would generate larger commissions.

It is true, as Lively notes, that the defamatory statements made to WME that Baldoni was a "sexual predator" and that WME was "working with a sexual predator," as well as the demand to "drop" Baldoni, were apparently uttered by Reynolds and not directly by Lively. FAC ¶¶ 8, 162. However, given the context, even these statements could only be understood by the alleged listener, WME, as having come with Lively's authorization. Indeed, as alleged in the FAC, Reynolds was not only Lively's designated representative but also, per Lively, one of her "dragons," whom she deploys to destroy perceived enemies. FAC ¶ 42. When conveying the defamatory statements that Baldoni was a "sexual predator," that WME was "working with a sexual predator," and demanding WME "drop" Baldoni and Wayfarer, Reynolds was plainly acting as Lively's agent with authority to speak on her behalf. *See* Cal. Civ. Code § 2343(3).

Lively's own subsequent statements to WME demanding that Wayfarer "put out a statement 'accepting blame' for the problems during filming, with an express threat that they themselves would attack Wayfarer in the press if Wayfarer refused," are reasonably understood as a ratification of Reynolds' prior statements and demand, and an explicit acknowledgement that Lively and Reynolds were committed to acting in tandem. FAC ¶ 253; *Rakestraw*, 8 Cal. 3d at 73 (implied ratification where "conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.") Accordingly, it was reasonable for WME to infer that Reynolds' defamatory statements to WME came from Lively herself, with her approval and adoption, and that the threats to further defame the Wayfarer Parties in the press came from both Lively and Reynolds together.

### 1. The FAC States a Claim for Intentional Interference with Contractual Relations

Lively acknowledges that California law applies to this cause of action, the pleading of

which "requires (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Cosmonova. LLC v. BioFilm, Inc.*, 2025 WL 319249 at *1 (S.D. Cal. Jan. 28, 2025). Where the contract is terminable at will, California law also requires a plaintiff to allege an independently wrongful act. *Ixchel Pharma LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020).

"[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Ixchel Pharma,* 9 Cal. 5th at 1142. Defamation is a sufficient independent wrongful act to serve as predicate for a tortious interference cause of action. *Garland Connect, LLC v. Wells Fargo Bank*, 2023 WL 5523936, at *15 (Cal. Ct. App. Aug. 28, 2023) ("If adequately alleged, defamation may constitute an independently wrongful act on which an interference claim can be based.")

Lively argues that there is no allegation that WME's contract with the Wayfarer Parties was disrupted. However, the FAC alleges that Lively "induc[ed] WME to cease performing under its contract with the Wayfarer Parties." FAC ¶ 350. That is disruption. Further, the clear implication, in the factual context of a talent agency being pressured by two mega-star clients to drop a smaller one, is that Lively's threats and demands, including the demand conveyed through Reynolds that WME "drop" Baldoni, caused WME to do exactly that. Lively calls these allegations "threadbare," citing to *Soil Retention Products, Inc. v. Brentwood Industries, Inc.*, 521 F. Supp. 3d 929, 960 (S.D. Cal. 2021). But the allegations concerning Lively's own relationship with WME, Reynolds' and Lively's communications with WME, and WME's communications with the Wayfarer Parties, are far more fulsome than the allegations in that case. And even then, dismissal in that case was granted only *with leave to amend*. *Id.*

Finally, Lively argues that there was no specific action allegedly taken by her to "prevent performance" by WME. But this ignores the reasonable inference that her (and Reynolds') demands and threats induced WME to cease working with Wayfarer or Baldoni. It further ignores the damage that her defamatory attacks through the NYT and other press did to WME's ability to continue procuring projects for Baldoni and Wayfarer.

### 2.    Alternatively, the FAC States a Claim for Intentional Interference with Prospective Economic Advantage

Per *Ixchel Pharma*, under California law, the elements of intentional interference with an at-will contract are effectively equivalent to intentional interference with prospective economic advantage, which also requires a plaintiff to plead "conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Panna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). The purpose of this requirement was to eliminate claims for interference where a defendant's acts were privileged as economically self-interested competition. *Id.* at 378. Accordingly, the pleading standard is the same for intentional interference with an at-will contract and with prospective economic advantage. *Ixchel Pharma*, 9 Cal. 5th at 1147.

As set forth above, the Wayfarer Parties have pled an intentional interference with contractual relations claim, even if their contracts with WME were terminable at-will, because Lively is at least vicariously liable for defamation, which is an independent wrongful act. However, in the alternative, the Wayfarer Parties' tortious interference cause of action may be deemed intentional interference with prospective economic advantage, because their relationship with WME "probably would have resulted in an economic benefit to the Wayfarer Parties." FAC ¶ 357.

To show an economic relationship, "the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference." *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987). Here, the allegations give rise to an inference that WME was engaged in procuring engagements for the Wayfarer Parties which were

reasonably probable to benefit them economically, as they had previously done. Indeed, discovery will show that there were specific interested counterparties inquiring with WME to engage the Wayfarer Parties.[9]

### E.    Lively Is Liable for Her Direct Actions as Well as by Conspiracy

The Wayfarer Parties have not brought a standalone claim for civil conspiracy, as conspiracy is instead a legal theory by which parties may be made jointly liable for an underlying wrong. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994) ("Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.") The burden of proving—let alone pleading—tort liability on a theory of conspiracy is not high. *Madanes v. Madanes*, 981 F. Supp. 241, 259 (S.D.N.Y. 1997) ("[I]t is axiomatic that the proof required to show that a defendant knowingly associated with an existing conspiracy need not be overwhelming . . . Indeed, participation in the conspiracy can be shown entirely through circumstantial evidence.") (quotation omitted).

The Wayfarer Parties have pleaded ample allegations in connection with each cause of action against Lively to support the existence of a conspiracy at the pleading stage. For example,

---

[9] As a further alternative, to the extent that Lively's intent was not sufficiently alleged, the negligent interference with prospective economic advantage claim survives under California law. California law does require a plaintiff to plead a duty of care. *See Axia Fin., LLC v. Mason McDuffie Mortg. Co.*, 2023 WL 7280443, at *10 (N.D. Cal. Sept. 20, 2023) ("The tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care."). Although the FAC does not directly address this legal issue, there are facts pled which may give rise to an inference of a duty of care, such as the fact that Lively was employed by a Wayfarer Party and was an executive producer of and co-star in a Film directed by Baldoni and financed by Wayfarer. *See Sky Billards, Inc. v. WolVol, Inc.*, 2016 WL 7479426, at *5 (C.D. Cal. Feb. 22, 2016) ("In determining whether the relationship between a plaintiff and a defendant gives rise to a duty of care, courts look to whether the defendant had 'entered into any relationships or undertaken any activity where negligence on his part was reasonably likely to affect plaintiff adversely.'") (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 358-59 (1997)). As such, Lively may be under a duty not to recklessly damage the Film's director, lead actor, and studio in the eyes of the public or their talent agency. Under California law, "[a] duty of care may arise through statute or by contract . . . [or] may be premised upon the general character of the activity in which the defendant engaged, the relationship between the parties or even the interdependent nature of human society." *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979); *Eads v. Marks*, 39 Cal. 2d 807, 812 (1952) ("[T]he agreement between plaintiffs and defendant created a duty of care.") Because a duty of care may arise here, the Wayfarer Parties should be permitted an opportunity to replead the existence of a duty of care.

the FAC alleges that Reynolds and Lively made a joint threat to "attack" the Wayfarer Parties in the press unless they immediately issued a self-immolating press statement. FAC ¶¶ 250-56. The Wayfarer Parties have also pleaded facts that establish each claim against Lively based on her own direct acts. Finally, even if there exist technical defects in the conspiracy allegations, the Wayfarer Parties should be granted leave to amend. *Panah v. State of California Dep't of Corr. & Rehab.*, 2015 WL 4274207, at *5 (N.D. Cal. July 14, 2015) (where "deficiency could feasibly be cured through amendment, the Court will dismiss the civil conspiracy claims . . . with leave to amend").

**F.    The FAC States a Claim for Breach of Implied Covenant of Good Faith and Fair Dealing**

Lively also argues that the FAC fails to state a claim for breach of the implied covenant of good faith and fair dealing for failure to identify "a specific contractual provision that was frustrated." Mot. at 30. Lively even argues, apparently with a straight face, that she did not "fail[] to cooperate" with the Wayfarer Parties. *Id.* The Wayfarer Parties can and will amend to add additional specifics, if needed. For example, Lively's contract requires that her right to consult and approve on certain aspects of the Film's production and marketing be exercised in a reasonable manner and not so as to frustrate Wayfarer's full and timely development, production, and/or exploitation of the Film, and/or to force Wayfarer to bear any additional costs with respect to such consultation or approval rights. The contract further specifies that Lively would not have the right to terminate her performance under the contract except in extremely narrow (and inapplicable) circumstances; yet, as alleged in the FAC, Lively threatened over and over to terminate her performance of both acting and promotional services. FAC ¶¶ 51-52, 75-77, 124, 144, 152, 154. Lively also agreed that she would not do any act that would "interfere with the complete enjoyment of the rights and privileges" granted to Wayfarer. Lively's claim that she did not frustrate any specific contractual provision is frivolous, and her Motion to dismiss this claim should be denied.

**G.    Even If the Motion Is Granted, Fees and Damages Cannot Be Awarded**

Lively is not entitled to damages or fees for the same reason she cannot prevail on this Motion, namely that her Motion raises disputed issues of fact that cannot be resolved at the pleading stage. As set forth in greater detail (*supra* Section III.A(5)), each of Section 47.1's three prerequisites implicate matters of disputed fact and cannot be determined as a matter of law on a motion to dismiss, where the Court must construe all factual allegations in the complaint as true. *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F. 3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002); *see also McSweeney*, 2025 WL 966022.

Furthermore, Section 47.1 cannot be used as a basis for an award of damages or fees for the same reasons that New York's anti-SLAPP statute cannot provide a basis for an award of fees to the other Consolidated Defendants on their motions to dismiss: Application of the law at this stage of the proceedings would conflict with Rule 11 of the Federal Rules of Civil Procedure by imposing a draconian and mandatory sanction where a defamation plaintiff brings a nonfrivolous claim that nonetheless does not survive a Rule 12(b)(6) motion to dismiss. *See Brady v. NYP Holdings, Inc.*, 2022 WL 992631 (S.D.N.Y. Mar. 31, 2022) (Liman, J.). As noted in *Brady*, "Rule 11 permits a court to impose sanctions only after the adverse party has been given notice and a reasonable opportunity to respond [and] to withdraw or correct the challenged paper." *Id.* at *11. By contrast, Cal. Civ. Code § 47.1 "has no such requirement" and "[a] party may seek sanctions without providing any advance notice to the adverse party." *Id.* at *11. Furthermore, "under Rule 11, sanctions are permissive," while under Section 47.1, "sanctions are mandatory." *Id.* Accordingly, Lively cannot be awarded any damages or fees pursuant to Section 47.1, both because issues of fact preclude any such award and because the statute conflicts with Rule 11.

Finally, awarding to Lively damages under Section 47.1 would violate the United States Constitution because imposing treble damages on unsuccessful defamation plaintiffs would impermissibly burden the exercise of rights protected by the Petition Clause of the First

Amendment under the *Noerr-Pennington* doctrine. The Petition Clause protects the right "to petition the Government for a redress of grievances," which the United States Supreme Court has recognized as "one of the most precious of the liberties safeguarded by the Bill of Rights." *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524-25 (2002) (quoting *Mine Workers v. Ill. Bar Ass'n*, 389 U.S. 217, 222 (1967)). The *Noerr-Pennington* doctrine arose in the context of antitrust law, in which the United States Supreme Court held that the Sherman Act cannot prohibit activity that constitutes "a concerted effort to influence public officials regardless of intent or purpose." *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *see also E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961). The *Noerr-Pennington* doctrine was subsequently expanded to include the right to petition the courts for redress, as the Supreme Court "made explicit that 'the right to petition extends to all departments of the Government,' and that '[t]he right of access to the courts is . . . but one aspect of the right of petition.'" *BE & K Const. Co.*, 536 U.S. at 525 (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972)).

The Supreme Court has extended *Noerr-Pennington* immunity to preclude liability for bringing a suit that, though based on a genuine grievance, is nevertheless unsuccessful. *BE & K Const. Co.*, 536 U.S. at 532-33. The Second Circuit applies *Noerr-Pennington* to state law claims. *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 229 F. 3d 1135, at *1 (2d Cir. 2000). The *Noerr-Pennington* doctrine now applies broadly to "shield[] defendants from liability 'for engaging in conduct (including litigation) aimed at influencing . . . the government.'" *CT Espresso LLC v. Lavazza Premium Coffees Corp.*, 2022 WL 17156759, at *3 (S.D.N.Y. Nov. 22, 2022) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014)).

Here, the pursuit of a civil claim against Lively, brought before a federal court, is plainly an exercise of a right protected by the Petition Clause of the First Amendment. *BE & K Const. Co.*, 536 U.S. at 525. Section 47.1(b) chills the exercise of that right in that it imposes draconian, one-

sided sanctions on a defamation plaintiff who brings a nonfrivolous but unsuccessful suit. *See id.* at 528 (chilling effect of "treble-damages remedy" for anticompetitive lawsuits under Sherman Act impermissibly burdens First Amendment right of petition). Notably, Section 47.1 imposes a mandatory award of attorneys' fees, costs, and treble damages, as well as potential punitive damages, only against an unsuccessful *plaintiff*; no similar remedies are available against an unsuccessful *defendant*. Cal. Civ. Code § 47.1(b); *see Miller v. Bonta*, 646 F. Supp. 3d 1218, 1227 (S.D. Cal. 2022) (statute that would award attorneys' fees only to prevailing defendant, not prevailing plaintiff, "chills the First Amendment right to petition government for the redress of grievances"). Nor is this a case where the Wayfarer Parties' claims are "baseless," let alone baseless to the point of falling "outside of the First Amendment." *BE & K Const. Co.*, 536 U.S. at 530-31 (quotation omitted). On the contrary, hundreds of pages of evidence demonstrate that a sound factual basis underpins the Wayfarer Parties' claims against Lively, and certainly no one could seriously accuse the Wayfarer Parties of lacking *both* an objective grounding in fact *and* a genuine subjective intent and expectation to prevail, as would be required to bring this case within the sham pleading exception to the *Noerr-Pennington* doctrine. *Id.* at 531. Accordingly, in a matter of first impression in any court, it is apparent that Cal. Civ. Code § 47.1 impermissibly chills the exercise of the rights guaranteed by the Petition Clause of the First Amendment and certainly cannot be applied to grant Lively an award of fees, costs, or damages at this stage *or any other*.

## IV.    <u>CONCLUSION</u>

The Wayfarer Parties respectfully urge that the Court deny the Motion in its entirety.[10] In the alternative, the Wayfarer Parties respectfully request leave to amend their complaint.

---

[10] The Wayfarer Parties incorporate by reference their arguments relating to the motion to strike Exhibit A to the FAC from their prior briefing. (Dkt. Nos. 121, 127, 160.)

Respectfully submitted,

Dated:  April 3, 2025          **MEISTER SEELIG & FEIN PLLC**
       New York, NY


By:___*/s/ Mitchell Schuster*_____
       Mitchell Schuster
       Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@msf-law.com
       kaf@msf-law.com


Dated:  April 3, 2025          **LINER FREEDMAN TAITELMAN**
       Los Angeles, CA          **+ COOLEY**


By:_____*/s/ Bryan Freedman*_____
       Bryan J. Freedman (*pro hac vice*)
       Miles M. Cooley (*pro hac vice*)
       Theresa M Troupson (*pro hac vice*)
       Summer Benson (*pro hac vice*)
       Jason Sunshine
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
       mcooley@lftcllp.com
       ttroupson@lftcllp.com
       sbenson@lftcllp.com
       jsunshine@lftcllp.com