P36VLIVO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    BLAKE LIVELY,

4                   Plaintiff,

5            v.                              24 Civ. 10049 (LJL)

6    WAYFARER STUDIOS LLC, *et al*,

7                   Defendants.

8    ------------------------------x

9    STEPHANIE JONES,
     JONESWORKS LLC,
10
                    Plaintiffs,
11
             v.                              25 Civ. 779 (LJL)
12
     JENNIFER ABEL, *et al*,
13
                    Defendants.              Oral Argument
14   ------------------------------x         Videoconference

15

16                                           New York, N.Y.
                                             March 6, 2025
17                                           10:05 a.m.

18   Before:

19                      HON. LEWIS J. LIMAN,

20                                           District Judge

21                         APPEARANCES

22   WILLKIE FARR & GALLAGHER LLP
          Attorneys for Plaintiff Lively
23   BY:  MERYL C. GOVERNSKI
          MICHAEL GOTTLIEB
24        -and-
     MANATT PHELPS & PHILLIPS
25   BY:  ESRA A. HUDSON

P36VLIVO

1                            APPEARANCES (continued)

2

3    QUINN EMANUEL URQUHART & SULLIVAN
          Attorneys for Plaintiffs Jones and Jonesworks LLC
4    BY:  NICHOLAS INNS

5    LINER FREEDMAN TAITELMAN + COOLEY LLP
          Attorneys for Defendant/Consolidated Plaintiff
     BY:  BRYAN FREEDMAN
6         JASON SUNSHINE
          SUMMER BENSON
7         THERESA TROUPSON
          -and-
8    MEISTER SEELIG & FEIN PLLC
     BY:  KEVIN A. FRITZ
9         MITCHELL SCHUSTER

10   BOIES SCHILLER & FLEXNER LLP
          Attorneys for Leslie Sloane and Vision PR, Inc.
11   BY:  SIGRID S. McCAWLEY
          ANDREW VILLACASTIN
12
     DAVIS WRIGHT TREMAINE LLP
13        Attorneys for The New York Times Co.
     BY:  KATHERINE M. BOLGER
14

15

16

17

18

19

20

21

22

23

24

25

P36VLIVO

|   |   |
|---|---|
| 1 | (Videoconference) |
| 2 | THE COURT:  Good morning.  This is Judge Liman. |
| 3 | Matt, are we ready to get started in *Lively v.* |
| 4 | *Wayfarer*? |
| 5 | THE DEPUTY CLERK:  Yes, Judge, we're all set. |
| 6 | (Case called) |
| 7 | THE DEPUTY CLERK:  We'll just ask, starting with |
| 8 | counsel for plaintiffs, please state your appearance for the |
| 9 | record. |
| 10 | MS. GOVERNSKI:  Good morning, your Honor. |
| 11 | This is Meryl Governski with Willkie Farr & Gallagher, |
| 12 | on behalf of Ms. Lively and Mr. Reynolds. |
| 13 | I'm joined by my colleague Michael Gottlieb, also from |
| 14 | Willkie Farr & Gallagher, on behalf of the same parties. |
| 15 | THE COURT:  Good morning. |
| 16 | MS. GOVERNSKI:  Good morning. |
| 17 | MS. McCAWLEY:  Good morning, your Honor. |
| 18 | Sigrid McCawley, along with my colleague Andrew |
| 19 | Villacastin from Boies, Schiller & Flexner.  We're here on |
| 20 | behalf of Leslie Sloane and Vision PR. |
| 21 | MR. INNS:  Good morning, your Honor. |
| 22 | In the related case of *Jones v. Abel*, this is Nicholas |
| 23 | Inns of Quinn Emanuel, representing Ms. Jones and Jonesworks |
| 24 | LLC. |
| 25 | MS. BOLGER:  Good morning, your Honor. |

P36VLIVO

1          Katherine Bolger from Davis Wright Tremaine, on behalf
2  of *The New York Times*.
3          MR. FREEDMAN:  Good morning, your Honor.
4          Bryan Freedman, on behalf of Wayfarer Studios, Justin
5  Baldoni, Jamey Heath, Melissa Nathan, Tag PR, Jen Abel, It Ends
6  With Us LLC, and I believe that's it.
7          THE COURT:  Any other counsel?
8          MR. FREEDMAN:  I apologize.  I'm joined by my
9  colleague Summer Benson is here, Theresa Troupson is also here.
10         MR. SCHUSTER:  And I believe Jason Sunshine is here as
11 well from your office, Bryan.
12         MR. FREEDMAN:  Yes.  And my local counsel, Nick
13 Schuster is here.
14         MR. SCHUSTER:  Good morning, your Honor.
15         I'm here with my partner Kevin Fritz from Meister
16 Seelig & Fein.
17         THE COURT:  Good morning.
18         Any other counsel needing to make an appearance?
19         Okay.  I have the proposed protective order provided
20 by the *Lively* parties which differs from my model protective
21 order principally by adding an attorneys' eyes only category.
22 It's opposed by the *Wayfarer* parties.
23         I'll hear first from the *Lively* parties why there's a
24 need to enter this protective order with the attorneys' eyes
25 only category at this time.  And in particular, counsel might

P36VLIVO

 1    focus herself or himself on what kinds of documents would fall

 2    within the attorneys' eyes only category.

 3         This case has been marked by allegations by both sides

 4    that the attorneys for each side have disclosed information to

 5    the press and have used the case to make claims in the press.

 6    That's not the subject of today's hearing, but it does prompt

 7    the question as to why I need an attorneys' eyes only category

 8    and what information is to be given to the attorneys but kept

 9    confidential to the parties.

10         Ms. Governski, I'm not sure whether you're going to

11    address that or Mr. Gottlieb, but I'll hear from the *Lively*

12    parties first.

13         MS. GOVERNSKI:  Thank you, your Honor.

14         Ms. Lively and Mr. Reynolds are the moving parties

15    here, along with Ms. Sloane and Vision PR.  We understand

16    Ms. Jones in the related case also has moved for an identical

17    PR.

18         If the Court permits, it may make sense for counsel

19    for Ms. Sloane and Vision PR to argue their position in the

20    first instance, and then we can fill in additive arguments

21    after.

22         THE COURT:  That's acceptable.

23         MS. McCAWLEY:  Thank you, Judge.

24         Sigrid McCawley, on behalf of Leslie Sloane and Vision

25    PR.

P36VLIVO

1          You're right, Judge, this is a unique case certainly.

2     And here we have an instance where there are a number of

3     competitive business parties involved in the case such that it

4     would require the attorneys' eyes only designation for that

5     competitively sensitive information.

6          Your Honor, you entered these similar orders, for

7     example, in your *Allstate v. Mota* case, which is 2022 WL

8     500419.  This is common in these types of cases because it's

9     absolutely necessary.  When you have competitors who could be

10    receiving information, having that heightened level of an

11    attorneys' eyes only designation to protect that sensitive

12    information is critical.

13         And here, the protective order is designed to have a

14    mechanism for the parties to be able to meet and confer.  To

15    the extent that that is not acceptable to one of the parties,

16    there's a built-in safety net where they can confer over that.

17    And to the extent there's any concern, it can ultimately be

18    raised by the Court, if necessary.  But at the outset, it's

19    going to help facilitate discovery because we can exchange

20    information, but yet protect our clients' interests.

21         And this goes on both sides of the fence, frankly.

22    These publicists run on both sides of the V.  They are in this

23    space and they have a number of competitively sensitive

24    information they would want to protect.

25         Your Honor, you asked for some information about what

P36VLIVO

1    that would be.  Certainly these publicists have trade secrets

2    they want to protect; they have their clients' business plans,

3    strategies, marketing plans.

4              THE COURT:  Slow down for a moment, Ms. McCawley.

5              MS. McCAWLEY:  Sure.

6              THE COURT:  Because I am familiar with *Allstate v.*

7    *Mota*.  I decided it some time ago, but I do recall it.

8              So you mentioned trade secrets.  What else was on your

9    list?

10             MS. McCAWLEY:  Correct.

11             Other clients' business plans and strategies,

12   marketing plans, any discussions in the documents concerning

13   other clients or nonpublic projects or leads.  And I believe I

14   started with trade secrets.

15             THE COURT:  In your category of documents discussing

16   other clients and leads, I guess I can understand why to the

17   extent that this is a feud between PR firms and similar to

18   *Allstate v. Mota*, if there are leads, maybe that would call for

19   an attorneys' eyes only category.  But simply because they

20   mention clients, this is a case where I suspect there are going

21   to be documents that mention a number of people who are not

22   parties to the case but who, because of the business they are

23   in, are potential clients.  So isn't that category

24   extraordinarily broad?

25             MS. McCAWLEY:  Judge, I can understand that concern.

P36VLIVO

1            But here, that is sometimes the trade secret, right,

2        who their clients are.  To the extent these PR companies are

3        warring over the competitive nature of who they can represent,

4        having to disclose that, basically their lists or other

5        information would put them in a competitive disadvantage.  And

6        surely to somebody like Leslie Sloane and Vision PR, who have

7        been unnecessarily dragged into this litigation, to have to

8        then disclose to their competitors information about who their

9        clients are and the sensitive nature of that information, we

10       consider that to be something that would warrant the AEO.

11           And again, your Honor, this is not absolute.  There is

12       a mechanism.  To the extent something is designated as AEO and

13       the other side does not believe it should be, there's a

14       mechanism for the parties to confer over that.  But this allows

15       discovery to flow out without the alternative that the other

16       side has proposed would require us to hold that back and then

17       come directly to you and have that argument immediately.  So

18       this really is a much more reasonable way and very common in

19       these cases, your Honor, as you well know.  I know you're very

20       seasoned in this.  But this is a very common way to deal with

21       this issue when you have competitive parties in a case together

22       of this nature.

23           THE COURT:  Okay.  Let me hear from anybody else

24       advocating for the attorneys' eyes only category.

25           Thank you, Ms. McCawley.

P36VLIVO

1          MS. McCAWLEY:  Yes.  Thank you, your Honor.

2          MR. INNS:  Yes, your Honor.  This is Nicholas Inns for

3     Jonesworks and Stephanie Jones.

4          And just to add to what Ms. McCawley was saying, we

5     certainly join in everything she said.

6          And to our mind, your Honor, this is precisely what

7     the Court just referenced, which is, this is functionally — for

8     our case at least — a feud between public relations firms.  As

9     the Court, I'm sure, is aware our complaint includes a number

10    of allegations that theft of trade secrets and theft of

11    confidential information has already occurred by the defendants

12    in that case by Ms. Abel and Ms. Nathan, each of whom operate a

13    competing public relations firm or at least something related

14    to the public relations industry.

15         So allowing the attorneys' eyes only designation to

16    protect the disclosure of further confidential information is

17    precisely what your Honor, of course, did in *Allstate* and, I

18    would also note, in a nearly on-point case, what Judge

19    Engelmayer did last year in the *Jane Street v. Millennium*

20    *Management* case, in which he specifically noted the risks of

21    requiring a company that has been aggrieved by former employees

22    to continue turning over confidential information to those

23    former employees.

24         So without repeating everything Ms. McCawley stated, I

25    think those grounds, specifically with respect to this

P36VLIVO

1   competitively sensitive information, warrant the entry of an

2   attorneys' eyes only designation.

3           THE COURT:  So, Mr. Inns, as I hear you, what you're

4   referring to are documents that could be considered to be trade

5   secrets.

6           MR. INNS:  Correct, your Honor.

7           And I would generally agree with Ms. McCawley on the

8   categories those would fall into; so business plans formulated

9   for clients, with the caveat that the business plans

10  specifically at issue here with respect to the clients at issue

11  here between Ms. Jones and Ms. Abel, specifically Wayfarer, we

12  would not expect that to be covered.  But other clients'

13  business plans, as Ms. McCawley said, the existence of other

14  clients, any potential future plans that Jonesworks has,

15  requiring the disclosure of that to competing firms in the

16  guise of Ms. Abel and Ms. Nathan would expose Jonesworks to a

17  significant competitive injury.

18          THE COURT:  All right.

19          Anybody else advocating for the attorneys' eyes only

20  category?

21          MS. GOVERNSKI:  Yes, your Honor, on behalf of

22  Ms. Lively and Mr. Reynolds.

23          Your Honor, of course all the parties agree that the

24  Court should enter at a minimum its model protective order.

25  And so the creation of the AEO category that we're requesting

P36VLIVO

1    is actually built off of that model protective order.

2         The model protective order already protects

3    information of a personal or intimate nature regarding any

4    individual.  And so what our proposed AEO category seeks to do

5    is to add an extra level of protection for materials that would

6    fall in that category, but that are especially personal,

7    sensitive or proprietary that would caught irreparable harm if

8    it were misused or revealed publicly.

9         I understand that the Court, it seems like, is

10   primarily interested in two aspects:  One is the reason why the

11   confidential designation is insufficient to capture all

12   discovery information, why an AEO designation generally is

13   needed; but also specific examples of the materials that we

14   would proffer would qualify as AEO.

15        So I'll start with the second and then go to the

16   first, unless the Court prefers a different ordering.

17        THE COURT:  I'll leave it to you.

18        MS. GOVERNSKI:  Great.

19        So as far as some specific examples of the types of

20   materials that we would imagine that would be subject to

21   discovery and that would pose the kind of irreparable harm it

22   disclosed, one example is specific security measures that

23   Ms. Lively and Mr. Reynolds have taken in order to protect

24   themselves and their families from this retaliatory campaign.

25        Defendants have notice and intent to subpoena a

P36VLIVO

1    third-party firm who Ms. Lively and Mr. Reynolds hired to

2    provide security and privacy protections.  That third-party

3    subpoena asks for all documents and communications concerning

4    or to or from Ms. Lively and Mr. Reynolds.

5            We will, of course, lodge objections to that subpoena.

6    But in the event that production is necessary, we don't see any

7    reason why the parties themselves need to know the specific

8    details about Ms. Lively and Mr. Reynolds' security measures

9    that they've put into place.

10           THE COURT:  So let me interrupt you for a moment on

11   that.

12           Are you saying that you believe that Mr. Freedman's

13   clients present a risk to your clients' security different than

14   what Mr. Freedman and his colleagues present?  I'm not saying

15   that Mr. Freedman presents a risk to your clients' security,

16   but your argument raises that issue.

17           MS. GOVERNSKI:  Of course, your Honor.

18           So, you know, Mr. Freedman, of course, is an officer

19   of the Court and is subject to the professional rules of

20   responsibility, as well as additional obligations unique and

21   specific to attorneys.

22           Unlike in typical cases, the parties in this case on

23   both sides of the V include people and businesses whose entire

24   living is made off of providing information to the press and

25   content creators.  I'm not intending to be pejorative; it's

P36VLIVO

1    just the reality of what they do.  They make money and to stay

2    in relationships by trading information with them, and having

3    techniques for doing so off the record and on background.

4         And, in fact, a particular note in this case, the

5    defendants themselves have bragged in text messages about being

6    able to do this in an untraceable way, of being able to publish

7    information without fingerprints and also having individuals

8    who will "do anything" for them and who hate Ms. Lively.  So

9    we'll pursue further evidence of this through the course of

10   discovery, but the evidence in this case so far demonstrates

11   that there is a significant risk, unlike others that perhaps

12   have been before this Court.

13        I also think it's worth noting that the defendants

14   appear to be operating on an unlimited budget that really

15   renders the traditional mechanism of using sanctions to control

16   parties meaningless in this case.  Defendant Sarowitz has

17   committed to spending $100 million to ruin the lives of

18   Ms. Lively and her family.  And the amended complaint includes

19   a separate quote saying -- in which Mr. Sarowitz says that

20   Ms. Lively and Mr. Reynolds will be the equivalent of dead

21   bodies when he is done with them.

22        We respectfully submit that threats like this raise

23   the question of whether traditional sanctions could possibly

24   deter the abuse of highly sensitive, personal and intimate

25   information that many parties and third parties may produce in

P36VLIVO

```
 1    this case.  And really no amount of sanctions could unring the
 2    harm that we think would come from this quite narrow category
 3    of what we think would fall into this AEO designation.
 4              THE COURT:  Why don't you get back to — now that
 5    you've answered my question — what you mean by the quite narrow
 6    category; because it appears that the Wayfarer parties already
 7    are privy to a fair amount of personal information about your
 8    clients.  So what is incremental that you think poses a
 9    particular risk in this case?
10              MS. GOVERNSKI:  Okay.  So I'm going to get to the
11    categories in one quick second, but I just want to make one
12    final point which is directly relevant to that question.
13              There is an insatiable appetite for any information
14    about this case, no matter how salacious it is.  We've seen
15    even the most benign and routine information become tabloid
16    fodder.  And just this week, for instance, your Honor, The
17    Daily Mail published a story based on an insider source with
18    information from Mr. Baldoni's legal team about the "first
19    group of potential witnesses who Baldoni's team want to hear
20    from who have been contacted but not yet scheduled."  So even
21    the prospect of discovery.  And so it's not a stretch for the
22    Court to imagine the harm that could come from actual discovery
23    information being placed in the wrong hands.
24              And so what kinds of information.  We've talked about
25    security measures.
```

P36VLIVO

1          Another category of information that they do not have

2    access to right now is medical information, including relating

3    to the physical and mental health of parties and nonparties

4    alike.  So there's, of course, an inherent privacy interest in

5    protecting information about one's health.  And we think

6    guaranteeing privacy with respect to medical information is

7    particularly critical here, where it may involve third parties

8    who this Court has a responsibility to protect, including

9    pursuant to *Seattle Times Co. v. Rhinehart*.

10          And then related to the third parties — who really are

11   one of our primary concerns here without an AEO protection — is

12   a third category of documents are personal and intimate

13   conversations with really unrelated third parties who have a

14   marginal relevance to this case where the PR value would be

15   high, but the evidentiary value would be virtually nonexistent.

16          We know that there will be significant third-party

17   discovery.  We received RFPs from the parties; they are

18   designated as confidential by the defendants, so I'm limited in

19   what I can talk about in open court.  But I can tell you that

20   there are dozens and dozens of third parties named by name.

21   And so we know that there will be production from parties

22   involving third parties; we know that there will be subpoenas

23   to third parties involving third parties.  And we think that

24   there is a significant chance of irreparable harm if marginally

25   relevant communications with high-profile third-party

P36VLIVO

1    individuals who are unrelated to the case were to fall into the

2    wrong hands.

3            And so we think that this narrow category would allow

4    the designation for the types of communications that have

5    tremendously high PR value, low evidentiary value, and could do

6    irreparable harm, that we would suggest this Court does have an

7    obligation to protect.  As the Supreme Court in *Seattle Times*

8    said, if information about third parties is released, it could

9    be damaging to their reputation and privacy, and that the

10   government clearly has a substantial interest in preventing

11   this sort of abuse of its processes.

12           THE COURT:  Ms. Governski, give me an example of the

13   type of "personal or intimate conversations" that you have in

14   mind, picking out something that would be remote from the

15   actual facts of this case.

16           MS. GOVERNSKI:  Sure.

17           THE COURT:  I'm not asking you -- decidedly I'm not

18   asking you to reveal what kind of communications you're

19   concerned about protecting at the same time as you're trying to

20   protect it, but so that I can give some definition to this

21   particular category.

22           MS. GOVERNSKI:  I understand, your Honor.

23           So let's take a complete hypothetical that I would not

24   have access to.  Let's say Mr. Baldoni has a very good friend

25   who is a very high-profile individual.  And he was venting

P36VLIVO

about his day.  And he mentioned something about our clients in

connection with what happened on the film.  That would be

responsive arguably; that would potentially be relevant, it's

communication by a party about another party.  But its value to

the case, its necessity to the case, its evidentiary value

would be outshadowed by the fact of who he was communicating

with.  If he was communicating with a high-profile individual,

that all of a sudden creates significant PR intrigue for a

communication that to a friend who was a completely private

anonymous individual, just would not carry the same kind of

weight.

     That is entirely different, your Honor, from

Mr. Baldoni talking with Mr. Sarowitz.  That is a directly

relevant case — or even Mr. Baldoni speaking with another cast

member.  That is a different type of relevance by nature of who

the individuals are as compared to the category of the types of

communications we would suggest would fall into this third

protective category.

     THE COURT:  Are there other categories that you have

in mind?

     MS. GOVERNSKI:  Well, so, you know, one of the reasons

that we use the language we did, which was reminiscent and

taken from other protective orders that courts in this district

have used, including I just referenced *River Light*, 20-CV

07088; *We the Protesters*, 22-CV 9565; and *Cowan,* involving the

P36VLIVO

1   Kardashians, that's 12-CV-1541.

2           One of the reasons that we use the type of language

3   that we did without expressly identifying specific categories

4   like we're using as exemplars today is because it's hard to

5   predict exactly what might fall into this.  But it's not

6   difficult to envision that there would be the type of materials

7   that are speaking about children or speaking about profound

8   mental health issues or locations of private residences or

9   homes.  You can imagine that there is just a level of personal

10  and intimate information that is particularly relevant because

11  of who these people are that in an ordinary case may not be

12  subject to an AEO, but would be in here.

13          This case is quite reminiscent of the cases before

14  other courts in this district in *Paisley*, which involved Prince

15  and Stern, which involved Rita Crosby.  And there, the court

16  was particularly concerned about discovery being used as a

17  vehicle for generating content.  And the court in *Paisley*

18  opined that court must be vigilant to ensure that their

19  processes are not used improperly for purposes unrelated to

20  that role.

21          THE COURT:  So a couple of follow-up questions to you.

22          First question is why wouldn't your objectives, if

23  they are legitimate, be accomplished by something that is more

24  narrowly tailored that says, in essence, that the names and PII

25  — personally identifiable information — of persons who are not

P36VLIVO

1  parties to this litigation, you know, may fall within the

2  definition of attorneys' eyes only, but certainly people who

3  are parties.  I mean, if Ms. Lively or Mr. Reynolds said

4  something about what was going on on the set or said something

5  that is relevant to this case, I wouldn't imagine that that

6  would be attorneys' eyes only.  Mr. Freedman should have the

7  right to discuss that evidence with his client.

8          MS. GOVERNSKI:  I appreciate the Court's question and

9  thought that you've put into this question.

10          I think that it would be too narrow to only limit it

11  to parties because, of course, these parties make their

12  business off of celebrities and people -- high-profile

13  individuals.  It's highly likely that the content of the

14  communications would indicate clues as to who these people

15  were, that would defeat the point of just abbreviating names.

16          For example, if there's a communication talking about,

17  I was at this event on this date, that would divulge a pretty

18  narrow universe of who might be covered by that; or a

19  communication, It was so great to see you last night, and we

20  know that Mr. Baldoni, Ms. Lively and Mr. Reynolds often are

21  photographed out publicly.  It would not take much to add one

22  and one together and figure out who the party is.

23          So we think that that would be too narrow and we think

24  that the current draft is certainly in keeping with the

25  language of the Court's original protective order and just

P36VLIVO

1   heightens it for a different level of sensitivity and intimacy.

2          THE COURT:  Now, Ms. Governski, as you know from my

3   model protective order, and if it's not sufficient, then I can

4   hear the parties with respect to it, but the obligations of the

5   protective order don't just apply to the lawyers, they also

6   apply to the parties.  And there's a separate document that

7   people have to sign who get access to confidential information

8   under the protective order that binds them to the protective

9   order.  That means that they can be held liable for contempt if

10  they violate it.  So why wouldn't that be sufficient?

11         First of all, I presume that people are going to

12  follow my orders.  And second, my orders are clear, and they

13  violate it, then they are going to be held liable for contempt.

14  And I'm perfectly comfortable having a contempt hearing and, if

15  necessary, authorizing discovery in connection with that.

16         MS. GOVERNSKI:  Well, as you and I both know, your

17  Honor, contempt proceedings and the processes that lead up to

18  them can take quite a while.  And in this case it would not be

19  sufficient to unring the bell if this material is released

20  publicly.

21         Also, your Honor, I don't believe that sanctions or

22  contempt proceedings are sufficient to protect the very

23  significant concerns that we have here, especially with respect

24  to trade secrets, but also with respect to health and mental

25  health records that really have absolutely no business being

P36VLIVO

1    publicly released.

2          And I would just suggest, your Honor, that this is an

3    entirely different case.  There are 100 million reasons for

4    these parties to leak information because the PR value is

5    greater than complying with the Court's orders.  And I just

6    don't think sanctions will be appropriate.

7          THE COURT:  Well, but there is a huge amount of

8    information, I presume, that is of PR value that's also

9    centrally relevant to the case that will, if the case goes

10   forward, become public.  It will be filed in connection with

11   motions for summary judgment as to which there is a presumptive

12   right of access.  If the case goes to trial, there are very

13   strict rules against closing the courtroom, and those will be

14   challenging obstacles for the parties.  So a lot of what you

15   are talking about is just inherent in the nature of the case.

16          You sue a high-profile person in this industry, as to

17   which there's a lot of attention paid, it's going to get picked

18   up by the press.  Mr. Freedman sues somebody who's

19   high-profile, it's going to be picked up by the press.  There's

20   a public interest in how the courts are being used that the

21   Court has to respect.

22          Now, that doesn't mean that you can't share discovery

23   confidentially in order to facilitate the processes of

24   discovery.  That's the point of the *Seattle Times* case.  But it

25   does mean that coming down the road, the stuff that's highly

P36VLIVO

1    relevant is going to end up being disclosed, maybe not every

2    bit of health information.

3              Want to respond to that?

4              MS. GOVERNSKI:  Of course, your Honor.

5              And it is absolutely not in our ultimate interest to

6    prevent the public from seeing all the evidence.  That is, of

7    course, what is going to happen here.

8              But in order to facilitate the production of highly

9    sensitive materials especially from third parties, we think it

10   makes sense for there to be an AEO category and then deal with

11   de-designation — whether with respect to summary judgment or

12   with trial — in a holistic way, which is standard in cases,

13   right.  I mean, we're going to have to deal with this for

14   confidential, so why not also deal with it for AEO.  It doesn't

15   really materially change the process you're describing that

16   would have to happen with confidential.

17             All that we think the AEO would do is actually allow

18   us to keep with your Honor's schedule.  Because six months to

19   produce all of this information — actually, four months for

20   substantial discovery — if we have to layer into that

21   conferrals anytime that a party or a third party wants to

22   designate it as AEO, I think we're just asking to divert

23   resources to meet-and-confers and to divert judicial resources

24   towards dealing with this as an *ad hoc* basis as opposed to in

25   the manner you have described as we get closer to summary

P36VLIVO

1    judgment designation.

2              THE COURT:  Isn't it going to lead to meet-and-confers

3    and coming to the Court no matter what?  If you designate stuff

4    that's AEO, and Mr. Freedman wants to discuss it with his

5    client and he thinks that it's overbroad, I'm going to have to

6    deal with that.  So I'm not sure how convincing relieving the

7    burden of the Court is or of the parties, because the question

8    is just what the default is.

9              MS. GOVERNSKI:  Well, but I think -- first of all, I

10   think the default, if we allow AEO, would allow the materials

11   to get produced much more quickly.  It seems to me like the

12   process as contemplated in the PO would require conferral or

13   coming to the Court in advance of production.  So if we allow

14   the AEO designation in the first place, it would facilitate and

15   allow us to keep this tight four-month schedule for substantial

16   completion and six months for the close of discovery.

17             But I also think, your Honor, that it would reduce the

18   resources -- the burden on the Court because it would allow us

19   to do it in a more holistic strategic manner.  By the time we

20   get closer to summary judgment or trial, the parties will know

21   what documents they need to use or plan to use.

22             Of course, if we do it this way, where it's every

23   single material that -- we all know that you produce a ton of

24   material that never sees the light of day or needs to see the

25   light of day.  And if the current process sticks, then we'll be

P36VLIVO

```
1    negotiating AEO for every single type of discovery material, as

2    opposed to knowing what we really need to come to the Court to,

3    because what needs to be de-designated or have a reduced

4    designation.  It will be a narrower world, a narrower universe;

5    it will be less ad hoc, it will be more comprehensive and

6    strategic.

7              THE COURT:  I've got a couple of follow-up questions,

8    but I do want to let you finish your argument before I ask

9    those questions and then turn to the other side.

10             MS. GOVERNSKI:  Your Honor, I think we've gotten

11   through everything that I had intended to discuss.

12             The Court has quite broad authority here to enter a

13   protective order, and broad discretion and an obligation to

14   protect personal interests and especially of third parties.  So

15   we would just submit, your Honor, that the way that we propose

16   (indiscernible) standard, routine and narrow way to do so.

17             THE COURT:  Let me ask my specific questions about the

18   form of the order that has been submitted.  And I'll call on

19   any party who's moving for this to address it.  Most of my

20   questions have gone to the broad language that defines what

21   could be attorneys' eyes only.

22             One question is whether if I agree to an AEO category,

23   the word "likely" should be modified by "highly likely."  The

24   notion of likely to cause a competitive injury to the producing

25   party is essentially a prerequisite to any protective order; it
```

P36VLIVO

1    would not seem to me to be sufficient for an AEO category.

2              Is there anybody who wants to address that from the

3    moving party?

4              MS. McCAWLEY:  Judge, this is Sigrid McCawley, on

5    behalf of Leslie Sloane and Vision PR.

6              We are comfortable with that from the perspective of

7    the business information we're trying to protect here.  "Highly

8    likely" would be something that would be sufficient in that

9    regard.  That's really what we're looking for; we're really

10   looking for to just protect that very, very sensitive

11   information that will cause a business harm to our clients.

12             THE COURT:  Okay.

13             Second, in paragraph 1, there is reference to

14   testimony and presentations by the parties or counsel, two are

15   in court.  There's no way that I'm going to sign a protective

16   order that defines information that is submitted to the Court.

17   With respect to information that goes to the Court, you're

18   going to follow my individual practices and the law of the

19   Second Circuit with respect to confidentiality.  I don't need

20   particular argument on that.  That is my ruling.

21             The last two points are that there is a reference

22   throughout to high-profile individuals.  For example, the

23   protective order refers to the personal interests of the

24   producing person and/or third party, including high-profile

25   individuals.  It's not apparent to me whether those words

P36VLIVO

1    "high-profile individuals" are intended to be language of

2    limitation or why there needs to be a reference to high-profile

3    individuals, in this what work that is doing.

4            There also is ambiguity in the model protective order

5    that you've submitted, the form protective order that you've

6    submitted, about whether information that is already public is

7    to be treated as confidential or AEO.  For example, there may

8    be photographs of family members that have been shared with the

9    *Wayfarer* parties already or that are in the press already.

10   That would not in my mind be the proper subject of a

11   confidentiality order.

12           Does anybody want to address either of those points?

13   Then I'll move to the *Wayfarer* parties.

14           MS. GOVERNSKI:  Your Honor, I'm happy to.

15           We would be fine striking the reference to

16   high-profile individuals and agree that's inclusive in "third

17   party."

18           As far as the second point, we do agree and think it's

19   inherent in the definition of "confidential discovery material"

20   that it would not cover information that is already in the

21   public sphere or that a party already has in their possession

22   separate from this litigation.

23           THE COURT:  Your picture didn't show up on my Teams.

24   Who was that who was speaking?

25           MS. GOVERNSKI:  Oh, this is Meryl Governski.

P36VLIVO

```
 1              THE COURT:  Okay.

 2              And just so it's clear, I should have said this

 3   earlier, but because this is a public proceeding as to which

 4   the members of the public may be listening in, but not see the

 5   visuals, I'm going to ask each counsel before they speak to

 6   identify themselves for the record.  I should have done that

 7   earlier.

 8              It was counsel, Ms. Governski, for the *Lively* parties,

 9   who spoke immediately before the last attorney who spoke.

10              All right.  Let me hear from the *Wayfarer* parties.

11              MR. FREEDMAN:  Thank you, your Honor.

12              This is Bryan Freedman on behalf of -- I'll just

13   reference it as the *Wayfarer* parties, which would include the

14   Tag PR, Melissa Nathan, and whatnot.

15              First of all, I do want to address, I think it's

16   rather offensive that anyone would suggest that we would

17   disregard a protective order.  In fact, we're in favor of the

18   Court's model protective order; we think it's sufficient to

19   protect the parties.

20              And it's not only sufficient to protect the parties,

21   but it feels like what the other sides are asking for is that

22   because there is celebrity, because there are people who are

23   powerful people in the industry, that somehow they get treated

24   differently and somehow there's a different law that applies to

25   them that otherwise would apply to normal, everyday people.
```

1          THE COURT:  So, Mr. Freedman, I'm going to hear you

2     with respect to that point.  I do want to make sure that on

3     your list to address is the PR firms and the feud between the

4     PR firms and the allegations of competitive injury.

5          And I should lay out one of the premises of that

6     question.

7          The premise of that question is that a reason for

8     attorneys' eyes only designations is that there is information

9     that may be useful to a party in business that when they are

10     exposed to it, they cannot put out of their minds and that,

11     therefore, presents a separate type of risk than the ordinary

12     risk of a disclosure or violation of the protective order.  So

13     make sure you're covering that point.

14          I do hear you and I'll permit you to continue to be

15     heard with respect to the general point about this being a

16     high-publicity case.

17          MR. FREEDMAN:  Sure.

18          And let me address the PR firms, because it's very

19     important within the entertainment industry to understand

20     what's publicized and what's publicized by those very PR firms.

21          Who people represent and who they speak on behalf of

22     is well-known.  It's in *Deadline*, it's in *The Hollywood

23     Reporter*, it's in *Billboard*.  It's in all of the trade

24     publications.  People are referenced all the time as which firm

25     that represents them as their publicists.  And that's very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P36VLIVO

1    common.  It's not secret as to which firm represents which

2    celebrities at all.  It's not something that's kept secret;

3    it's not something that's not disclosed to the public.  In

4    fact, it's not only disclosed to the public, but on a routine

5    basis PR agents call up the press all of the time to talk about

6    their clients and why their clients either shouldn't be in a

7    story, should be in a story, what their clients are up to, what

8    their clients are doing.  It is in no way a trade secret or

9    kept confidential by any PR firm who they represent in any way.

10        And even in this case, we're not really interested in

11   who is represented by what PR firm and what other clients are

12   at issue.  That's not the issue in this case.  There's not a

13   trade secret or something that's kept confidential by the PR

14   firms that we're interested in at all.  In fact, a lot of these

15   people within the PR firms -- Jen Abel used to work for

16   Stephanie Jones.  And so there is commonality amongst all of

17   that.

18        But most importantly, it's not something that's kept

19   secret.  As a matter of fact, it's something that's advertised

20   who they represent.  In articles it's quoted all the time that

21   the publicist for so-and-so says this.  And, in fact, in this

22   case you'll see numerous text messages from reporters, whether

23   it be at *The Daily Mail*, whether it be reporters at *TMZ*,

24   whether reporters otherwise, who specifically state the names

25   of the publicists that they spoke with on behalf of those

P36VLIVO

1   particular clients.  This is not confidential trade secret

2   information.

3             And I think that when we talk about publicists and we

4   talk about the parties in this case, I'm reminded of a couple

5   of things:  Number one, the case started with *The New York*

6   *Times* having five weeks worth of confidential information, and

7   put out an article with all of that confidential information

8   right out there.  That confidential information was obtained by

9   *The New York Times* themselves from these parties in the case.

10            THE COURT:  That's at least the allegation.

11            MR. FREEDMAN:  That's the allegation.  I'm not sure

12   how else it could be, but --

13            MS. BOLGER:  Your Honor, just to be clear*, The New*

14   *York Times* would dispute that allegation.  And it is just an

15   allegation.

16            THE COURT:  Thank you, Ms. Bolger.  But I will call on

17   you later if you wish to be heard.  I'll give anybody else who

18   wants to an opportunity to be heard.

19            I'm taking from both sides what their allegations are.

20   So I understand there are allegations that are made by the

21   *Lively* parties with respect to the *Wayfarer* parties.  I

22   understand, Mr. Freedman, you're making allegations with

23   respect to the *Lively* parties and with respect to *The New York*

24   *Times*.  Parties are free to make allegations to a limited

25   extent, to some extent.  That's what discovery and trials are

P36VLIVO

```
 1    for.

 2              Go ahead, Mr. Freedman.

 3              MR. FREEDMAN:  Thank you, your Honor.

 4              I actually am not even making an allegation; I'm

 5    almost quoting The New York Times who came out and said, We've

 6    reviewed thousands of pages of documents.

 7              THE COURT:  You're not testifying.  If you want to

 8    testify as a witness, I'll put you under oath.  So everything

 9    you're saying with respect to the facts, I'm going to take it

10    as an allegation.  You understand that.

11              MR. FREEDMAN:  I do, your Honor.

12              And to continue, it almost reminds me of the argument

13    being like the old Sesame Street, one of these things is not

14    like the other.  And this is not Texaco/Pennzoil; this is not

15    Apple/Microsoft.  These are not direct competitors that have

16    trade secret information that is so highly protective.  This is

17    not Coke and Pepsi and the formula for Coke and Pepsi or

18    anything like it.  These are hardly competitors and information

19    that's not truly protected at all.  As a matter of fact, they

20    use it to advertise.

21              We do believe you have broad discretion, your Honor.

22    And we do believe that the parties seeking the burden, the

23    protective order has the burden of showing good cause that it

24    exists for issues and an issue of what would be a strenuous

25    attorneys' eyes only provision.  We think it's important and,
```

P36VLIVO

1   frankly, necessary that we are able to utilize our clients who

2   are in this industry and to discuss with our clients those

3   documents and other information that could be helpful for us

4   defending the case and clearing our clients' names in the case.

5   And we think that's imperative and it would be a burden on us

6   every single time to come into the court and argue about

7   whether an AEO provision which is highly unusual is proper.

8           In fact, your Honor, your model order addresses all of

9   this.  It says that if you need greater protection, you're

10  welcome to come into the court and ask for greater protection,

11  first to meet and confer with the other side.  Of course,

12  things like medical records of Ms. Lively, you know, she's

13  alleged emotional distress, there will be an IME.  We wouldn't

14  dispute in a meet-and-confer that that information would be

15  confidential and could even be attorneys'-eyes-only

16  information.  That's an issue in the case because of the

17  damages in the case.  And we certainly are not interested in

18  saying that that's something that somehow is not protected.

19          But this is a confidential protective order.  Things

20  are supposed to remain confidential.  We intend to follow the

21  confidentiality.  And there are provisions in the order which

22  fully protect all of the parties that if they need some sort of

23  greater protection and for some reason they don't need our

24  clients to see something, that they can make a showing for it.

25  But there just has not been a specific showing at all today.

P36VLIVO

1           And my concern is that the burden from the *Lively*

2      parties is they are trying to shift the burden; and somehow

3      that there should be an AEO provision in here and we should

4      have to prove up and run into court every single time, when we

5      feel like that's a burdensome process, that that's an

6      unnecessary process.

7           It's all addressed in your model order, your Honor.

8      And, in fact, it's not only addressed in your model order,

9      there's a specific provision that says that any party can come

10     in at any time if they think they are not protected by the

11     model order.  We're prepared to adhere to the model order.  We

12     think the model order protects all of the parties.  And

13     frankly, we see no difference because someone is a celebrity or

14     because someone advertises their client as a PR agency that

15     they should have the right to somehow indicate that this is a

16     trade secret, which it's clearly not.

17          THE COURT:  So one difference between this case and

18     many other cases is that there are allegations in this case by

19     each side against the other that the other has leaked

20     confidential sensitive information that they were entrusted

21     with through their job position in ways that are difficult to

22     trace.  That's not an allegation about the attorneys, it's an

23     allegation about the parties and it is something that I have to

24     take seriously.

25          So why wouldn't that support at least some limited

P36VLIVO

1    amounts of an AEO provision?

2        MR. FREEDMAN:  It wouldn't support it, your Honor,

3    because the confidentiality in the order should be enough.  I

4    mean, what you've seen in the model order, it does protect

5    that.  And my concern is this:  So far in the case what has

6    been disclosed are addresses of my clients in proofs of service

7    which we have not done at all.  There have been addresses now

8    that the world knows about where certain clients live and where

9    they reside which has been highly offensive and unnecessary.

10        THE COURT:  So let's actually now drill down a little

11    bit more on categories.  It may be a burden on the parties to

12    protect certain PII such as addresses, medical information,

13    email addresses, telephone numbers that are really of marginal

14    value — no value — to an attorney consulting with their client

15    as to how to defend or prosecute the case.

16        There are other specific categories that were

17    mentioned by the other side such -- beyond the physical health

18    information, but that included security measures, trade

19    secrets, business plans.  Maybe you can address yourself to the

20    specific things that the other side said, you know, presents

21    particular concerns for them and why those concerns are not

22    appropriate ones for an AEO category.

23        MR. FREEDMAN:  Your Honor, no one is interested in

24    what somebody's security is doing.  It hasn't even been the

25    suggestion of anyone that what is a security guard or a

P36VLIVO

1    security person.  It's not even remotely relevant to the case

2    at all what someone's security is doing.  It is a complete ruse

3    and not relevant at all to the proceeding.  So I don't know why

4    that even comes up at all and why that's even a concern.

5          With respect to Ms. Lively's medical records and

6    psychological records based on her own damage allegations,

7    there's a process in the model order that says meet and confer.

8    We would fully intend to agree that that should be something

9    that should be designated as highly confidential.  It's

10   something that should not be disclosed.  We have no intention

11   in disclosing that.  We have no intention in violating the

12   Court's order.

13         But the point is, is something going to be ordered

14   that's so restrictive that's not even -- it's so premature for

15   this, it's not even something that's at issue in the case

16   itself yet, it's not even something that's relevant to the case

17   itself yet, and it's guesswork on whether something is going to

18   come up or not.

19         There's a procedure in here to meet and confer.  No

20   one is disclosing anything to the public or anything like that.

21   And we can meet and confer.  And if there's a disagreement as

22   to something that should be AEO, we can present it to your

23   Honor.  But it's highly unusual to have a blanket AEO provision

24   and us not being able to utilize that with our clients and to

25   gain information from our clients if it's relevant to the case

P36VLIVO

1    itself.

2          And certainly if there's an objection and they want to

3    meet and confer about something and want to try to designate it

4    with some sort of higher standard, we'd be happy to meet with

5    them before sharing that information with our clients.  We'd be

6    happy to give them the opportunity, like the model protective

7    order allows, and allow them to go to court and ask for higher

8    protection, if we object.  The likelihood is most of these

9    things we won't object to likely.  But they are not even at

10    issue yet.

11          The idea that we would care what Mr. Reynolds' or what

12    Ms. Lively's security people are up to in terms of how they are

13    being protected or otherwise is clearly nonsense.  The only

14    people that have been mentioned, frankly, third parties in this

15    case, is an executive — I won't repeat her name — from Sony

16    whose name is mentioned three times in Ms. Lively's complaint.

17    And we have gone to great lengths to not mention third parties

18    by names and things like that.  I think it's completely

19    unnecessary.

20          I think the model order completely protects everyone.

21    And certainly if we're meeting and conferring and there's a

22    disagreement, they can go to the Court, like the model order

23    provides, and ask the Court for greater protection.  And we can

24    discuss it before it's disclosed to clients.  We can give them

25    that right.

P36VLIVO

```
 1              THE COURT:  How does that work?  They produce it to
 2    you.  And there's a pause before you present it to your client,
 3    for them to press the claim that it's AEO, is that what you're
 4    saying, Mr. Freedman?
 5              MR. FREEDMAN:  No, I'm saying when they produce it to
 6    us, that they say, Hey, we want greater protection on this
 7    particular document.  Please don't share that with your client,
 8    which we would agree to.  We would meet and confer.
 9              If we met and confer and agreed on that, then there's
10    not an issue.  If we met and confer and didn't agree, we would
11    still be holding on to it, not sharing it with our client,
12    until they had an opportunity for your Honor to make that
13    decision.  There's no harm whatsoever under the model order in
14    that.
15              THE COURT:  Isn't that actually exactly what the
16    attorneys' eyes only provision does?  The only difference
17    between what you're saying and what the attorneys' eyes only
18    provision does is it gives a little bit of definition to
19    attorneys' eyes only.  And it means that you're not just
20    promising them that you're not going to disclose the
21    information to your clients, you're bound by a court order.
22              I mean, it's easy enough to write into this protective
23    order that if there is not a meet-and-confer within a certain
24    period of time after production, then the information will not
25    be deemed to be attorneys' eyes only, provisions like that that
```

P36VLIVO

1    puts a little bit of process around it.

2              MR. FREEDMAN:  The difference -- I'm sorry to

3    interrupt, your Honor.

4              THE COURT:  Go ahead.

5              MR. FREEDMAN:  The difference is the burden and who is

6    the one running to court.  Under the model protective order,

7    they are entitled to go to your Honor and ask for greater

8    protections.  The model protective order is no different for

9    this case than it should be for any other case.  And the

10   difference is the burden, the burden of who has to run to court

11   to be able to either try to undo something that they deem to be

12   an attorneys' eyes only provision or whether it's their

13   obligation to go to court and seek greater protection if they

14   can't agree on it.  And that's the difference.

15             We shouldn't have to run to court every time that

16   something is given greater protection that is not something

17   that should be attorneys' eyes only.  We shouldn't be put in a

18   position where we are the ones who have to run into court every

19   single time and say, No, this shouldn't be blanketly just given

20   attorneys'-eyes-only protection.  It should be their burden,

21   because this is what they want to designate to go into court

22   and get greater protection.  There shouldn't be a presumption

23   that they're entitled to that greater protection.  And there's

24   no harm, there's no damage.  There's a process to meet and

25   confer, and there's a process to go in and see your Honor,

P36VLIVO

```
 1   which is what the model protective order provides.  The burden

 2   shouldn't be on us to do that, it should be on the party

 3   seeking attorneys'-eyes-only protection.

 4               THE COURT:  Anything else from you, Mr. Freedman?

 5               MR. FREEDMAN:  Yes, your Honor.

 6               THE COURT:  Mr. Freedman, you're now on mute, so I

 7   don't hear you either.

 8               MR. FREEDMAN:  Am I still on mute?

 9               THE COURT:  No, you're not on mute anymore.

10               MR. FREEDMAN:  Terrific.  Sorry about that.  I

11   apologize.

12               The proposed protective order in paragraph 16.

13               THE COURT:  Okay.  Give me a second to go there.

14               Yes.

15               MR. FREEDMAN:  It basically says you cannot transmit

16   any confidential information over the internet or use in

17   communications that flow through the internet, including, but

18   not limited to, via text message, Snapchat, Instagram, TikTok,

19   Reddit, YouTube, or any other online or social media platform.

20               That provision is so overbroad, your Honor, that it

21   would prevent me from sending an email to my own colleague

22   about anything that would be considered to be confidential

23   discovery material, because you have to use an internet

24   platform system to use email.  It's so hopelessly overbroad and

25   unnecessary, that that's why, first of all, it's not in the
```

P36VLIVO

```
 1    model order; second of all, it's not even usable in the form
 2    that it talks about.
 3            THE COURT:  I'm going to hear from the other side with
 4    respect to that.
 5            MS. GOVERNSKI:  Do you want to hear it now, your
 6    Honor?
 7            THE COURT:  No, I'll let Mr. Freedman finish.
 8            Is there anything else, Mr. Freedman?
 9            MR. FREEDMAN:  I'll just close by saying that, your
10    Honor, I don't think that because this case is so different
11    than any other case, that what it requires is that persons of
12    celebrity switch the burden, and the burden has to be on the
13    other side to run to court when they object.
14            The model protective order fully protects everything
15    we've heard about today, and it fully has a mechanism in it
16    which we agree with which allows the other side to go to court
17    if they seek greater protection on certain issues.  And I have
18    no doubt that we'll be reasonable in being able to meet and
19    confer, and hopefully being able to work something out on a
20    meet-and-confer.
21            My concern is what's going to happen is things are
22    going to be stamped by one of these many parties as attorneys'
23    eyes only, and we'll be seeing -- and we enjoy seeing your
24    Honor, but I think you'll see maybe too much of us and possibly
25    get a little tired of us under this scenario, the way that it's
```

P36VLIVO

1    proposed in the modified order.

2              THE COURT:  Is there anybody else who wishes to be

3    heard in opposition to the protective order with the attorneys'

4    eyes only provision?

5              Okay.  Now let me hear from the proponents of it.

6              Ms. McCawley, did you wish to -- or Ms. Governski?

7              MS. McCAWLEY:  This is Sigrid McCawley.  I'm happen to

8    address it briefly and then turn it over to Ms. Governski.

9              Just to have this resonate with the Court, your Honor,

10   Mr. Freedman made the argument for us.  This is exactly why we

11   need an AEO.

12             While he used disparaging language about my client's

13   business, certainly her trade secrets and her business

14   information is entitled to protection.  She was dragged into

15   this court inappropriately and she should not have to give over

16   competitive information.

17             So let's just talk about that a little bit --

18             THE COURT:  It will be for me to determine whether she

19   was brought into this case inappropriately.  Go ahead.

20             MS. McCAWLEY:  Understood, your Honor.

21             But the point that Mr. Freedman made was he was not so

22   interested in this material.  If that's the case, then he has

23   no argument against the AEO designation.  It allows the parties

24   to have that designation, protect their sensitive commercial

25   business information.  And if there is something in that that

P36VLIVO

```
1    he believes he needs to share with his client, there's a

2    meet-and-confer process.  And then if it can't get resolved, it

3    goes to the Court.  But that's a much smaller universe of what

4    ultimately goes to the Court.  Rather, with the protective

5    order as it is now, all of that -- we'd have to go to the Court

6    before any of that could be disclosed.

7            So Mr. Freedman made the points for us, your Honor.

8    This is exactly why --

9            THE COURT:  So why aren't your concerns entirely

10   satisfied by a draft of this that creates and permits you to

11   designate something as presumptively attorneys' eyes only or

12   claim of attorneys' eyes only, but then requires you to

13   establish to my satisfaction, if there's a dispute over it,

14   that it is the type of information where there is an

15   incremental risk with disclosure to Mr. Freedman's clients that

16   would be unacceptable?

17           MS. McCAWLEY:  It's a very fair point, your Honor.

18   And if that's the only stumbling block with respect to why

19   Mr. Freedman is objectionable to this, because he doesn't want

20   to have to be the one moving in court, I think that's something

21   that the Court can handle.  Certainly the point is to be able

22   to protect this information.

23           So I've seen protective orders where there's a period

24   of time after which the dispute is that then the party who

25   wants to protect that information has to move to protect that
```

P36VLIVO

1    information.   The procedure by which this happens is not the

2    concern I have.   The concern I have is that information of this

3    nature can be protected at the outset, and it is not disclosed

4    to the competitive clients until such time that the Court deems

5    that would be necessary.

6            THE COURT:   Well, so maybe though you should address

7    Mr. Freedman's point that the clients' PR agencies are

8    well-known to the people in the industry and are known to

9    competitors.   It's not a case like the *Allstate* case, where

10   there's virtually an unlimited list of clients.   The people who

11   will be a public interest is the limited group of people who

12   are stars, right, or budding stars.   And *Entertainment Weekly*

13   knows who they are, *The Hollywood Reporter* knows who they are.

14   And they also know who the agents are because those are the

15   people who call them up, that's what even the complaint here

16   establishes.

17           MS. McCAWLEY:   Of course, your Honor, and that's not

18   our argument.   Our argument is within the context of the work

19   that they are doing, there are clients that are not yet

20   disclosed; there's clients that they are actively seeking to

21   engage with.   They don't want to turn that information over to

22   their competitor.   There is, as we said, marketing plans,

23   business strategy, discussions of nonpublic leads and other

24   things that they are going after.   All of these are trade

25   secrets of our client.   All of this is information they should

P36VLIVO

1    be entitled to protect and not disclose.  Now, we're not saying

2    the lawyers can't see it, we're saying their competitor cannot

3    see this.

4        THE COURT:  So I take it, Ms. McCawley, from your

5    argument that documents such as the marketing plans with

6    respect to *It Ends With Us* would not be considered to be

7    attorneys' eyes only; that's highly pertinent information to

8    this case.  Some, if not all of it, is information that the

9    parties would have been privy to and it's already dated.  The

10   movie is out.

11       MS. McCAWLEY:  Correct, your Honor.  We are talking

12   about a limited scope of information.

13       THE COURT:  So you're not talking about the marketing

14   plans for *It Ends With Us*.

15       MS. McCAWLEY:  Correct.

16       I'm talking about my client's other marketing plans

17   for other customers that she is dealing with that could cross

18   over in the broad scope of what the discovery requests in this

19   case would be.

20       And just to take issue with what Mr. Freedman said

21   about arguing about this now, it's absolutely 100 percent

22   commonplace, as you know in commercial litigation, to up front

23   define and set forth a protective order so that the parties can

24   cohesively go forward with discovery.  So this is an

25   appropriate conversation to be having now, even though we have

P36VLIVO

1    not yet received discovery requests.  We know that the scope of

2    what some of -- already been requested in the case itself

3    encompasses this type of information.  And because we want to

4    ensure that we're able to protect our clients' information and

5    not just take Mr. Freedman's word for it that he would hold it

6    in good faith for some period of time, we really need this AEO

7    designation.

8              And, Judge, this is not far off from cases where this

9    happens all the time.  I mean, AEO, while it's not in the model

10   protective order, is not unusual when you're in a case with

11   business competitors where that information needs to be

12   protected.

13             So we would ask, your Honor, to entertain this.  If

14   for some reason the Court feels that it is not being utilized

15   in the appropriate way, the first time we're in front of you,

16   you're able to address that with the parties.  So I think that

17   this gives us the necessary protection to allow the parties to

18   proceed appropriately with discovery in a logical manner

19   without having to burden the Court.  And if for some reason it

20   doesn't feel to the Court that it is being utilized in an

21   appropriate way, the Court can address that with us and we can

22   change that at that time if it's necessary.  But I believe that

23   this is the only way to protect that competitive and highly

24   sensitive information at the outset of discovery.

25             And I appreciate the Court's time today.

P36VLIVO

1              THE COURT:  Thank you, Ms. McCawley.

2              Ms. Governski, do you wish to be heard?

3              MS. GOVERNSKI:  Yes, your Honor.  I have eight very

4    discrete points.  I'll start with the low-hanging fruit.

5              As far as paragraph 16, I think we can all agree that

6    the intent of this provision is not to prevent the emailing

7    internally, it's to prevent the publication of any confidential

8    discovery information on the internet.  So we would be happy to

9    propose modified language or, better yet, we'd be happy for

10   Mr. Freedman to provide modified language to us.  He never

11   objected to this or provided any suggestion that there was an

12   issue or alternative language during the conferral.  So we'd be

13   happy to consider alternative language.

14             With respect to his accusation about publicizing his

15   clients' addresses, my understanding is those addresses were

16   pulled from publicly available sources, and so they were

17   already in the public domain.  But separate and perhaps more

18   importantly, Mr. Freedman or no one from his team ever informed

19   us about improper disclosure.  Of course, if they had, we would

20   have properly addressed it and considered the points.

21             Point three.  Mr. Freedman made some reference about

22   his attempt to limit the number of third parties.  Again, I am

23   restrained by their own use of the confidential designation on

24   their (indiscernible).  But I will represent that there are

25   dozens and dozens of third parties specifically named and

P36VLIVO

|1| identified even in -- I'll stop there.  Specifically named.  So

|2| he knows full well that there will be many third-party privacy

|3| interests implicated in his own requests.

|4|     Number four.  You know, I think that there is a false

|5| assumption here that is predicating all of Mr. Freedman's

|6| arguments.  He is assuming that Ms. Lively and Mr. Reynolds and

|7| Ms. Sloane and Vision PR will be the only people availing

|8| themselves of the AEO designation.  This does not pose a burden

|9| uniquely on him.  He said many times we would have to go to the

|10| Court or it's burden-shifting to us.

|11|     They would be available -- they would be availing

|12| themselves of the AEO provision, just as they already have

|13| availed themselves of the confidential provision before a PO is

|14| even in place.  And not to mention, there are third parties.

|15| They are just assuming that every third party who designates

|16| AEO will be someone who they are contrary to.  It may be, in

|17| fact, that we have issues with third parties over a designation

|18| or use of AEO provision.  So the process that's contemplated

|19| here is not placing an unfair burden on him, it's the exact

|20| same burden as to every individual.

|21|     THE COURT:  Ms. Governski, you're not making the

|22| argument to me that there shouldn't be an AEO category because

|23| you want to share the information with your clients, are you?

|24|     MS. GOVERNSKI:  No.

|25|     THE COURT:  Go ahead.

P36VLIVO

1            MS. GOVERNSKI:  No, I'm sorry, I'm not making that

2    suggestion.  What I'm saying is that he was arguing that this

3    having to come to the Court to de-designate places a different

4    burden than the one established in the PO, as if it would be

5    uniquely placed on him.  I don't think that that's a unique

6    burden for him.  Everybody party will have that when they

7    disagree with an AEO designation.

8            I also think Mr. Freedman made our point for us and

9    it's difficult to understand why we're here.  One, he's

10   attempting to create a whole new process for, as your Honor

11   knows, is essentially the AEO process.  So rather than have to

12   take their words for it or give them the benefit of the doubt

13   or trust them, it should just be memorialized the way we

14   propose.

15           And related to that, he agrees that the medical record

16   would be AEO, that security would be AEO.  So he here has

17   admitted that there shouldn't really be a dispute over the text

18   of categories we've been discussing today.

19           My next point --

20           THE COURT:  So, Ms. Governski, I take it that you

21   would not -- it would satisfy your concerns for there to be a

22   protective order in place that has a category that is a claim

23   of AEO, but that if you don't come to the Court within a

24   certain period of time and you don't justify why there is an

25   incremental unacceptable harm in disclosure to the -- to the

P36VLIVO

```
 1   parties themselves, would lose that claim of AEO.  Am I
 2   correct?  That would satisfy your concerns?
 3            MS. GOVERNSKI:  No, I don't think that that would
 4   satisfy my concerns, your Honor.  First of all, I've never --
 5   most of the cases, respectfully, that I've done set it up this
 6   way, where you can -- right, designated as AEO, meet and
 7   confer.  If they want to de-designate it, they can de-designate
 8   it.  That is the typical process that I -- that is common in my
 9   practice.
10            I fear that doing it this new way, especially on the
11   fly without actually seeing the language or how it would work,
12   because, again, we were never proposed with this option during
13   the conferral process, I fear that this will just create the
14   same challenges and problems we had with what was in the model
15   protective order, which is it would make us have to come over
16   and over to the Court in a piecemeal ad hoc way, as opposed to
17   at a point when de-designation makes sense.  And I would --
18            THE COURT:  What it does do is it protects against the
19   promiscuous use of an AEO category; requires you to really
20   think about it and to think about it after a meet-and-confer.
21            MS. GOVERNSKI:  But I think it places a really unfair
22   disproportionate burden on third parties, I really do.  I think
23   with the type of materials and individuals we're dealing with,
24   they should be entitled -- they are third parties here.  The
25   rules try to prohibit the additional burdens on third parties.
```

P36VLIVO

1    The burden should be on the parties, if they want to

2    de-designate third-party materials, to go to the Court and not

3    make the dozens and dozens of third parties who are going to be

4    implicated here run to the Court.  I've never seen something

5    like that and it doesn't feel consistent with the idea of

6    reducing burden to third parties.

7          I want to be mindful of the time, so I'm trying to be

8    very quick.

9          Mr. Freedman said that security is "not even remotely

10    relevant."  Well, if that's his position, then he should

11    withdraw the third-party subpoena he served on a third-party

12    security firm that asks for all documents and communications

13    concerning Lively and Reynolds, and to Lively and Reynolds.

14    This is a firm hired for their personal security; and so it's

15    difficult for me to understand how we can be claiming that this

16    is a fictitious concern and consistent with the third-party

17    subpoena that they have served.

18          Two more very quick points.

19          One is, in their opposition -- it really wasn't an

20    opposition, it was criticizing, casting aspersions, which I

21    won't go into.  And then it was a single paragraph that

22    amounted to claiming that Ms. Lively had no privacy interest

23    because she has chosen to defend herself and speak out against

24    claims of sexual harassment.

25          I respectfully suggest, your Honor, that we are

P36VLIVO

1    dubious of his claim that "no doubt we will be reasonable," if

2    their starting position is that a woman who speaks out against

3    sexual harassment is entitled to no (indiscernible).

4          THE COURT:  I'm going to assume that everybody is

5    going to be reasonable in this case.

6          MS. GOVERNSKI:  We would hope so, your Honor.

7          Finally --

8          THE COURT:  It's my assumption for you, as well as for

9    Mr. Freedman.  Go ahead.

10          MS. GOVERNSKI:  Well, I can commit to that, your

11    Honor.

12          And finally, my last point is Mr. Freedman started his

13    argument with saying that we are asking to be treated

14    differently.  And he multiple times — I counted at least twice

15    — he said that AEO provisions are highly unusual.

16          Well, I would suggest to your Honor that they are not

17    highly unusual; a significant number of cases include them.

18    And I would note, your Honor, that Mr. Freedman himself has

19    used an AEO designation in his defense of Mr. Tarantino in a

20    case in California where they included an AEO provision

21    specifically for any information that there is a good cause or

22    a compelling reason why it should not be part of the public

23    record of this case.  Or, I'm sorry, that it's disclosure which

24    to another party or nonparty would create significant risk of

25    serious harms that could not be avoided by less restrictive

P36VLIVO

1    means.  So we would proffer that not only is this not unusual

2    in many cases, it appears not to be unusual to Mr. Freedman

3    either.

4            THE COURT:  Read that language to me again.

5    Significant risk.

6            MS. GOVERNSKI:  He said -- let me pull up the exact

7    language here to read to you.

8            Highly confidential, attorney eyes only, extremely

9    sensitive confidential information or items, disclosure of

10   which to another party or nonparty would create substantial

11   risk of serious harm that could not be avoided by less

12   restrictive means.  This was the *Miramax v. Tarantino* case in

13   the Central District of California, 21-CV-08979.

14           I'm happy to answer more questions, otherwise I'll

15   cede.

16           THE COURT:  Anybody else wish to be heard on either

17   side?  Just identify yourself and speak, otherwise the Court

18   will take this under submission.

19           MR. FREEDMAN:  Yes, your Honor, briefly.

20           Mr. Freedman.

21           THE COURT:  Okay.

22           MR. FREEDMAN:  Just to quickly address the *Tarantino*

23   matter.  The *Tarantino* matter involved actual trade secrets.

24   It involved actual screenplay pages from *Pulp Fiction*.  And it

25   was a highly -- very different situation.

P36VLIVO

```
 1              And as the Court knows, these matters of
 2     attorneys'-eyes-only provisions are typical, but they are
 3     typical in trade secret cases, not cases like these.
 4              And I think it's important that the Court understand
 5     that this is a case where no one has any intention of beating
 6     up or repeating or somehow harming Ms. Lively in any way as to
 7     her allegations.  In fact, she filed 138-page amended complaint
 8     with nearly 500 paragraphs where she detailed the sexual
 9     harassment claims and put that out there.  This is a case
10     about -- and quite frankly, we've seen a lot of these, where my
11     clients have been adjudicated as guilty right when the case was
12     filed.  And my clients have a right to defend themselves.  They
13     have a right to tell the truth.  They have a right to
14     transparency.  That is not in any way abusing the victim, your
15     Honor.
16              All we're trying to do in this particular case is
17     agree to the model protective order which we think completely
18     protects the parties and it places the burden on the party
19     who's going to designate something as attorneys' eyes only or
20     it wants greater protection.  It forces them to go to court.
21     And it's a way of stopping what's going to inevitably happen in
22     this case, where everything is going to be stamped as
23     attorneys' eyes only.  And the burden should be on that party
24     that takes that kind of extreme position for whatever reason
25     they do.
```

P36VLIVO

 1              And frankly, we think the model protective order is

 2      pretty good.  I mean, it's actually a really well-thought-out,

 3      well-protected document.

 4              Thank you very much for your time.

 5              THE COURT:  Thank you, Mr. Freedman.

 6              I do think that the model was well thought out.  The

 7      question of whether it's appropriate for this case is something

 8      that I'll take under submission and I'll give you my views

 9      soon.

10              I will end with an observation that I made during the

11      course of this proceeding just so that there's no

12      misunderstanding.  The reason why we're talking about

13      protective orders now is that we are in the discovery phase.

14      And in *Seattle Times v. Rinehart*, the Supreme Court made it

15      quite clear that courts are encouraged to use protective orders

16      to facilitate the provision of information from one side to

17      another, which in the discovery phase of a case is intended to

18      be a private exercise; it doesn't take place in open court

19      itself.

20              This is a case as to which there has been a lot of

21      public attention.  And there should be no confusion that with

22      respect to anything that's filed in court or that takes place

23      in court, there is a presumption of public access.  The Second

24      Circuit has been quite vehement about that, has been quite

25      strong about that, and the Court is strong about that in terms

P36VLIVO

1   of protecting the rights of the public to know how the court is

2   being used.  So you all are on notice of that.  And whatever I

3   decide with respect to the protective order will not affect the

4   way in which documents are used in court proceedings.  There

5   will have to be a separate application with respect to that.

6           That concludes the proceeding.  I'll take it under

7   submission.

8           Thank you all for excellent presentations.

9                          *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25