**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>    Plaintiff,<br><br>-v-<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,<br><br>    Defendants. | Case No. 1:24-cv-10049-LJL<br>(consolidated with 1:25-cv-00449-LJL) |

**MEMORANDUM OF LAW IN SUPPORT OF OMNIBUS MOTIONS FOR RELIEF**

## SUMMARY OF CORE ARGUMENT

1. Your Honor, basically it comes down to this. I have been watching this case closely and I have observed an abundance of irregularities that have led me to certain beliefs about this case. I am open to challenge to rebut these presumptions. However, I believe there is a scheme running through this case like a vein of sulfur through a volcano. This case in my opinion, originally involved a troubled young woman with certain narcissistic tendencies, who developed a delusion, a persecution complex, which has clouded her mind.

2. This woman actually does believe that people failing to see her artistic and creative potential enough to prevent her from inserting herself into their own creative works, is wrong. She feels bad enough when this happens that she thinks it is akin to how victims of sexual harassment must feel. She further believes that it is wrong that society has not provided means of legal recourse for having her creativity squelched. Ergo she has chosen to falsely allege sexual harassment and retaliation, justifying it with her feelings of failed recognition.

3.  Again, despite being functioning, she is troubled. But she has money. And that's where the scheme comes in. She found lawyers. Instead of being on their client's side, and helping her to come to the appropriate conclusion, that she already got everything she wanted, and her claims are not actionable; these, what in my humble opinion appear to be, unscrupulous lawyers, chose to use her delusion to keep the spigot of money running, racking up the billable hours, while assuring the client not to worry because they will get the fees shifted, and make the defendant pay her back in triplicate.

4.  As part of this scheme to keep the money coming in, I believe they have chosen to engineer the situation to indulge their client's unreasoned beliefs and fuel her desire for vengeance. They were well aware that their client would perceive any backlash as unjustified persecution, so her lawyers have gone out of their way to make outrageous legal maneuvers targeting outspoken people with oppressive legal gambits. They also allow her to go out and carry out her own optically damaging behaviours. When the inevitable wave of backlash crashes in, they turn to their client and say "Look, they're at it again. They are all against you…Give us the go-ahead to make them pay" and Ms. Lively obliges by opening the money spigot even further.

5.  *Why* does this matter in regards to this motion? Because in executing this scheme of indulgence for financial gain, these lawyers have engaged in reprobatic actions, throwing a hundred or so non-parties and indeed this Court itself, under the bus. They've targeted us with oppressive and pointless subpoenas forcing some of us to pay thousands of dollars, and others of us to waste hundreds of hours researching case law, through painful, gut-wrenching sleepless nights of worry.

6.  They've also unleashed a gargantuan mountain of frivolous, duplicative, oppressive, and sometimes just plain goofy, legal filings and motions. Multiple volleys of expensive motions for sanctions, motions to compel that were plainly unnecessary, motions to change venue, when venue did not matter.

7.  Ms. Lively's lawyers have lied to the Defendants, the Court, and even their client, the Plaintiff, see Exhibit B.

8.  I know that this Omnibus will make things worse for Blake, and add some clutter to this mess, temporarily. But I, and we, are not her lawyer, and the court should recognize that we are people too, and we have rights. Some of us are women who are even less advantaged than Blake Lively is. Some even look as

aesthetically pleasing as Blake Lively does. Just because the Plaintiff may remind us all of Princess Peach, does not suddenly mean that her air of royal authority has a place in this justice system.

## ARGUMENTS REGARDING MOTIONS ONE AND TWO FOR DECLARATORY JUDGMENT

9. The Court has broad discretion under 28 U.S. Code § 2201 to declare the rights and other legal relations of any interested parties, by way of a Declaratory Judgment. I seek such declarations, as it pertains to this case. I request of the Court that the individual Right of Free Speech and Right Of Free Association and Assembly as described in the First Amendment of the Constitution of The United States of America be conferred on these people, as a group, some of whom Ms. Lively and her counsel have targeted with subpoenas. Namely that group of people who have professed a skepticism of Ms. Lively's claims and her tactics, suspecting her and her attorneys of manipulation for ulterior motives. As a subset of this large swath of people, those who act anonymously to speak on the issues of this case are worthy of collective protection as well. As such we request further, a judgment to that effect as well.

10. There is precedent; a sound legal basis for this approach. The NAACP won a landmark Supreme Court Case in 1958 in this regard. A legal framework for group rights was created to protect the rights of a number of people where the whole group was collectively being unfairly targeted based on their shared interest in a common set of beliefs. Below is a quotation from the case cited as NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958), which reads:

11. "action which, although not directly suppressing association, nevertheless carries this consequence, can be justified only upon some overriding valid interest" "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by **group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly.** *De Jonge v. Oregon,* 299 U. S. 353, 299 U. S. 364; *Thomas v. Collins,* 323 U. S. 516, 323 U. S. 530. It is beyond debate that **freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of** the **"liberty"** assured by the Due Process Clause

of the Fourteenth Amendment, which embraces freedom of speech. *See Gitlow v. New York,* 268 U. S. 652, 268 U. S. 666; *Palko v. Connecticut,* 302 U. S. 319, 302 U. S. 324; *Cantwell v. Connecticut,* 310 U. S. 296, 310 U. S. 303;*Staub v. City of Baxley,* 355 U. S. 313, 355 U. S. 321. Of course, **it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."**

12. My intended purpose of seeking these Declaratory Judgments is for there to be a legal means to redress grievances in this court for the collective as a whole even where individual members have not yet been, or no longer are, individually under legal compulsion. The members continue to bear the negative effects of the chilling of their rights, and the advancement of the dialogue they once enjoyed, even if they personally aren't named at this time. Joinder of rights would facilitate members of the collective who had previously been subpoenaed to request relief from the Court despite being individually dropped from the requests. That the alleged ongoing harm to the collective as a whole justifies our right to seek sanctions or compensation, or fees, or protective orders, and non-exhaustive sundry. We did not arrive as a group, but Ms. Lively opened our eyes to the existence of our common beliefs, and we will fight to express them, free from vindictive and inappropriate oppression. Further evidence of the existence of an association in this regard can be found in Exhibit A

## SECTION A: MS. LIVELY CANNOT MAKE A PRIMA FACIE CASE FOR RETALIATION

## PART I: THE PLAINTIFF HERSELF LACKS ANY FACTS IN SUPPORT OF THE CLAIM

1. In her hourslong deposition, the Plaintiff admitted she personally had no reasonable basis in fact to sustain a claim of retaliation. Such admissions took

place in at least two exchanges that we know of. First, in docket number 596-1 we find an unsealed excerpt from Ms. Lively being deposed by Bryan Freedman. On page 202 (Page 4 of excerpt) lines 20-23 we find the following exchange.

> "Q [Attorney Freedman] What about the defendants, what did they do that's part of the ongoing smear campaign?
> A [Deponent Lively] Like I said, outside of conversations with my attorney, I'm unable to answer that."

2. Furthermore, in docket 649-3 we find another unsealed excerpt from Ms. Lively's deposition in which she is being deposed by Charles Babcock. On page 251 (Page 14 of excerpt) lines 16-25, we find the following exchange:

> "Q [Attorney Babcock] Is there anything you've seen in writing that you believe that Mr. Wallace has authored that is defamatory, disparaging or says mean things about you?
> A [Deponent Lively] That's happening currently?
> Q [Attorney Babcock] Well, let's start with currently, sure.
> A [Deponent Lively] Currently, I don't read news about me or go on social media about me. So personally, I don't have knowledge, no.

3. And lastly, at Idem, page 252(Page 15 of excerpt) from lines 1-22, Mr. Babcock finishes this line of questioning:

> "Q [Attorney Babcock] ~~ And going backward in time, can you identify any written thing that you believe Mr. Wallace published about you that is defamatory, disparaging, in anyway offending to you?
> A [Deponent Lively] A specific article or – no, I don't know a specific – I don't know a specific article.
> Q [Attorney Babcock] Okay. And it could be a post, anything in writing that you can look at it like I'm looking at this screen and reading.
>     And you're not aware of anything that he's authored that you can actually see whether it's a post, an article, or a video or something like that, correct?
> A [Deponent Lively] I can't cite a specific article. I – my understanding from the documents I received is that he was a

part of this campaign which contained a lot of content. But to name one specific article, if that's what you're asking, no.

4. It is clear that Ms. Lively had no specific independent facts of her own to allege the retaliation that she has claimed. We don't have a Justice System that is built to indulge every person's feeling that they may have been harmed by someone else. We have a Justice System where a person develops specific facts of their own that indicate (an) action(s) of (an)other(s), harm to themselves, and a causal link between the two. At that point the person hires lawyers to file a claim based on those facts.

5. The discovery process is only meant to flesh out the particulars and details of the case from the core facts. A fishing expedition is an abuse of the process, because even where the process isn't all that burdensome, it becomes undue where the case as developed isn't worthy of the burden.

6. All the moreso when it actually is burdensome. Where it risks trampling people's rights, and where people are forced to choose between saving thousands of dollars in legal fees, or giving up their private financial data to a stranger.

## PART II: FIRST AMENDMENT TRANSGRESSIONS

***This part is quoted verbatim from sections of an earlier motion dkt #462 as written by the non-party prior to his becoming a non-party, or prior to his knowledge of this status***

1. The vast majority of Ms. Lively's claims of harm revolve around her allegations that Mr. Baldoni, through his agents, propagated truthful yet negative information about Ms. Lively which damaged her reputation. As well, that this propagation was allegedly motivated by an intention to unlawfully retaliate against her for her protected activities. In essence, that Mr. Baldoni engaged in speech and expression that violated State and Federal statutes against retaliation, namely California's FEHA, and The Federal Title VII.

2. More Specifically, her claims, set out in Lively v. Wayfarer Studios LLC (1:24-cv-10049) Docket No. 84 ¶ 224-293, are Summarized in Idem ¶ 230 as inclusive of: *"seeding of content on traditional and social media platforms, the boosting of content (sometimes the very content that TAG and its affiliates had seeded), the suppressing of negative content about Mr. Baldoni, and the*

6

*amplifying of negative content about Ms. Lively (including through engagement via comments on social media)."*

3.  Though Lively and her counsel do not detail specifics of what this involves, we can presume that it involves:
    A.  Writing out prosaic articles and snippets of opinions accompanied by factual information to substantiate them and posting these written words into social media entries.
    B.  Having one or more agents of Mr. Baldoni express Mr. Baldoni's positive opinion of these posts by liking the post, engaging the site's algorithm to increase the post's exposure across the network, otherwise known as boosting
    C.  Having one or more agents of Mr. Baldoni express Mr. Baldoni's negative opinion of posts that are critical of Mr. Baldoni by disliking the post or commenting negatively using certain words that are flagged by internal programs, thus engaging the site's algorithm to decrease the post's exposure across the network, otherwise described as suppressing.
    D.  Having one or more agents of Mr. Baldoni find negative posts critical of Ms. Lively written by other users, and then expressing Mr. Baldoni's positive opinion of these posts by liking the post, engaging the site's algorithm to increase the posts exposure across the network, otherwise known as amplifying.

4.  Ms. Lively has not alleged that any of what she calls "social manipulation", that allegedly occurred during the summer of 2024 as a result of Mr. Baldoni's hiring of Crisis PR managers, amounted to defamation. Her claims are that they are wrong solely on the basis that they are pleaded to have been retaliatory. That truthful information damaged her.

5.  Yes, it must be acknowledged that a claim of defamation, where statements that Mr. Freedman has made are concerned, has been added to the amended claim of Ms. Lively. However, it is very unlikely she could prevail on such, as Mr. Freedman has qualified privilege, and there is no evidence he disbelieves his client. The closest thing Ms. Lively has plead towards proving knowledge of falsity is a statement Justin made to Melissa Nathan regarding Ms. Lively at Idem ¶ 301: *"I just know her personality and this is the kind of person that genuinely believes she's right and that all of this is unjust."*

6.  However even this statement is not dispositive of any such knowledge on Mr. Freedman's part. History is rife with examples of deceptive people who believed

they were right despite their lies. Both Presidents Richard Nixon and Bill Clinton spring to mind. During their respective scandals, each genuinely believed they were right, and justified in their expressions, even where they were later found to have lied multiple times. In any case defamation is not adequately claimed.

7. Thus, the legal question before us is whether Ms. Lively has sufficiently plead or can make a showing that truthful information involving her reputation that was already in the public eye, and which are matters of public concern, when expressed by Mr. Baldoni through his agents, constitute legally actionable retaliatory acts

## SELECT FACTUAL INFORMATION AND BACKGROUND AS RELEVANT TO THE MOTION

.

8. **The Allegedly Propagated Facts Ms. Lively Claims Harmed Her, With Plaintiff's Own Sources:**

   A. That Ms. Lively engineers situations in order to take creative control over productions she's involved in. (Dkt. No 84 P 229 Internal reference no. 35 [Several news sources which intimate a creative rift between actress and director, including one from The Hollywood Reporter. They reference competing edits of the film, one sponsored by Lively. Sources state that Ms. Lively and Mr. Baldoni "Lock[ed] Horns" over the creative direction of the film.])

   B. That Ms. Lively and her associates were not promoting the film alongside its Director and that Blake Lively herself had unfollowed her director on social media accounts. (Idem A Deadline article "'It Ends With Us': Justin Baldoni Hires Crisis PR[...]" mentioned that people on tiktok had noticed Ms. Lively no longer followed her director on instagram *"rumors began to swirl, particularly among fans on TikTok, that there was a big fight between Baldoni and Lively. Fans pointed to myriad examples, read the duo didn't take photos together at the Aug. 6 NYC premiere; Baldoni arrived very early and Lively later. Some observed that Lively doesn't follow Baldoni on social."*)

   C. That Ms. Lively, during the promotional events for the movie, discussed upbeat and banal subjects that were off-color to the seriousness of the film's premise. (Dkt. No 84 P 329 Internal reference no. 85, links to a Daily

Mail article "How Blake Lively keeps getting it wrong: Ryan Reynolds' wife is criticised[…]" which had this to say: *"Blake finally addressed the domestic violence in her new film It Ends With Us this week - after fans slammed her 'tone deaf' and 'shallow' promotion of the drama."*)

D. That Ms. Lively called this movie about domestic violence her "Big Beautiful Summer Movie" and asked her audience to 'wear their florals', as though it were a romance comedy to which women should want their boyfriends to take them. And crucially, failed to discuss the subject of the film(Idem)

E. That Ms. Lively used the promotional events for the film to concurrently promote her personal hair care line and her drink products, some of which are alcoholic and therefore "tonedeaf" to the subject matter of the film which was ending domestic violence. (Dkt. No 84 P 329 Internal reference no. 85 again links to another Daily Mail Article: "Meghan McCain slams 'insensitive' and 'strange' Blake Lively over It Ends With Us controversy: 'I don't understand why she's famous'", DailyMail.com, (Aug. 22, 2024, 11:57):*"Blake,36, has been criticized in recent weeks for marketing her personal projects, including her haircare range and her drinks company, seemingly on the back of a film dealing with domestic violence"*)

F. Ms. Lively also claimed that the absence of her excuse that she was simply following the marketing plan enhanced the damage of claims C and D  (Dkt. No 84 ¶ 329)


9. Factual Demonstration That The Allegedly Disseminated Facts Were True Or Substantially True And Publicly Available, Respectively:

A. Blake's reputation for wrestling for creative control is substantially true. Her own public statements prove this. At the 2022 Forbes Power Women's Summit, Blake Lively herself had this to say: *"When I went in the meetings I would just seem like I'm just there to be the actress and ready to get the gig, I wouldn't reveal that I actually need to have authorship in order to feel fulfilled. So I think that for them sometimes that might have felt like a rug pull because 'you're trying to assert yourself into something that we didn't hire you to do'"* In addition to her public statements, her own evidence proves this happened with the very film at issue. I direct the Court to Dkt. No 84-2, Lively's Contract Rider. In which at points 3, 5, 7, 11, 12, 13, 14, 15, 16, and 17, Blake Lively managed to finagle for herself various

creative rights she did not earn via ownership of the intellectual property. Rights such as final script approval, choice of hiring of dayplayers and body doubles, the right to dictate other actresses' performances of their characters. The right to remove content from the film that had already been shot, and which she herself was not even present for. The right to multiple mediators to handle creative differences. The right to hire her own additional producer. The right to call her own all hands meeting. Ms. Lively's own evidence belies her assertion that she didn't take creative control she otherwise should not have gotten. This truthful information was publicly shared by Ms. Lively herself to all cast and crew, as well she shared it with a third party: Sony, which has no direct affiliation with It Ends With Us Movie, LLC. This was not invasion of privacy.

B. The facts that Blake Lively was not promoting the film alongside her Director, and that she had unfollowed her Director on social media accounts are substantially true as well as publicly available information. Several media outlets covered promotional events where the cast, including Lively, was not seen with Justin. Including the film's New York Premiere and an advance screening at Book Bonanza in Texas. Since these were also public events, it was publicly discernable information. With regard to the fact that Blake had unfollowed her Director, this was readily accessible information. A simple search on Blake's instagram account page is all one needs to do to find out if she is following someone. In addition Ms. Lively's own references to news articles demonstrate that several tiktokers had noticed this fact prior to the alleged "Digital Campaign" period. Not to mention that Blake herself admits to this unfollowing in her own complaint. (Dkt. No. 84 ¶ 186 Internal Reference No. 26 *"In fact, both Ms. Lively and her husband had unfollowed Mr. Baldoni's social media accounts ten months prior."*

C. (C + D) The underlying facts of both items C and D (and further substantiation for Justin's absence from promotions (B)), The discussion of banal and distracting subject matter, as well as the refusal to discuss the serious nature of the film, in the prior subheading can be found quite readily upon a viewing of Blake's very public promotional discussion panel at Book Bonanza 2024 that was also broadcast on YouTube:

  i.   In Part I :
       ([https://www.youtube.com/watch?v=irrDkMc7kcs&ab_channel=VRAIMagazineEntertainment](https://www.youtube.com/watch?v=irrDkMc7kcs&ab_channel=VRAIMagazineEntertainment)) Blake starts off discussing how much she loves the character she plays, and how much the book's author loves her, and happily brings up the prospect of "easter eggs" in the film, How much she loved the Cinnamon Rolls she had during

filming. How the production made simple aesthetical mistakes between the book and the film and how they corrected them using special effects. And she ends part I by calling the film "A Love Story"

    ii.    In Part II :
(https://www.youtube.com/watch?v=bzkmbZXcizA&ab_channel=VRAIMagazineEntertainment) Blake variously laughs about how she's not 19 years old, how the actress playing her younger self looks just like her. She gleefully discusses the wonderful casting choices and her fabulous slippers she wears in the film.

    iii.    I couldn't find part three, but I did find the entire panel discussion on YouTube at
(https://www.youtube.com/watch?v=8P5POKBU7Ys&ab_channel=TheMovieReport.com) Where additional subjects of Blake's criminal actions of stealing the hard drive from the studio which contained the not-yet-authorized cut of the film that Blake edited, and her character's difficult decision of which person she loves. Her character's 'Sophie's choice' between Ryle and Atlas are discussed very casually..

D. It's a giddy fun and flippant interview, until one remembers this is a serious film about the heartbreak of domestic violence. In point of fact neither the word "domestic" nor "violence" can be found to be discussed throughout the entire panel discussion that day.

E. Blake Lively did, as part of the marketing of the film, feature her own booze brand on New York morning television (Fox 5). Everyone had access and it was and is readily available across the country from YouTube:

    i.    (https://www.youtube.com/watch?v=hZsEUgFRqmQ&ab_channel=FOX5NewYork)

F. The fact that Blake Lively was actively involved in creating the marketing plan is both public knowledge and a fact which belies her argument: Deadline Article from August 11th 2024 'It Ends With Us': How Blake Lively Was "A Creative Tour De Force" In Transforming Colleen Hoover Novel Into A Motion Picture Event' which stated *"Lively rolled up her sleeves, not just for rewrites, but also was involved in editing the movie, **all aspects of the pic's marketing**, directing the social media campaign and jumping into all aspects of it"* https://deadline.com/2024/08/it-ends-with-us-blake-lively-1236037203/ Since it was widely known that Blake Lively is the person who created the marketing plan for the film it makes no sense that she should shield herself from the backlash of the elements of her own plan by claiming she

11

was just following orders. In other words, the fact that she was following her own marketing plan means its irrelevance to the allegedly propagated truths is substantially true. Therefore the fact of Blake marketing the film in a tonedeaf manner being allegedly restated by agents of Baldoni is simply balancing out the discussion on the national stage, and would not be deceptive in the least.

## Legal Standard

10. Supreme Court precedent holds that Court Judgments based on statutory law are considered State action, and therefore must conform themselves to constitutionality in order to be valid. New York Times V. Sullivan(1964) :"What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel"

11. Ms. Lively has brought suit under Californian and Federal Civil Statutes against retaliation. Specifically California Government Code Section 12940(h) A/K/A FEHA AND 42 U.S.C. § 2000e-3(a) A/K/A Title VII [of the Civil Rights Act of 1964]

12. Therefore if Ms. Lively desires to have this Court apply these statutes to punish or otherwise curtail truthful yet negative speech concerning her reputation, it is her burden to prove that such application in her case is not violative of the First Amendment or in the alternative, that her evidence exceeds the level of scrutiny that can form a justification to restrict the constitutional right at issue. 303 Creative LLC v. Elenis, 600 U.S. 570 (2023) *"When a law restricts speech based on its content, it is subject to strict scrutiny, meaning the government must demonstrate that the restriction is narrowly tailored to serve a compelling state interest"*

13. What we must ask ourselves is "what level of scrutiny is truthful speech protected by?", and then ask ourselves if the Plaintiff in this case can reasonably expect to surpass that level with the evidence she has so far.

14. Multiple landmark Supreme Court cases have set a very high bar for this:

    A. In Bartnicki v. Vopper, 532 U.S. 514 (2001), the Court upheld free and truthful speech on a matter of public concern even where Criminal Statutes against wiretapping were invoked.

B. In Hustler Magazine, Inc. v. Falwell (1988), the U.S. Supreme Court held that even malicious opinion, widely publicized, was not actionable under tort law. That the intent to cause emotional and other harm was not justification enough to curtail free speech rights.

C. Smith v. Daily Mail Publishing Co., 443 U. S. (1979) *"[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards."* AND *"[If there exists] truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent **a need ... of the highest order."***

D. Butterworth v. Smith, 494 U. S.(1990): *"our decisions establish that **absent exceptional circumstances**, reputational interests alone cannot justify the proscription of truthful speech."*

E. Reed v. Town of Gilbert, 576 U.S. 155 (2015): *"Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why **the First Amendment expressly targets the operation of the laws—i.e., the "abridg[ement] of speech"—rather than merely the motives of those who enacted them."***

15. Additional rulings for the Court's consideration: while the United States Supreme Court has not yet weighed in, social media engagement such as "liking" a post has been categorized by lower Courts as protected free speech. The case of *Bland v. Roberts* (4th Cir. 2013) remains unchallenged.


## SECTION B: ARGUMENTS REGARDING MOTION TO QUASH CERTAIN SUBPOENAS IN THEIR ENTIRETY, AND MODIFY OTHER SUBPOENAS

1. I do believe that these subpoenas are overly broad, unduly burdensome, oppressive and clearly and convincingly brought for an improper purpose. However, in addition to that argument they fail particular legal tests which are persuasive in this circuit. The Dendrite test from New Jersey (*Dendrite International , Inc. v. John Doe No. 3*) and there's *Cohen v. Google 2010* in New York. Both cases endorsed and used legal tests which require at minimum a showing of a Prima Facie case before initiating disclosures that jeopardize the non-party's right to anonymous speech. Regarding Cohen, the New York Law School Review had this to say: "The Cohen court's "meritorious cause of action" standard requires a plaintiff to make a prima facie showing of a cause of action

before it will issue a court order for a pre-action disclosure" - *Eirik Cheverud, Cohen v. Google, Inc., 55 N.Y.L. SCH. L. REV. 333 (2010-2011) Page 351, Paragraph 1.*

2. Ms. Lively's Claim for retaliation has clearly failed to do so. Therefore I move to Quash the Google/X subpoenas in their entirety, and further to modify all other subpoenas to the effect that communications with people anonymous to the individuals subpoenaed are not discoverable.

## SECTION C: ARGUMENTS REGARDING SANCTIONS FOR ABUSE OF PROCESS

1. There are certain abuses of process that affected me and all of us non-parties collectively, but they are all part and parcel of a larger scheme of such abuses, and therefore the whole ball of wax becomes relevant. The first abuse of process on the part of the Plaintiff in this case, that we are aware of, is the Vanzan subpoena. Blake Lively has admitted in her deposition that she personally has no facts to support her claim of retaliation, as evidenced above.. Therefore she had no such facts when she commenced this litigation, which of course includes the preparation phase. Therefore, when Ms. Lively allowed her lawyers to file a dummy lawsuit against fictitious and unknown individuals, ostensibly in a contract dispute of all things, she had absolutely no justification for doing so.

2. For the sake of this mission her legal team at Manatt, Phelps & Phillips, LLP, offered up a casualty in the form of attorney Ms. Samantha Katze. Katze broke every rule of professional conduct in the book when she filed this fake atrocity of a lawsuit in New York State Court. In so doing, she intentionally misrepresented to the Court that she intended to follow through on a legitimate lawsuit, when she had no such intention. She and her handlers at MP&P used the dummy suit as a means to circumvent the defendants' right to confront their accuser, and rights to due process. To deprive them of fair notice that their private information was subject to subpoena, and disallow their opportunity to object. When the fake action had served its purpose, they secretively moved to close it without any Judicial oversight whatsoever.

3. What did Ms. Lively's attorneys discover from this? Well they uncovered evidence of normal PR tactics that everyone in Hollywood, including the Plaintiff, engages in lawfully every day. Even Ms. Lively's own mother was once an agent who spun PR and marketed actors and actresses for a living. But to a paranoid and troubled young woman, these tactics were going to be seen as threatening

to her. Her lawyers again used that to feed this delusion and their client's desire for vengeance. When their client became inflamed by this provocation she paid out more money to act on it. This is the pattern of improper motive.

4. It is clear that although Ms. Lively is a troubled, vengeful person, with delusions of persecution, she is not unintelligent. Her lawyers know this. They know that it isn't enough to simply state that there are parties taking action against their client. She would not continue to believe such things to her detriment unless there were actions by others that she could see with her own eyes, and interpret as threatening. Ergo, Ms. Hudson and Mr. Gottlieb needed certain pressure points, or metaphorical 'lightning rods' to take the brunt of their claims, and put on the best show for their mark. Bryan Freedman became the main event. They targeted Bryan with volleys of legal manoeuvers in expectation that he would defend his client and himself in the most public and impactful ways. Which he did. And that show proved to Ms. Lively, once again, that she needed her lawyers, and lawyers need money. And the cycle restarts.

5. That is where us non-parties came into the equation. They could only get so much play out of Bryan Freedman, and the biggest blow to their scheme came when Justin's defensive lawsuit was tossed out. The first 'lightning rod' had burnt out. They had to pivot.

6. It was too much of a stretch to come after us directly, that would risk breaking the illusion in Lively's mind, so they set up an intermediate 'lightning rod'...Judge Lewis J. Liman… If they could dupe enough of the non-parties into believing your Honor was biased, and have them speak out openly of such speculation and ridiculousness, then they could show Ms. Lively a new target for her paranoia and vengeance, the community of online content creators who are skeptical of Ms. Lively. "Look Blake, Bryan Freedman has come at you with a new band of paid accomplices and they're even going after the Judge for siding with you. We've got to do something… Give us more money so we can take them down"

7. Ms. Lively took the bait and authorized the expense for a huge attack on over 100 non-parties and their first amendment rights. Isabela Ferrer and James Vituscka are the next rods to be erected. And that is where we stand today.

8. **To be absolutely clear, so that there is no doubt, I am NOT stating that the subpoena process itself is abusive**. It is an integral and necessary part of the Justice System, but there are limits. The subpoena process is not meant to allow a Plaintiff, with no basis in fact for her claim, to exact revenge on the people she

believes are wronging her merely because they are speaking their mind on the validity of this case. It is especially not meant to enable unscrupulous legal agents to swindle their rich and motivated client into pouring huge amounts of her money into a meritless claim.

9.  I seek monetary sanctions on behalf of myself and the group collectively. I make a recommendation to the court that each member of our collective who was forced to, and did, respond to these frivolous subpoenas be awarded $500 USD in punitives for the abuse, and If it please the court, that these sanctions be ordered not to come from the legal fees they are charging Ms. Lively. I also seek that any other motions that others of my group have written, be appropriately seen to and adjudicated. And I seek to enable the Court, if it be needed, to impose whatever further sanctions The Court deems appropriate for these misdeeds.

## SECTION D: ARGUMENTS REGARDING CONTEMPT OF COURT MOTION

1.  Contrary to popular belief, contempt of court encompasses more misdeeds than a refusal to follow court orders or decisions. At least in the Federal realm, it also includes misbehavior of court officers in their official transactions. Such prohibition can be found at 18 U.S.C. Section 401(2). Two such categories of misbehavior are listed in the New York Rules Of Professional Conduct 8.4(c) and (d), proscribing acts of misrepresentation as well as acts prejudicial to the administration of justice. It is my considered belief that lawyers for the Plaintiff in this case manufactured a **<u>falsified</u> appearance of impropriety** on the part of the court, namely a bias in favor of their client. They did so with utter indifference to the risk of broadly undermining judicial authority and inciting disrespect against the Justice System.. They did this with the intent of using the misled public outcry against this appearance as a signal to their client to reinforce her delusions and steele her resolve to throw more money at the legal case. "Look, Ms. Lively. Now Baldoni and his allies are even going after the Judge just because he likes you. Their depravity knows no bounds. Let us write up another motion for sanctions, and don't worry about the cost, We'll get Baldoni to pay for it when you win.".

2.  In Exhibit C, I summarize a very key insight into the timeline of the events that culminated in this widespread false belief of judicial bias. It is not simply a case of sour grapes from a ruling. It was a calculated framing of the factors by the Plaintiff's counsel, with a few lies thrown in. It started with your ruling on June 9th, 2025 dismissing Justin Baldoni's countersuit for failure to state a claim. The

Edgeworth protective order had recently gone through without issue, so this wasn't a case of a mob primed to take bad news in the worst way. What happened to make it different this time? Simple, Blake Lively and her attorneys made deceptive public statements that led people to a seriously erroneous conclusion.

3. In your Honor's ruling, found in docket number 296; page 131, the Court could not have been more explicit that California Civil Code 47.1 was not the basis for the ruling, and on top of that, all of the many recent amicus brief requests were immaterial, and did not form part of the Court's decision process as "The Court has not considered any of [them]" (idem, internal reference no 67 )

.
4. However, the Plaintiff and her lawyers took to social media and the press, respectively, and after a victory lap they both misrepresented the Court's ruling.

5. The Plaintiff herself had this to say: "Last week, I stood proudly alongside 19 organizations united in defending women's rights to speak up for their safety." and further "While the suit against me was defeated, so many don't have the resources to fight back", and finally "I'm more resolved than ever to continue to stand for every woman's right to have a voice in protecting themselves, including their safety, their integrity, their dignity and their story"

6. Ms. Lively intentionally gave everyone the impression that the 19 organizations who filed amicus briefs in support of 47.1 stood by her side and helped her defeat the "retaliatory lawsuit", implying that your Honor had been swayed by these organizations' emotional pleas, to overlook the law, and rule based on societal pressures. Of course, Ms. Lively is not a lawyer so it carries less weight. But her lawyers failed to correct their client's official story. They were too busy doubling down on the falsities. They released a simultaneous statement: "Today's opinion is a total victory and a complete vindication for Blake Lively"..."As we have said from day one, this '$400 million' lawsuit was a sham, and the Court saw right through it,"...and here's the most important part, even though your Honor had just ruled that attorney's fees and specifically the treble damages invoked by 47.1 were DENIED, these lawyers couldn't help bringing 47.1 back into the frame immediately: "We look forward to the next round, which is seeking attorneys' fees, treble damages and punitive damages against Baldoni, [Steve] Sarowitz, [Melissa] Nathan and the other Wayfarer Parties who perpetrated this abusive litigation."

17

7.  As your Honor knows, the only legal mechanism linked to this case which could accomplish a treble damages finding is through 47.1.

8.  Collectively, Ms. Lively and her attorneys gave the impression that Judicial Bias was at work in her favor. For her part, Ms. Lively wanted desperately to believe that someone was on her side, without needing to be paid. Whereas her attorneys had the sinister motive to provoke the backlash that secured their continued access to the Lively-Reynolds cash machine.

9.  It was only after these false and misrepresentative statements were made that The Court became subject of skepticism and accusations of impropriety by well-meaning yet misinformed people on the side of truth. The Plaintiff's attorneys either knew, or ought to have known that they were producing the falsified appearance of impropriety, impugning the Justice System for their own ends. They should therefore be held in contempt of court. (*see United States v. Cutler, SDNY 1993)*

/s/ J Alexander Townsend, Movant Pro Se