# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

BLAKE LIVELY,

*Plaintiff,*

v.

WAYFARER STUDIOS LLC, *et al.*,

*Defendants.*

No. 24-CV-10049 (LJL) (Lead Case)

---

WAYFARER STUDIOS LLC, *et al.*,

*Plaintiffs,*

v.

BLAKE LIVELY, *et al.*,

*Defendants.*

No. 25-CV-00449 (LJL) (Member Case)

---

**BRIEF OF *AMICI CURIAE* SANCTUARY FOR FAMILIES,
NATIONAL ORGANIZATION FOR WOMEN, NATIONAL ORGANIZATION FOR
WOMEN NYC, WOMEN'S JUSTICE NOW, NEW YORK CYBER ABUSE TASK
FORCE, HERUNIVERCITY INC., WOMEN'S EQUAL JUSTICE, NEW YORK CITY
ALLIANCE AGAINST SEXUAL ASSAULT, COALITION AGAINST TRAFFICKING
IN WOMEN, NATIONAL NETWORK TO END DOMESTIC VIOLENCE, ESPERANZA
UNITED, NEW YORK STATE ANTI-TRAFFICKING COALITION,
HER JUSTICE, AND URBAN RESOURCE INSTITUTE
IN SUPPORT OF DEFENDANT BLAKE LIVELY**

John Terzaken (*pro hac vice* pending)

SIMPSON THACHER & BARTLETT LLP
900 G. Street, N.W.
Washington, D.C. 20001

Sarah E. Phillips
Jacob Lundqvist
Damian P. Gallagher

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, N.Y. 10017

*Counsel to Amici*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

INTERESTS OF AMICI CURIAE ................................................................................ 2

ARGUMENT ................................................................................................................. 3

   I.   PERPETRATORS INCREASINGLY EMPLOY DARVO TACTICS IN THE
       WORKPLACE AND THROUGH MERITLESS DEFAMATION LAWSUITS TO
       SILENCE THEIR VICTIMS ................................................................................ 3

       A.  Overview of DARVO Tactics ........................................................................ 3

       B.  The Use of DARVO Tactics in the Workplace ............................................. 5

       C.  The Chilling Effects of DARVO Tactics in Defamation Lawsuits .............. 9

  II.  STATE LEGISLATURES HAVE RESPONDED TO THE RISE OF MERITLESS
       DARVO DEFAMATION LAWSUITS BY ENACTING LAWS AFFORDING
       GREATER PROTECTION TO VICTIMS OF SEXUAL VIOLENCE ......................... 12

       A.  California's Anti-SLAPP Law Amendments ............................................... 15

       B.  New York's Anti-SLAPP Law Amendments .............................................. 19

       C.  Legislative Efforts Impact Victims ............................................................ 22

 III.  A RULING DISMISSING THE WAYFARER PARTIES' LAWSUIT WOULD
       FURTHER ADVANCE THE LEGISLATIVE INTENT BEHIND RECENT
       ENACTMENTS ..................................................................................................... 25

CONCLUSION ............................................................................................................ 29

ANNEX A  LIST OF AMICI ......................................................................... Annex A-1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Benlevi v. Rukaj*,
  2024 N.Y. Misc. LEXIS 24737 (N.Y. Civ. Ct. Aug. 13, 2024)..............................13

*Briggs v. Eden Council for Hope & Opportunity*,
  969 P.2d 564 (Cal. 1999) ..........................................................................26

*Burlington Industries, Inc. v. Ellerth*,
  524 U.S. 742 (1998)..................................................................................6

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty. Tenn.*,
  555 U.S. 271 (2009)..................................................................................6

*Dababneh v. Lopez*,
  No. 4-2018-00238699-CU-DF-GDS, 2019 Cal. Super. LEXIS 63845 (Cal.
  Sup. Ct. Jan. 16, 2019)............................................................................16

*Dababneh v. Lopez*,
  No. C088848, 2021 Cal. App. Unpub. LEXIS 6258 (Cal. Ct. App. Oct. 1,
  2021) ...........................................................................................16, 23

*Faragher v. Boca Raton and Burlington Industries, Inc.*,
  524 U.S. 775 (1998)..................................................................................6

*Great Wall Med. P.C. v. Levine*,
  2022 N.Y. Misc. LEXIS 988 (N.Y. Sup. Ct. Mar. 8, 2022) ..................................20

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971)..................................................................................6

*Harris v. Am. Accounting Ass'n*,
  No. 20-CV-01057 (MAD) (ATB), 2021 U.S. Dist. LEXIS 226517 (N.D.N.Y.
  Nov. 24, 2021) ......................................................................................20

*Jordan-Benel v. Universal City Studios, Inc.*,
  859 F.3d 1184 (9th Cir. 2017) ...................................................................13

*Metabolife Int'l, Inc. v. Wornick*,
  264 F.3d 832 (9th Cir. 2001) .....................................................................13

*Nelson v. Bridgers*,
  Nos. B325454, B328612, B330346, 2024 Cal. App. Unpub. LEXIS 6911 (Cal.
  Ct. App. Oct. 30, 2024)............................................................................23

*Sagaille v. Carrega*,
194 A.D.3d 92 (1st Dep't 2021), *leave to appeal denied*, 174 N.E.3d 710
(2021) ............................................................................................................... 9

**Statutes**

42 U.S.C. §§ 2000e - 2000e17 (1972) ............................................................... 6

735 ILL. COMP. STAT. ANN. 110/15 (2019) .................................................... 12

CAL. CIV. CODE § 47 (2023) ............................................................................ 16

CAL. CIV. CODE § 47.1 (2024) ................................................................. *passim*

CAL. CIV. PROC. CODE § 425.16 (2023) ............................................. 12, 13, 23

N.Y. C.P.L.R. 3211 (2022) ............................................................................. 20

N.Y. CIV. RIGHTS LAW § 70-a (2020) ..................................................... *passim*

N.Y. CIV. RIGHTS LAW § 76-a (2020) ...................................................... passim

**Regulations**

29 C.F.R. § 1604.11 (1999) .............................................................................. 6

**Legislative Materials**

*Assembly Floor Analysis: Comments*, Cal. AB-993 at 1 (as amended
May 25, 2023), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml
?bill_id=202320240AB933# .................................................................. *passim*

Del. Senate Bill No. 312, 152d Gen. Assemb. (introduced May 21, 2024) ................................. 14

N.H. H.B. No. 2025-391-FN, 169th Gen. Ct., 2025 Reg. Sess.
(introduced Jan. 23, 2025) ....................................................................... 14

N.J. Assemb. B.  No. 4857, 221st Legis., Reg. Sess. (as passed by Assembly,
May 22, 2025) ......................................................................................... 14

*N.Y. Senate Sponsor's Memoranda*, N.Y. S-52A (rev. July 22, 2020),
https://www.nysenate.gov/legislation/bills/2019/S52 ............................ 21

Oregon Senate Bill 180, 83d Legis. Assemb., Reg. Sess. (as passed by House and
Senate, May 29, 2025) ............................................................................ 14

*Senate Floor Analysis: Comments*, Cal. AB-993 at 4 (as amended May 25, 2023),
https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=20232
0240AB933# .................................................................................... 18, 19

## Other Authorities

Aff. In Supp. of Prop. *Amicus* Br. at 7, Ventura v. Todaro, No. 2024-10775 (N.Y. App. Div. 2d Dep't Jan. 29, 2025) ........................................................................... 19

Alexandra Del Rosario, *TikTok's Impact on the Depp-Heard Trial Takes Center Stage in a New NBC Documentary*, L.A. TIMES (July 13, 2022), https://www.latimes.com/entertainment-arts/story/2022-07-13/johnny-depp-amber-heard-defamation-trial-tiktok-documentary ................................................ 26

Aliosha Hurry, *Defamation as a Sword: The Weaponization of Civil Liability against Sexual Assault Survivors in the Post-#MeToo Era,* 34 CAN. J. WOMEN & L. 82 (2022) ........................................................................................................ 9

Alyssa R. Leader, Note, *A "Slapp" in the Face of Free Speech: Protecting Survivors' Rights to Speak Up in the "Me Too" Era*, 17 FIRST. AMEND. L. REV. 441 (2019) ............................................................................................................ 12, 22

Andrew Beckerman-Rodau, *Prior Restraints and Intellectual Property: The Class Between Intellectual Property and the First Amendment from an Economic Perspective*, 12 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1 (2001) ................................. 13

*Anti-SLAPP Legal Guide*, REPS. COMM. FOR FREEDOM OF THE PRESS (2025), https://www.rcfp.org/anti-slapp-legal-guide/ ......................................................... 12

*Assembly Floor Analysis*, CAL. STATE ASSEMBLY OFF. CHIEF CLERK (2025), https://clerk.assembly.ca.gov/about-us/assembly-floor-analysis#:~:text=The%20Assembly%20Floor%20Analysis%20(AFA,and%20amendment%20on%20the%20Floor ...................................................................... 16

Balter, *A Guide to My Reporting on Alleged Misconduct by UC Santa Barbara Archaeologist Danielle Kurin [Updated Aug. 10, 2022]*, BALTER'S BLOG (Nov. 16, 2020, 11:47 AM), https://michael-balter.blogspot.com/2020/11/a-guide-to-my-reporting-on-alleged.html .................................................................... 24

Bernadette Hogan, *Cuomo Signs Law Making It Harder for Rich and Powerful to File Lawsuits to Stifle Free Speech*, N.Y. POST (Nov. 10, 2020), https://nypost.com/2020/11/10/cuomo-signs-law-making-it-harder-to-file-lawsuits-to-stifle-free-speech/ ................................................................................ 21

Beth V. West, *California Law Now Provides an Express Statutory Privilege Against Defamation Claims by Those Accused of Sexual Harassment*, WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORP. (July 16, 2018), https://www.thelelawblog.com/2018/07/articles/harassment/california-law-now-provides-an-express-statutory-privilege-against-defamation-claims-by-those-accused-of-sexual-harassment/ ................................................................... 23

Brooke White, Comment, *The SLAPP Happy State: Now Is the Time for Ohio to Pass Anti-SLAPP Legislation*, 74 CASE W. RES. 559 (2023) ................................................. 13

Chai R. Feldblum & Victoria A. Lipnic, *Select Task Force on the Study of Harassment in the Workplace, Report of Co-Chairs*, U.S. EQUAL EMP. OPPORTUNITY COMM'N (June 2016), https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686298 ..................................................... 6, 7

*Cosby's Conviction and How #MeToo Is Affecting Legal Cases*, Winston & Strawn LLP (Apr. 26, 2018),  https://www.winston.com/en/insights-news/cosby-s-conviction-and-how-metoo-is-affecting-legal-cases .................................................... 25

Darren Magee, *The DARVO Method: How Narcissists Avoid Accountability and Blame Victims*, SENTIENT (Mar. 15, 2023), https://sentientcounselling.co.uk/2023/03/15/the-darvo-method-how-narcissists-avoid-accountability-and-blame-victims/ ............................................... 3

Deborah Tuerkheimer, *This Was Never About Amber Heard*, MS. (June 2, 2022), https://msmagazine.com/2022/06/02/amber-heard-sexual-abuse-domestic-violence-believe-women/ ................................................................................... 26

Deeksha Shukla, *Understanding and Addressing DARVO in the Workplace: A Guide for HR and Managers*, LINKEDIN (July 23, 2024), https://www.linkedin.com/pulse/understanding-addressing-darvo-workplace-guide-hr-managers-shukla-gcf8c ............................................................................. 4

Def.'s Ltr. Req. Pre-Mot. Conf., Kurin v. Balter, No. 20-CV-04613 (S.D.N.Y.) ....................... 24

Eliana Dockterman, *The Depp-Heard Trial Perpetuates the Myth of the Perfect Victim*, TIME (June 2, 2022), https://time.com/6183505/amber-heard-perfect-victim-myth-johnny-depp/ ............................................................................. 26

*Ending Sexual Assault and Harassment in the Workplace*, NAT'L SEXUAL VIOLENCE RES. CTR. (2025), https://www.nsvrc.org/ending-sexual-assault-and-harassment-workplace ............................................................................................. 7

Erin O'Callaghan & Katherine Lorenz, *"I Realized That I Couldn't Act Normal": A Qualitative Study of Sexual Assault Survivors' Experiences of Workplace Disclosure*, 37 J. FAM. VIOLENCE 381 (July 16, 2020) ........................................... 6, 8

*False Allegations, Case Unfounding, and Victim Recantations in the Context of Sexual Assault*, ATT'Y GEN.'S SEXUAL ASSAULT TASK FORCE at 3 (Jan. 10, 2018), https://evawintl.org/wp-content/uploads/ORSATFPaperFalseReports.pdf .................................................. 9

*False Reporting*, NAT'L SEXUAL VIOLENCE RES. CTR. 3 (2012), https://www.nsvrc.org/sites/default/files/2012-03/Publications_NSVRC_Overview_False-Reporting.pdf .................................................. 28

George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPS"): An Introduction for Bench, Bar, and Bystanders*, 12 BRIDGEPORT L. REV. 937 (1992) ................................................................... 10

Gordon B. Dahl & Matthew M. Knepper, *Why Is Workplace Sexual Harassment Underreported? The Value of Outside Options Amid the Threat of Retaliation*, NAT'L BUREAU OF ECON. RSCH. (Sept. 2021), https://www.nber.org/papers/w29248 ................................................................... 6

Harvey Weinstein Timeline: *How the Scandal Has Unfolded*, BBC (Feb. 24, 2023), https://www.bbc.com/news/entertainment-arts-41594672 ........................... 26

Holly Kearl, Nicole E. Johns & Anita Raj, *Measuring #MeToo: A National Study on Sexual Harassment and Assault*, UNIV. CAL. SAN DIEGO CTR. ON GENDER EQUITY AND HEALTH 10 (2019) ............................................................................ 7

*How the #MeToo Movement Changed Hollywood and Society At-Large*, LAS VEGAS SUN (Apr. 28, 2025), https://lasvegassun.com/news/2025/apr/28/how-the-metoo-movement-changed-hollywood-and-socie/ .......................................... 26

Jacey Passmore, *The Underreporting and Dismissal of Sexual Assault Cases Against Women in the United States*, BALLARD BRIEF (June 2023), https://ballardbrief.byu.edu/issue-briefs/the-underreporting-and-dismissal-of-sexual-assault-cases-against-women-in-the-united-states ..................................... 28

Jaclyn Diaz, *This Lawyer Is Fighting Defamation Lawsuits That Can Silence Sexual Assault Victims*, NPR (Nov. 10, 2024), https://www.npr.org/2024/11/08/nx-s1-5111723/me-too-assault-victims-protections-defamation ......................................................................... 13, 27

Janice Mah, *DARVO: Understanding the Manipulation Tactic That Silences Workplace Voices*, LINKEDIN (Mar. 13, 2025), https://www.linkedin.com/pulse/darvo-understanding-manipulation-tactic-silences-mah-%E9%A6%AC%E7%A7%80%E7%91%9C-mba-wygcc ................................ 8

Janice Mah, *Institutional Betrayal: When Trust Turns To Trauma – Part 1*, LINKEDIN (Feb. 12, 2025), https://www.linkedin.com/pulse/when-trust-turns-trauma-janice-mah-%E9%A6%AC%E7%A7%80%E7%91%9C-mba-jduuc?trk=article-ssr-frontend-pulse_little-text-block ............................................. 8

Jennifer Becker, Kyra Batté & Cassie Walter, *A Guide to Defamation for Survivors of Sexual Assault or Harassment*, LEGAL MOMENTUM: THE WOMEN'S LEGAL DEF. & EDUC. FUND (Sept. 5, 2023), https://www.legalmomentum.org/library/guide-defamation-survivors-sexual-assault-or-harassment ................................................................................... 4

Jennifer J. Freyd, *Violations of Power, Adaptive Blindness and Betrayal Trauma Theory*, 7 FEMINISM & PSYCH. 22 (SAGE Publications 1997) ................................. 9

Jennifer Safstrom, Time to SLAPP Back: Advocating Against the Adverse Civil
  Liberties Implications of Litigation That Undermines Public Participation, 3
  LSU L.J. Soc. Just. & Pol'y 125 (2023) ........................................................ 10, 22

Jessica Winter, *The Johnny Depp-Heard Verdict Is Chilling*, The New Yorker
  (June 2, 2022), https://www.newyorker.com/culture/cultural-comment/the-
  depp-heard-verdict-is-chilling................................................................................ 12, 26

Jonathan Segal, *Anti-SLAPP Law Make Benefit for Glorious Entertainment
  Industry of America: Borat, Reality Bites, and the Construction of an Anti-
  SLAPP Fence Around the First Amendment*, 26 Cardozo Arts & Ent. L.J.
  639 (2009)............................................................................................................... 13

Julia Jacobs, *#MeToo Cases' New Legal Battleground: Defamation Lawsuits*, N.Y.
  Times (Jan. 12, 2020), https://www.nytimes.com/2020/01/12/arts/defamation-
  me-too.html............................................................................................................. 25

Katharine Rubery, Comment, *Reporting Sexual Assault: What Privileges Should
  Exist in Defamation Suits Stemming from a Police Report*, 50 Fordham Urb.
  L.J. 907 (2023)....................................................................................................... 12, 28

Kathleen C. Basile, Sharon G. Smith, Marcie-jo Kresnow, Srijana Khatiwada &
  Ruth W. Leemis, *The National Intimate Partner and Sexual Violence Survey:
  2016/2017 Report on Sexual Violence*, Ctr. Disease Control & Prevention
  (2022)........................................................................................................................ 1

Katie Heaney, *Almost No One Is Falsely Accused of Rape*, CUT (Oct. 5, 2018),
  https://www.thecut.com/article/false-rape-accusations.html).................................. 28

Kelly Alison Behre, *Rape Exceptionalism Returns to California: Institutionalizing
  a Credibility Discount for College Students Reporting Sexual Misconduct*, 73
  Okla. L. Rev. 101 (2020)......................................................................................... 3

Madeline Baxter, *Sexual Harassment Is Underreported When the US Economy and
  Safety Net Are Weak*, WorkRise (Jan. 30, 2024),
  https://www.workrisenetwork.org/working-knowledge/sexual-harassment-
  underreported-when-us-economy-and-safety-net-are-
  weak#:~:text=Approximately%205%20million%20workers%2
  0are,US%20Equal%20Employment%20Opportunity%20Commission .................................. 6

Madison Pauly, *She Said, He Sued: How Libel Law Is Being Turned Against
  MeToo Accusers*, Mother Jones (April. 2020),
  https://www.motherjones.com/criminal-justice/2020/02/metoo-me-too-
  defamation-libel-accuser-sexual-assault/ .............................................................. 11

Maia Spoto, *Singer Phoebe Bridgers Defeats Defamation Suit Again on Appeal*,
  Bloomberg News (Oct. 30, 2024),

https://news.bloomberglaw.com/litigation/singer-phoebe-bridgers-defeats-defamation-suit-again-on-appeal ......................................................... 23

MANDI GRAY, SUING FOR SILENCE: SEXUAL VIOLENCE AND DEFAMATION LAW (UBC Press 2024)) .................................................................... 27

Maria Puente & Cara Kelly, *How Common Is Sexual Misconduct in Hollywood?*, USA TODAY (Feb. 20, 2018), https://www.usatoday.com/story/life/people/2018/02/20/how-common-sexual-misconduct-hollywood/1083964001/ ......................................................... 7

Mary-Claire Dale & Jocelyn Noveck, *Depp-Heard Trial: Advocates Fear Chilling Effect on Accusers*, ASSOCIATED PRESS (June 3, 2022), https://apnews.com/article/bill-cosby-johnny-depp-amber-heard-entertainment-politics-c105463a8b87f54d2ce19a9cd772a5d1 ......................................... 12

Michael Balter, *Attorneys for #MeToo Reporter, Citing New York's New Anti-SLAPP Law, Ask Federal Judge to Consider Motion for Summary Judgment*, BALTER'S BLOG (Jan. 5, 2021, 12:16 PM), https://michael-balter.blogspot.com/2021/01/attorneys-for-metoo-reporter-citing-new_5.html .................... 24

Moira Donegan, *There's an Antifeminist Backlash Silencing Women – More and More Literally*, THE GUARDIAN (July 7, 2022), https://www.theguardian.com/commentisfree/2022/jul/07/theres-an-antifeminist-backlash-silencing-women-more-and-more-literally ........................................ 11

Monica Hunter-Hart, *Meet the Little-known Billionaire Caught Up in the Baldoni-Lively Scandal*, Forbes Austl. (Jan. 10, 2025), https://www.forbes.com.au/news/billionaires/meet-the-little-known-billionaire-caught-up-in-the-baldoni-lively-scandal/ ................................................ 14

Mot. for Leave to File *Amicus* Br. at 15, Coleman v. Grand, No. 21-800 (2d Cir. 2021), *on appeal from* 523 F. Supp. 3d 244 (E.D.N.Y. 2021) ................................ 24

Nancy Chi Cantalupo, Keynote Speech, *Title IX & The Civil Rights Approach to Sexual Harassment in Education*, 25 ROGER WILLIAMS U.L. REV. 225 (2020) ..................... 3

Olivia Cleal, *Victim-Survivors Are Encouraged to Speak Out About Sexual Harassment. Defamation Laws Stop Them in Their Tracks*, Women's Agenda (May 17, 2024), https://womensagenda.com.au/latest/victim-survivors-are-encouraged-to-speak-out-about-sexual-harassment-defamation-laws-stop-them-in-their-tracks/ ............................................................. 27

Press Release, Brad Hoylman-Sigal, *Free Speech 'SLAPPs Back: Governor Signs Hoylman/Weinstein Legislation to Crack Down on Meritless Lawsuits Used to Silence Critics*, N.Y. STATE SENATE (Nov. 10, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/free-speech-slapps-back-governor-signs ......................................... 22

Press Release, *NYCLU Statement on Signing of Anti-SLAPP Bill*, ACLU OF N.Y. (Nov. 10, 2020), https://www.nyclu.org/press-release/nyclu-statement-signing-anti-slapp-bill ................................................................................................................ 21

Raphael Helfand, *Defamation Lawsuit Against Phoebe Bridgers Dismissed*, THE FADER (Nov. 10, 2022), https://www.thefader.com/2022/11/10/defamation-lawsuit-against-phoebe-bridgers-dismissed ................................................................ 23

Rebecca Nicholson, *Depp v Heard Review – Amber and Johnny Make for Profoundly Depressing Television*, THE GUARDIAN (May 21, 2023), https://www.theguardian.com/tv-and-radio/2023/may/21/johnny-depp-v-amber-heard-review-profoundly-depressing-television ......................................... 25

Ruth A. Kennedy, *Insulating Sexual Harassment Grievance Procedures from the Chilling Effect of Defamation Litigation*, 69 WASH. L. REV. 235 (1994) ................................. 9

Samuel J. Morley, *Florida's Expanded Anti-SLAPP Law: More Protection for Targeted Speakers*, 90 FLA. BAR J. 16 (2016) ...................................................... 13

Sarah J. Harsey & Jennifer J. Freyd, *Defamation and DARVO*, 23 J. TRAUMA & DISSOCIATION 481 (2022) .......................................................... 3, 9, 10, 11

Sarah J. Harsey, Alexis A. Adams-Clark & Jennifer J. Freyd, *Associations Between Defensive Victim-Blaming Responses (DARVO), Rape Myth Acceptance, and Sexual Harassment*, PLOS ONE (Dec. 4, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11616802 ................................... 4, 5, 27

Sarah J. Harsey, Eileen L. Zurbriggen & Jennifer J. Freyd, *Perpetrator Responses to Victim Confrontation: DARVO and Victim Self-Blame*, 26 J. AGGRESSION, MALTREATMENT & TRAUMA 644 (2017) ......................................... 4, 10, 11

*Sexism at Work: How Can We Stop It?*, EUR. INST. FOR GENDER EQUAL. (2025), https://eige.europa.eu/publications-resources/toolkits-guides/sexism-at-work-handbook/part-1-understand/under-reporting-sexual-harassment?language_content_entity=en ................................................................ 6

*Sexual Harassment in Our Nation's Workplaces. Office of Enterprise Data and Analytics (OEDA) Data Highlight No. 2*, U.S. EQUAL EMP. OPPORTUNITY COMM'N (Apr. 2022), https://www.eeoc.gov/data/sexual-harassment-our-nations-workplaces ................................................................................................ 7

*Sharing Your Story Publicly*, SEXUAL VIOLENCE L. CTR. (2025) ................................... 4

Theresa M. House, *New York's New and Improved Anti-SLAPP Law Effective Immediately*, ARNOLD & PORTER KAYE SCHOLER LLP (Nov. 17, 2020), https://www.arnoldporter.com/en/perspectives/advisories/2020/11/new-yorks-new-anti-slapp-law ................................................................................................ 21

*Thursday Thinkpiece: Suing for Silence: Sexual Violence and Defamation Law*,
   Slaw (Apr. 4, 2024), https://www.slaw.ca/2024/04/04/thursday-thinkpiece-
   suing-for-silence-sexual-violence-and-defamation-law/ ........................................................ 27

Tina Tchen, Editorial, *#MeToo Identified a Disease That Infects Business. We Still
   Have a Long Way to Go*, CNN Bus. (Oct. 15, 2018),
   https://www.cnn.com/2018/10/14/perspectives/metoo-anniversary/index.html ................... 28

Tyler Kingkade, *As More College Students Say "Me Too," Accused Men Are
   Suing for Defamation*, BUZZFEED NEWS (Dec. 5, 2017),
   https://www.buzzfeednews.com/article/tylerkingkade/as-more-college-
   students-say-me-too-accused-men-are-suing) ....................................................................... 11

U.N. Special Rapporteur, *Promotion and Protection of the Right to Freedom of
   Opinion and Expression*, ¶ II.D.22, U.N. Doc. A/76/258 (July 30, 2021),
   https://www.ohchr.org/en/documents/thematic-reports/a76258-gender-justice-
   and-freedom-expression-report-special-rapporteur ................................................................. 9

*What Is Sexual Violence Fact Sheet*, NAT'L SEXUAL VIOLENCE RES. CTR. (2010);
   *see also About Sexual Violence*, CTR. DISEASE CONTROL & PREVENTION (Jan.
   23, 2024), https://www.cdc.gov/sexual-violence/about/index.html ......................................... 1

*What is the Office of Senate Floor Analyses*, CAL. STATE SENATE OFF. SENATE
   FLOOR ANALYSES (2025),
   https://sfa.senate.ca.gov/whatisthesenateofficeoffflooranalysis#:~:text=The%20
   Floor%20Analyses%2C%20written%20by,background%20information%20on
   %20the%20issue .................................................................................................................... 18

## <u>PRELIMINARY STATEMENT</u>

The retaliatory defamation lawsuit instigated by the Wayfarer Parties[1] against Blake Lively is another example of "DARVO" tactics (Deny, Attack, Reverse Victim and Offender) in the post-#MeToo era where perpetrators of "sexual violence," in particular sexual harassment, attempt to silence their victims into submission.[2] Perpetrators use defamation suits to deny their own liability, discredit survivors of sexual violence, and reverse the narrative to cast themselves as the real victims. This smear tactic comes at a real cost to victims who muster the enormous courage required to report their abusers in the first instance. If the use of DARVO tactics in defamation lawsuits is allowed to continue unchecked, embroiling victims in costly and drawn-out litigation proceedings that force them to relive their trauma, it will embolden perpetrators and contribute to a culture of silence. This will impact survivors from all socioeconomic backgrounds, including those with the least means to defend themselves as well as the most high-powered celebrities.

*Amici curiae* ("*Amici*") respectfully submit this brief in support of Ms. Lively's motion to dismiss the Wayfarer Parties' case on grounds that her statements about the sexual harassment she experienced in her workplace on and around the set of filming "It Ends with Us" in legal filings, to the press, and to third parties, fall within California's recently enacted sexual harassment

---

[1] The "Wayfarer Parties" are Justin Baldoni, Jamey Heath, Steve Sarowitz, Wayfarer Studios LLC, It Ends With Us Movie, LLC, Melissa Nathan, and Jennifer Abel.

[2] "Sexual violence" means "that someone forces or manipulates someone else into unwanted sexual activity without their consent[,]" and can take the forms of rape or sexual assault, intimate partner sexual assault, unwanted sexual contact/touching, sexual harassment, sexual exploitation, showing one's genitals or naked body without consent, or watching someone in a private act without their knowledge or permission. *What Is Sexual Violence Fact Sheet*, Nat'l Sexual Violence Res. Ctr. (2010); *see also About Sexual Violence*, Ctr. Disease Control & Prevention (Jan. 23, 2024), https://www.cdc.gov/sexual-violence/about/index.html ("Sexual violence is sexual activity when consent is not obtained or freely given."); Kathleen C. Basile, Sharon G. Smith, Marcie-jo Kresnow, Srijana Khatiwada & Ruth W. Leemis, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence*, Ctr. Disease Control & Prevention (2022) (report addressing five types of sexual violence, including sexual harassment, noting that "[s]exual violence comprises numerous acts that happen without the consent of the victim or where the victim cannot consent or refuse, ranging from street harassment of a sexual nature to unwanted penetrative acts.").

privilege under Section 47.1 of the California Civil Code. Lively Mem. of Law in Support of Motion to Dismiss ("Lively Mem."), ECF No. 145, at 18–21.[3] The privilege codified in Section 47.1, and similar legislative enactments in New York and elsewhere, play a pivotal role in creating an environment where survivors are encouraged to report sexual assault and harassment without fear of being sued. Survivors' voices belong in courtrooms, in campus disciplinary hearings, and in public forums. The law should protect survivors' rights to speak their truth, not silence them.

## INTERESTS OF *AMICI CURIAE*

*Amici* are leading nonprofit organizations, victim advocates, and professionals from around the world dedicated to advancing the safety and well-being of survivors of domestic violence.[4] Collectively, *Amici* provide a broad range of legal and other services to victims and survivors of sexual violence, which broadly includes sexual assault, sexual harassment, stalking, and sexual exploitation.

*Amici* wish to advise this Court of the potential chilling effects an unfavorable application of Section 47.1 in this highly publicized case will have on victims seeking to protect themselves, report abusers, and raise awareness with the public. As active contributors and experts in the scholarship surrounding the dynamics of sexual violence, *Amici* are uniquely qualified to assist the Court in understanding the interests of victims with respect to this issue of common public concern.

---

[3] Unless otherwise indicated, all citations to the record refer to those filed on the docket for Case No. 24-CV-10049 (LJL) (Lead Case).

[4] A full list of *Amici* is attached hereto as Annex A.

## ARGUMENT

I. **PERPETRATORS INCREASINGLY EMPLOY DARVO TACTICS IN THE WORKPLACE AND THROUGH MERITLESS DEFAMATION LAWSUITS TO SILENCE THEIR VICTIMS**

### A.   Overview of DARVO Tactics

"DARVO" is a term initially coined by Jennifer J. Freyd to describe the "perpetrator tactic . . . [to] deny committing any wrongdoing, attack their victim's credibility, and cast their victims as the real aggressor and themselves as the real victims when held accountable or confronted with their abusive behavior."[5]   In application, "DARVO is a tactic used to urge observers to believe that the only real wrongdoing is a false accusation—a terrible injustice brought on by someone pretending to be a victim."[6]   The premise is simple: when facing allegations, many accused individuals are more likely to victim-blame to shift the narrative.[7]   As some have suggested, DARVO is "a form of gaslighting in the sense that the person using the strategy rewrites the narrative, rewrites the version of events."[8]   In this sense, "[p]erpetrators of

---

[5] Sarah J. Harsey & Jennifer J. Freyd, *Defamation and DARVO*, 23 J. TRAUMA & DISSOCIATION 481, 482 (2022) [hereinafter Harsey & Freyd, *Defamation and DARVO*].

[6] *Id.*

[7] *See* Nancy Chi Cantalupo, Keynote Speech, *Title IX & The Civil Rights Approach to Sexual Harassment in Education*, 25 ROGER WILLIAMS U.L. REV. 225, 228 (2020); *see also* Kelly Alison Behre, *Rape Exceptionalism Returns to California: Institutionalizing a Credibility Discount for College Students Reporting Sexual Misconduct*, 73 OKLA. L. REV. 101, 116 (2020) (describing impact of case requiring survivors to be subjected to additional adjudicative processes, which increases student's trauma and delay recovery).

[8] Darren Magee, *The DARVO Method: How Narcissists Avoid Accountability and Blame Victims*, SENTIENT (Mar. 15, 2023), https://sentientcounselling.co.uk/2023/03/15/the-darvo-method-how-narcissists-avoid-accountability-and-blame-victims/; *see also id.* ("For instance, they might even claim they've been wrongly accused by someone who is malignant, insane, and therefore gain sympathy and support from others.  And it tends to happen whenever a victim of abuse, mistreatment, or any kind of wrongdoing confronts or challenges their abuser[]" and "[t]he attacks are aimed at deflecting away from [the abuser's] own behaviour and onto to the character, behaviour, motives, sometimes even the mental health of someone else, usually their victim.  It's a way of diminishing the victim's credibility.").

interpersonal violence thrive when victims are silenced[,]"[9] and instill fear before victims feel that they can "go public" with their experience.[10]    Commentators have highlighted the usage of DARVO tactics in the workplace, noting that they can "manifest in various workplace scenarios, including performance reviews, allegations of misconduct, and interpersonal conflicts."[11]

In attempting to understand how DARVO tactics are applied situationally, studies have focused on observing how individuals react when they are confronted with allegations of wrongdoing.[12]    In one study, college students and general community members were provided a short-form questionnaire with a series of statements representing DARVO methods, including denials, attacks, and reversals of victim and offender.[13]    Participants were asked to consider a personal example where someone confronted them with a serious allegation (of any kind).[14]    Each participant then measured their own use of DARVO during that confrontation, including:

> Denial statements like, "That never happened" and "Whatever you're saying happened isn't my fault."

---

[9] Sarah J. Harsey, Eileen L. Zurbriggen & Jennifer J. Freyd, *Perpetrator Responses to Victim Confrontation: DARVO and Victim Self-Blame*, 26 J. AGGRESSION, MALTREATMENT & TRAUMA 644, 644 (2017) [hereinafter Harsey, et al., *Perpetrator Responses*]; *see also id.* at 645 ("in a large sample of over 1,300 primarily male North American individuals convicted of domestic violence perpetrated against another-sex partner, denial, minimization, and justification were present in perpetrators' descriptions of their offenses") (citation omitted).

[10] *See Sharing Your Story Publicly*, SEXUAL VIOLENCE L. CTR. (2025) (noting that "an abuser does not need to have a strong case to file a [defamation] lawsuit" since such suits are "becoming a more common intimidation tactic by abusers to silence survivors"); *see also* Jennifer Becker, Kyra Batté & Cassie Walter, *A Guide to Defamation for Survivors of Sexual Assault or Harassment*, LEGAL MOMENTUM: THE WOMEN'S LEGAL DEF. & EDUC. FUND (Sept. 5, 2023), https://www.legalmomentum.org/library/guide-defamation-survivors-sexual-assault-or-harassment (providing 50 state defamation survey and noting the "rise in survivors publicly voicing their experiences was met by a spike in defamation lawsuits filed both by abusers trying to further silence their victims and by survivors fighting back against harmful claims spread by their abusers in retaliation for sharing their stories.").

[11] Deeksha Shukla, *Understanding and Addressing DARVO in the Workplace: A Guide for HR and Managers*, LINKEDIN (July 23, 2024), https://www.linkedin.com/pulse/understanding-addressing-darvo-workplace-guide-hr-managers-shukla-gcf8c; *see also id.* ("Examples in the workplace include dismissing claims of harassment as mere jokes (Deny), belittling the accuser's professional abilities (Attack), and claiming undue stress caused by the accuser's complaints (Reverse Victim and Offender).").

[12] *See* Sarah J. Harsey, Alexis A. Adams-Clark & Jennifer J. Freyd, *Associations Between Defensive Victim-Blaming Responses (DARVO), Rape Myth Acceptance, and Sexual Harassment*, PLOS ONE (Dec. 4, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11616802/ [hereinafter Harsey, *et al.*, *Associations*].

[13] *Id.*

[14] *Id.*

> Attack statements like, "You're acting crazy" and, "No one would believe you if you said anything about it."
>
> Reverse Victim and Offender statements like, "I'm the real victim here" and, "You should be apologizing to me."[15]

After considering these items, participants rated their own responses on a scale of one to five, from "not at all like this" to "almost exactly like this."[16]  Nearly one third of undergraduates and nearly half of the general community population reported using all three DARVO elements during a confrontation.[17]  In the undergraduate population, the study found that individuals "who reported using higher levels of denial during confrontations were also more likely to employ personal attacks and attempt to portray themselves as the real victim."[18]  Additionally, "individuals who issue denials, personal attacks, and reversals of victim and offender roles as a means of responding to confrontations are more likely to hold victim-blaming beliefs and sexually harass others."[19]  As these studies suggest, when confronted with allegations, perpetrators are inclined to use DARVO tactics to counterattack and shift blame.

### B.     The Use of DARVO Tactics in the Workplace

DARVO tactics are frequently employed in workplace settings as a means to undermine a target's credibility and standing.  Workplace sexual harassment, which includes "sexist or sexual hostility, sexual coercion, and unwanted sexual attention," is significantly underreported: data suggests approximately five million workers are victimized by workplace sexual harassment annually and "yet only one in 11,000 file a formal charge with the US Equal Opportunity

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

Commission [("EEOC")]."[20]  While survivors often do confide in friends or family, "[s]exual assault disclosure in the workplace is understudied . . . because formal reporting rates in the workplace are so low (about 25%) even though prevalence remains high (1/3 of cases filed to the [EEOC] in 2015 were sexual harassment claims)."[21]  Despite incentives for both employers and employees to identify and ameliorate workplace harassment,[22] EEOC reports on the study of harassment do not dispute that workplace harassment often goes unreported and that up to 90% of individuals who experienced harassment never take formal action against the harasser, such as filing a charge or a complaint.[23]  While EEOC Charge Data reflect a slight uptick in charges in the

---

[20] Madeline Baxter, *Sexual Harassment Is Underreported When the US Economy and Safety Net Are Weak*, WORKRISE (Jan. 30, 2024), https://www.workrisenetwork.org/working-knowledge/sexual-harassment-underreported-when-us-economy-and-safety-net-are-weak#:~:text=Approximately%205%20million%20workers%20are,US%20Equal%20Employment%20Opportunity%20Commission (citing Gordon B. Dahl & Matthew M. Knepper, *Why Is Workplace Sexual Harassment Underreported?  The Value of Outside Options Amid the Threat of Retaliation*, NAT'L BUREAU OF ECON. RSCH. (Sept. 2021), https://www.nber.org/papers/w29248).

[21] Erin O'Callaghan & Katherine Lorenz, *"I Realized That I Couldn't Act Normal": A Qualitative Study of Sexual Assault Survivors' Experiences of Workplace Disclosure*, 37 J. FAM. VIOLENCE 381, 382 (July 16, 2020).

[22] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e17 (1972) (as amended), which prohibits employment discrimination and discrimination on the basis of race, national origin, sex, or religion, prohibits quid-pro-quo and hostile work environment harassment and is designed to achieve equality of employment opportunities by removing barriers that favor certain employees.  *See Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971); *see also* 42 U.S.C. § 2000e-2(1).  In *Faragher v. Boca Raton and Burlington Industries, Inc.*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court set the standards for employer liability in both the supervisor and coworker sexual harassment cases.  This includes employer liability in a coworker harassment case if the employer knew or should have known of the harassment and failed to take proper and immediate action, *see* 29 C.F.R. § 1604.11(d) (1999), and strict liability in a supervisor harassment case if the employee suffered a tangible negative employment action.  If no tangible employment action exists, the *Faragher-Ellerth* defense permits employers to be shielded from liability if the employee unreasonably failed to utilize the employer's preventative and corrective opportunities.  *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807–08.  Thus, employers have "strong inducement to ferret out and put a stop to any discriminatory activity in their operations as a way to break the circuit of imputed liability." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty. Tenn.*, 555 U.S. 271, 278–79 (2009) (noting "studies demonstrating that *Ellerth* and *Faragher* have prompted many employers to adopt or strengthen procedures for investigating, preventing, and correcting discriminatory conduct").  Employees are also incentivized to report harassment under Title VII to facilitate employer remediation, and if they do not report, the *Faragher-Ellerth* defense may block their claim.

[23] *See* Chai R. Feldblum & Victoria A. Lipnic, *Select Task Force on the Study of Harassment in the Workplace, Report of Co-Chairs*, U.S. EQUAL EMP. OPPORTUNITY COMM'N (June 2016), https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686298.  Under-reporting is also problematic abroad.  A United Kingdom survey found that 79% of targets of sexual harassment in the workplace did not report it.  *Sexism at Work: How Can We Stop It?*, EUR. INST. FOR GENDER EQUAL. (2025), https://eige.europa.eu/publications-resources/toolkits-guides/sexism-at-work-handbook/part-1-understand/under-reporting-sexual-harassment?language_content_entity=en.

two years following the #MeToo movement that first emerged in October 2017, from Fiscal Years 2018 through 2021, sexual harassment charge receipts have repeatedly declined.[24]

Organizations such as the National Sexual Violence Resource Center have compiled data further confirming that "[w]orkplace sexual harassment is common but is rarely reported."[25]  For example, 38% of all women (and 14% of men) have reported experiencing sexual harassment at work,[26] and one in seven women have sought a new job assignment, changed jobs, or quit a job because of sexual harassment and assault.[27]  In some industries, more than nine in ten women shared that they had been sexually harassed.[28]  This included 69% of those surveyed being touched in a sexual way, and just under 40% were shown sexual pictures without consent.[29]  Sixty percent of women experienced unwanted sexual attention, coercion, crude conduct, or comments in the workplace.[30]  Despite the prevalence of sexual violence in the workplace, over 85% of people who experience sexual harassment never file a formal legal charge, and approximately 70% never address their complaints internally.[31]

---

[24] *Sexual Harassment in Our Nation's Workplaces: Office of Enterprise Data and Analytics (OEDA) Data Highlight No. 2*, U.S. EQUAL EMP. OPPORTUNITY COMM'N (Apr. 2022), https://www.eeoc.gov/data/sexual-harassment-our-nations-workplaces.

[25] *Ending Sexual Assault and Harassment in the Workplace*, NAT'L SEXUAL VIOLENCE RES. CTR. (2025), https://www.nsvrc.org/ending-sexual-assault-and-harassment-workplace.

[26] Holly Kearl, Nicole E. Johns & Anita Raj, *Measuring #MeToo: A National Study on Sexual Harassment and Assault*, UNIV. CAL. SAN DIEGO CTR. ON GENDER EQUITY AND HEALTH 10 (2019).

[27] *Id.* at 31.

[28] Maria Puente & Cara Kelly, *How Common Is Sexual Misconduct in Hollywood?*, USA TODAY (Feb. 20, 2018), https://www.usatoday.com/story/life/people/2018/02/20/how-common-sexual-misconduct-hollywood/1083964001/ (noting that in a survey of 843 women who worked in the entertainment industry in a variety of roles including actors, producers, directors, editors, and others, nearly 94% said they experienced "some form of harassment or assault, often by an older individual in a position of power over the accuser.").  Additionally, 21% of those surveyed shared they were forced to do something sexual at least once.  *Id.*

[29] *Id.*  Only one in four women reported their experiences due to "fear of personal or professional backlash or retaliation."  *Id.*  Of those individuals brave enough to report their experiences, only 28% felt their workplace situation improved after reporting.  *Id.*

[30] Feldblum & Lipnic, *supra* note 23.

[31] *Id.* at 16.

One qualitative study identified victims who described negative reactions from their employers after reporting sexual assault in the workplace, including "not being believed, not offering support in the workplace, or even actively harming the survivor through lost wages or harassment."[32] Study participants described the harmful impacts on their recovery ranging from poor responses to reporting of workplace sexual harassment, including lack of appropriate responses, to the creation of a toxic work environment, and termination of employment.[33]

There have also been accounts of DARVO's application in the workplace to "not only silence[] victims, but also undermine[] [victims'] mental health and well-being, while maintaining the status quo within organizations."[34] These effects can create self-doubt in victims, raise questions about whether a victim "is too sensitive" or "misunderstanding" workplace norms, and lead to a situations where victims "stopped raising concerns altogether" since the outcome often leads to begging more questions like: "why speak up when the result would be feeling worse than before?"[35] Victims emphasize that "DARVO's effectiveness relies partly on making the target feel alone in their experience," creating psychological stress, anxiety symptoms, and dreaded interactions with supervisors.[36]

---

[32] O'Callaghan & Lorenz, *supra* note 21, at 382, 388.

[33] *Id.* at 389–90.

[34] Janice Mah, *DARVO: Understanding the Manipulation Tactic That Silences Workplace Voices*, LINKEDIN (Mar. 13, 2025), https://www.linkedin.com/pulse/darvo-understanding-manipulation-tactic-silences-mah-%E9%A6%AC%E7%A7%80%E7%91%9C-mba-wygcc; *see also* Janice Mah, *Institutional Betrayal: When Trust Turns To Trauma – Part 1*, LINKEDIN (Feb. 12, 2025), https://www.linkedin.com/pulse/when-trust-turns-trauma-janice-mah-%E9%A6%AC%E7%A7%80%E7%91%9C-mba-jduuc?trk=article-ssr-frontend-pulse_little-text-block.

[35] *Id.*

[36] *Id.*

## C.     The Chilling Effects of DARVO Tactics in Defamation Lawsuits

Participating in "retraumatizing, expensive, time-consuming, and hostile legal process is chilling and upsetting."[37]  As courts like the New York Appellate Division, First Department have recognized, "sexual assaults remain vastly underreported, primarily due to victims' fear of retaliation.  It does not escape us that defamation suits like the instant one may constitute a form of retaliation against those with the courage to speak out."  *Sagaille v. Carrega*, 194 A.D.3d 92, 94 (1st Dep't 2021), *leave to appeal denied*, 174 N.E.3d 710 (2021).   In a 2021 report to the General Assembly, U.N. Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression, Irene Khan warned of "a perverse twist . . . [that] women who publicly denounce alleged perpetrators of sexual violence online are increasingly subject to defamation suits or charged with criminal libel or the false reporting of crimes."[38]  The idea that victims are deterred from speaking out about their abuse by retaliatory lawsuits is supported by scholarship and experiential evidence.[39]  These same concerns have been echoed in contexts where victims seek protective orders,[40] and application of Title VII where the threat of defamation suits can discourage complaints.[41]

---

[37] Harsey & Freyd, *Defamation and DARVO*, *supra* note 5; *see also* Jennifer J. Freyd, *Violations of Power, Adaptive Blindness and Betrayal Trauma Theory*, 7 FEMINISM & PSYCH.  22 (SAGE Publications 1997).

[38] U.N. Special Rapporteur, *Promotion and Protection of the Right to Freedom of Opinion and Expression*, ¶ II.D.22, U.N. Doc. A/76/258 (July 30, 2021), https://www.ohchr.org/en/documents/thematic-reports/a76258-gender-justice-and-freedom-expression-report-special-rapporteur.

[39] *See, e.g.*, Aliosha Hurry, *Defamation as a Sword: The Weaponization of Civil Liability against Sexual Assault Survivors in the Post-#MeToo Era*, 34 CAN. J. WOMEN & L. 82, 84 (2022) (noting how defamation lawsuits have a chilling effect on victims speaking out against abuse).

[40] The threat of defamation lawsuits may chill victims from seeking protective orders against abusers when such applications can be used against them.  *See False Allegations, Case Unfounding, and Victim Recantations in the Context of Sexual Assault*, ATT'Y GEN.'S SEXUAL ASSAULT TASK FORCE 3 (Jan. 10, 2018), https://evawintl.org/wp-content/uploads/ORSATFPaperFalseReports.pdf (stating that victims may choose not to speak out against abuse due to socio-cultural influences such as isolation or disapproval from their community).

[41] *See* Ruth A. Kennedy, *Insulating Sexual Harassment Grievance Procedures from the Chilling Effect of Defamation Litigation*, 69 WASH. L. REV. 235 (1994).

For perpetrators, offensive "lawsuits are an opportunity to enforce DARVO through civil litigation."[42] "Strategic Lawsuit Against Public Participation" or "SLAPP" suits, as coined by Professors George Pring and Penelope Canan,[43] were first used to "quash controversial speech" in the 1970s and 1980s. As scholars note, "SLAPP suits are designed to chill or punish the speech of individuals or organizations who speak out on issues of public interest or concern."[44] And when used to threaten litigation or to overtly and covertly attack the credibility of victims, "a defamation lawsuit in this context is therefore an act of DARVO."[45] These lawsuits have "provide[d] an avenue for targeted legal attacks against survivors of sexual assault or domestic violence[]" especially with the "#MeToo movement [that] catalyzed an upsurge in SLAPP suits brought by the accused with the sole intent to intimidate and silence their accusers, leaving indigent survivors or those without financial resources to defend themselves to bear the brunt of such meritless claims."[46]

Statistical evidence confirms the increasing usage of DARVO tactics, including the weaponization of the law against victims. For example, a 2016 survey of undergraduates analyzed responses that each participant received when asked an open-ended prompt to share "a time when you confronted someone who wronged you in some way."[47] After being asked to recall a specific time they confronted someone else over this wrongdoing, participants were asked how much phrases in a questionnaire resembled three DARVO elements (denial, victim-blaming, and

---

[42] Harsey & Freyd, *Defamation and DARVO*, *supra* note 5, at 482.

[43] George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPS"): An Introduction for Bench, Bar, and Bystanders*, 12 Bridgeport L. Rev. 937, 939 (1992).

[44] Jennifer Safstrom, *Time to SLAPP Back: Advocating Against the Adverse Civil Liberties Implications of Litigation That Undermines Public Participation*, 3 LSU L.J. Soc. Just. & Pol'y 125, 132 (2023).

[45] Harsey & Freyd, *Defamation and DARVO*, *supra* note 5, at 483.

[46] Safstrom, *supra* note 44, at 142.

[47] Harsey, et al., *Perpetrator Responses*, *supra* note 9.

assuming a victimized role) on a five-point scale (from "not at all like this" to "almost exactly like this").[48]  Nearly 72% "of participants indicated they heard at least one phrase each . . . from all three components of DARVO," which showed "that DARVO was indeed commonly experienced by individuals who confronted another person over a wide variety of wrong-doings, ranging from milder social indiscretions between acquaintances to more severe interpersonal abuses."[49]

In 2017, one attorney who worked with campus sexual assault victims shared that "previously only a small fraction—five percent—of her cases included a defamation lawsuit but more recently that number had jumped to about 50%."[50]  A 2020 review by MotherJones of court records and media since 2014 found that over 100 defamation lawsuits had been brought against individuals raising sexual assault and harassment allegations, with nearly half of those filed after the #MeToo campaign that emerged in October 2017.[51]  Even more "cases have been filed at a faster rate[]" since 2020.[52]  Advocacy groups like Know Your IX, which lobbies on behalf of student survivors of sexual violence, indicated that 23% of students who made Title IX complaints were threatened with defamation suits by their abusers.[53]

---

[48] *Id.* at 650.

[49] *Id.* at 655, 657

[50] Harsey & Freyd, *Defamation and DARVO*, *supra* note 5 at 481 (citing Tyler Kingkade, *As More College Students Say "Me Too," Accused Men Are Suing for Defamation*, BUZZFEED NEWS (Dec. 5, 2017), https://www.buzzfeednews.com/article/tylerkingkade/as-more-college-students-say-me-too-accused-men-are-suing).

[51] Madison Pauly, *She Said, He Sued: How Libel Law Is Being Turned Against MeToo Accusers*, MOTHER JONES (April. 2020), https://www.motherjones.com/criminal-justice/2020/02/metoo-me-too-defamation-libel-accuser-sexual-assault/.

[52] *Id.*

[53] Moira Donegan, *There's an Antifeminist Backlash Silencing Women – More and More Literally*, THE GUARDIAN (July 7, 2022), https://www.theguardian.com/commentisfree/2022/jul/07/theres-an-antifeminist-backlash-silencing-women-more-and-more-literally.

"For survivors of sexual violence, SLAPPs can be especially chilling."[54]  While there has been a historic understanding that "victims have chosen not to report their assault for many reasons, including financial consequences, guilt, fear of discrepancies in their stores, and public shame," now "liability resulting from highly visible defamation suits may be another."[55]  Individuals have shared that verdicts, in particular in high-profile celebrity cases, cause apprehension about pursuing relief.[56]  This is the purpose of DARVO-instigated lawsuits: to dissuade victims from speaking out.  Ms. Lively's case, however, is critical for victims to see that appropriately protectionist statutes like California's Section 47.1 will shield them so that they may report abuse and seek protection without fear of retaliatory litigation.

## II.   STATE LEGISLATURES HAVE RESPONDED TO THE RISE OF MERITLESS DARVO DEFAMATION LAWSUITS BY ENACTING LAWS AFFORDING GREATER PROTECTION TO VICTIMS OF SEXUAL VIOLENCE

In response to ill-motivated SLAPP suits, state legislatures have proactively sought to enact or amend laws to protect individuals engaged in protected speech, commonly known as anti-SLAPP statutes.  As of January 2025, 34 states and the District of Columbia have enacted anti-SLAPP statutes to combat nuisance defamation lawsuits.[57]  These enactments permit early

---

[54] Alyssa R. Leader, Note, *A "Slapp" in the Face of Free Speech: Protecting Survivors' Rights to Speak Up in the "Me Too" Era*, 17 FIRST. AMEND. L. REV. 441, 448 (2019) (citation omitted).

[55] Katharine Rubery, Comment, *Reporting Sexual Assault: What Privileges Should Exist in Defamation Suits Stemming from a Police Report*, 50 FORDHAM URB. L.J. 907, 909 (2023) (citing Shaila Dewan, *Why Women Can Take Years to Come Forward with Sexual Assault Allegations*, N.Y. TIMES (Sept. 18, 2018), https://www.nytimes.com/2018/09/18/us/kavanaugh-christine-blasey-ford.html).

[56] *See* Jessica Winter, *The Johnny Depp-Heard Verdict Is Chilling*, THE NEW YORKER (June 2, 2022), https://www.newyorker.com/culture/cultural-comment/the-depp-heard-verdict-is-chilling (noting how victims may believe that "they will be disbelieved, harassed, shamed, and ostracized if they press charges or share their experiences"); Mary-Claire Dale & Jocelyn Noveck, *Depp-Heard Trial: Advocates Fear Chilling Effect on Accusers*, ASSOCIATED PRESS (June 3, 2022), https://apnews.com/article/bill-cosby-johnny-depp-amber-heard-entertainment-politics-c105463a8b87f54d2ce19a9cd772a5d1 (recounting concerns expressed by Christine Scartz, director of the University of Georgia School of Law's Family justice clinic, that the *Depp v. Heard* verdict may prevent victims from pursuing claims for fear of being called a liar).

[57] *See, e.g.*, CAL. CIV. PROC. CODE § 425.16 (2023); 735 ILL. COMP. STAT. ANN. 110/15 (2019); N.Y. CIV. RIGHTS LAW §§ 70-a & 76-a (2020); *see also Anti-SLAPP Legal Guide*, REPS. COMM. FOR FREEDOM OF THE PRESS (2025), https://www.rcfp.org/anti-slapp-legal-guide/.  Those jurisdictions that have adopted anti-SLAPP statutes include:

dismissal of meritless SLAPP suits, save costs, and protect free speech.[58]  Such anti-SLAPP laws, like Section 425.16 of the California Code of Civil Procedure, were "'enacted to allow dismissal of meritless [F]irst [A]mendment cases aimed at chilling expression through costly, time-consuming litigation.'"[59]  *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017) (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001)); *see also Benlevi v. Rukaj*, 2024 N.Y. Misc. LEXIS 24737, at *6 (N.Y. Civ. Ct. Aug. 13, 2024) ("[T]he purposes and intents of the Anti-SLAPP Law [is] to deter and punish those who would bring meritless harassing litigations in contravention of public policy.").

Notwithstanding the underlying purpose of anti-SLAPP statutes to prevent meritless nuisance suits, many of these laws originally did not include express language aimed at protecting victims of sexual assault, abuse, or discrimination or built-in protections for victims forced to defend against such lawsuits to reduce the financial burden of litigation.[60]  As a result of advocacy

---

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Vermont, Virginia, and Washington. *Id.*

[58] *See, e.g.*, Samuel J. Morley, *Florida's Expanded Anti-SLAPP Law: More Protection for Targeted Speakers*, 90 FLA. BAR J. 16 (2016) ("the purpose of anti-SLAPP laws has always been clear – to stop abusive lawsuits brought to chill speech . . ."); Brooke White, Comment, *The SLAPP Happy State: Now Is the Time for Ohio to Pass Anti-SLAPP Legislation*, 74 CASE W. RES. 559, 567 (2023) ("Indeed, one of the primary purposes of anti-SLAPP legislation is to allow the expeditious dismissal of frivolous lawsuits so that defendants do not have to spend exorbitant amounts of money to defend themselves.").

[59] *See* Jonathan Segal, *Anti-SLAPP Law Make Benefit for Glorious Entertainment Industry of America: Borat, Reality Bites, and the Construction of an Anti-SLAPP Fence Around the First Amendment*, 26 CARDOZO ARTS & ENT. L.J. 639, 641 (2009) ("California's anti-SLAPP law, and others like it across the United States, gave dissenters another option, offering them a mechanism to get a SLAPP suit dismissed and to collect their attorney's fees from whoever filed the meritless suit in the first place.  Such anti-SLAPP laws offered this litigation privilege to those who were sued over their participation in government debates and public controversies, focusing especially on those who were sued for exercising their rights to petition or lobby the government and participate fully in civic life"); Andrew Beckerman-Rodau, *Prior Restraints and Intellectual Property: The Class Between Intellectual Property and the First Amendment from an Economic Perspective*, 12 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1, 3 n.14 (2001) ("Most SLAPP suits are meritless.  They are brought to coerce or intimidate vocal critics into ceasing exercise of their First Amendment rights to speak out.").

[60] Jaclyn Diaz, *This Lawyer Is Fighting Defamation Lawsuits That Can Silence Sexual Assault Victims*, NPR (Nov. 10, 2024), https://www.npr.org/2024/11/08/nx-s1-5111723/me-too-assault-victims-protections-defamation.

work by organizations to raise awareness of these issues, policymakers in California, New York, and Illinois have introduced and enacted bills to add explicit protections for victims of sexual violence or harassment from being targeted through retaliatory defamation lawsuits. *See*, *e.g.*, CAL. CIV. CODE § 47.1 (2024) (creating a privilege for communications or statements made without malice about "sexual assault, harassment, or discrimination"); N.Y. S-52A (2020) (amending N.Y. CIV. RIGHTS LAW § 70-a & 76-a, expanding protections against retaliatory lawsuits to include more people who report misconduct, including victims); Ill. H.B. 5452 (2024) (amending Illinois's anti-SLAPP law to explicitly protect victims). Legislatures in other states, including New Hampshire, Delaware, Oregon, and New Jersey have introduced similar bills to statutorily protect victims against such lawsuits.[61]

In this Part, *Amici* aim to equip the Court with additional context behind these statutory amendments that demonstrate that they were intended to afford greater protections of speech to victims in Ms. Lively's current situation.[62]

---

[61] *See*, *e.g.*, N.H. H.B. No. 2025-391-FN, 169th Gen. Ct., 2025 Reg. Sess. (introduced Jan. 23, 2025) (establishing legal process for preventing SLAPP suits by granting qualified immunity from suit for defendants that impacts their First Amendment rights); Del. Senate Bill No. 312, 152d Gen. Assemb. (introduced May 21, 2024) (seeking to adopt Uniform Public Expression Protection Act to protect public's right to engage in activities protected by First Amendment without expensive legal retaliation); Oregon Senate Bill 180, 83d Legis. Assemb., Reg. Sess. (as passed by House and Senate, May 29, 2025) (seeking to protect victims who make communications regarding sexual assault, harassment or discrimination from defamation claims when made without malice and providing attorneys' fees and imposition of remedial sanctions against plaintiff); N.J. Assemb. B. No. 4857, 221st Legis., Reg. Sess. (as passed by Assembly, May 22, 2025) (designed to extend anti-SLAPP protections to complaints of sexual assault, harassment, and discrimination by protecting reports or complaints made "in good faith and without malice.").

[62] While *Amici* acknowledge that Ms. Lively may not be the intended target for the protections against financial expenses associated with litigation, it is worth noting that she is up against a billionaire who has promised to spend $100 million. *See* Monica Hunter-Hart, *Meet the Little-known Billionaire Caught Up in the Baldoni-Lively Scandal*, FORBES AUSTL. (Jan. 10, 2025), https://www.forbes.com.au/news/billionaires/meet-the-little-known-billionaire-caught-up-in-the-baldoni-lively-scandal/ (referring to Ms. Lively's Complaint suggesting that Steve Sarowitz, co-founder of Wayfarer Studios, is prepared to spend $100 million to ruin the lives of Ms. Lively and her family, and Mr. Sarowitz's attorney confirmed that "his client is prepared to spend whatever necessary to defend Baldoni, Wayfarer Studios and himself.")

A.     **California's Anti-SLAPP Law Amendments**[63]

In 2019, California amended its Civil Code to expressly provide protections for individuals who make communications about sexual violence without malice.  Specifically, the law as amended provides that a "communication" that is made by an individual without malice "regarding an incident of sexual assault, harassment, or discrimination is privileged[.]"  CAL. CIV. CODE § 47.1(a).  The law specifically applies any individual who "has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not."  *Id.*  § 47.1(c).  "Communication" applies to a variety of forms of sexual violence including "factual information related to" any "incident of sexual assault, harassment, or discrimination experienced by the individual making the communication" that includes (but is not limited to): sexual assault, sexual harassment, workplace harassment or discrimination (and aiding, abetting, inciting, compelling, or coercing the same), workplace retaliation for reporting or opposing workplace harassment or discrimination, and cyber sexual bullying.  *Id.* § 47.1(d)(1)– (7).  The law not only protects victims' ability to speak out about their experiences, but also provides that attorney's fees that "shall be" awarded to "prevailing" victims in any defamation case brought against them for making a privileged communication for "successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action against them[.]"  *Id.* § 47.1(b).

The legislative history of Section 47.1 of the California Civil Code provides additional context in understanding the harm state legislatures like California intended to address.  After the #MeToo movement began in late 2017, lobbyist Pamela Lopez publicly accused former California

---

[63] Ms. Lively and the Wayfarer Parties agree that California laws apply to their claims.  *See* Lively Mem. at 10–11; Consol. Pls.' Mem. of Law In Opp'n to Def. Lively's Mot. to Dismiss Am. Compl.  ("Pls.' Opp'n Mem."), ECF No. 162, at 3 ("Lively and the Wayfarer Parties agree that California law applies to their claims.").

Assemblymember Matt Dababneh of sexually assaulting her at an event in Las Vegas.[64] Ms. Lopez initiated a formal complaint process with the California Rules Assembly Committee and gave a press conference that detailed the incident, identified Dababneh, and generated significant publicity.[65] Thereafter, in August 2018, Dababneh sued Ms. Lopez for both her complaint to the Assembly and the press conference for defamation and intentional infliction of emotional distress.[66] After filing an anti-SLAPP motion arguing that her complaint and press conference were protected under Section 47 of the California Civil Code, the trial court ruled her complaint was privileged, but her statements to the press were not, subjecting her to Dababneh's claims.[67] *Dababneh v. Lopez*, No. 4-2018-00238699-CU-DF-GDS, 2019 Cal. Super. LEXIS 63845 (Cal. Sup. Ct. Jan. 16, 2019). Despite the appeals court ultimately finding in 2021 that both Ms. Lopez's complaint and press conference statements were privileged, *see Dababneh v. Lopez*, No. C088848, 2021 Cal. App. Unpub. LEXIS 6258 (Cal. Ct. App. Oct. 1, 2021), her experience highlighted the danger posed by retaliatory defamation and related tort claims for those who suffer sexual assault and harassment.[68]

In February 2023, the California Legislature first introduced Section 47.1.[69] Comments to the Assembly Floor Analysis acknowledge that enacting Section 47.1 would codify then-existing

---

[64] *Assembly Floor Analysis: Comments*, Cal. AB-993 at 1 (as amended May 25, 2023), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240AB933#. "Floor Analyses" such as the "Assembly Floor Analysis" are prepared by the California State Assembly's Office of the Chief Clerk that provides the public and Assembly Members "with analyses, prepared by committee staff, of every bill and amendment on the Floor." *Assembly Floor Analysis*, CAL. STATE ASSEMBLY OFF. CHIEF CLERK (2025), https://clerk.assembly.ca.gov/about-us/assembly-floor-analysis#:~:text=The%20Assembly%20Floor%20Analysis%20(AFA,and%20amendment%20on%20the%20Floor.

[65] *Id.*

[66] *Id.*

[67] *Id.* at 2.

[68] *Id.*

[69] *Id.*

California law that already protected communications made without malice and "would also potentially help curb any unnecessary, and ultimately unsuccessful, litigation against individuals who choose to come forward with their stories of sexual assault and harassment."[70]  As stated in the Assembly Floor Analysis Comments, the California statute effectively:

> expands the privileges already encompassed in Section 47 of the Civil Code to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same.  The protections proposed by the bill would apply to individuals who, after relaying any factual statement, whether in the form of a formal complaint or a statement outside a formal proceeding such as to a media outlet, is sued for defamation.  The bill only applies to a statement by an individual who has experienced sexual harassment, assault, or discrimination. That is to say that the *perpetrator* of an incident of sexual harassment, assault, or discrimination would *not* be covered by the expanded protections.[71]

The amendment was intended to "dissuade litigation against those who have made the difficult decision to come forward about their experiences" and dissuade "a perpetrator who would otherwise opt to silence survivors by targeting them with litigation . . . due to the significant potential damages and penalties provided by this bill."[72]  In support of the bill, the California Employment Lawyers Association ("CELA") and Equal Rights Advocates ("ERA") wrote that it "provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits."[73]

---

[70] *Id.*

[71] *Id.* (emphasis in original).

[72] *Id.* at 3.

[73] *Id.*

The California Senate Floor Analysis[74] adds further color regarding the purposes of the bill.  In acknowledging that the "tort of defamation is also a frequent tool of persons who would chill legitimate speech [by way of SLAPP suits]" these plaintiff-perpetrators "file[] the lawsuit not because they expect to win—indeed, winning is not the point—but to use the cost and emotional toll of the lawsuit to (1) bully the defendant[-victim] into silence or to retaliate for speaking out against the plaintiff, and (2) intimidate others who might speak out, thereby chilling additional legitimate speech."[75]  In noting that the bill creates a conditional privilege for communications made regarding an incident of sexual assault, harassment, or discrimination, comments to the bill share that communications are protected when made without malice and by only the individual "who has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether or not the complaint was filed."[76]  The same organizations who filed arguments in support of the Assembly Floor Analysis, CELA and ERA, added:

> As news coverage of this abusive litigation tactic increases, our organizations are regularly contacted by workers, students, and others who are too fearful to speak out about sexual harassment and violence they have experienced for fear of being hit with a retaliatory defamation suit.  Even if they will ultimately prevail against such an attack, survivors are often unable to take on the cost and emotional toll of such lengthy and costly litigation[.][77]

---

[74] Like the Assembly Floor Analysis, the "Senate Floor Analysis" is "written by policy committee staff, includes point-by-point specifics on what the bill would do, the arguments in favor and against the bill, the fiscal impacts of the bill (if relevant), as well as the prior history of the bill and background information on the issue."  *What is the Office of Senate Floor Analyses*, CAL. STATE SENATE OFF. SENATE FLOOR ANALYSES (2025), https://sfa.senate.ca.gov/whatisthesenateofficeoffflooranalysis#:~:text=The%20Floor%20Analyses%2C%20written%20by,background%20information%20on%20the%20issue.

[75] *Senate Floor Analysis: Comments*, Cal. AB-993 at 4 (as amended May 25, 2023), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240AB933# .

[76] *Id.* at 5.

[77] *Id.* at 6.

The bill was thus aimed at protecting good faith speech without fear of retaliation.[78]  Section 47.1 was enacted on October 10, 2023, and became effective as of January 1, 2024.  *See* CAL. CIV. CODE § 47.1.

### B.    New York's Anti-SLAPP Law Amendments

In 2019, New York Senate Bill S-52A was introduced to amend Sections 70-a and 76-a of the New York Civil Rights Law to expand New York's anti-SLAPP statute by protecting defendant victims in legal actions "involving public petition and participation."  N.Y. CIV. RIGHTS LAW §§ 70-a & 76-a.  The intent of New York's amendments was clear: the "express intent when it amended the anti-SLAPP law in 2020, proclaiming repeatedly in legislative memoranda, press releases, and other public statements that the prior law had allowed survivors to be dragged through the courts on retaliatory claims solely intended to silence them, and that the new law would protect survivors."[79]  An "action involving public petition and participation" is defined to include claims based upon:

> (1)    any communication in a place open to the public or a public forum in connection with an issue of public interest; or

> (2)    any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. CIV. RIGHTS LAW § 76-a(1)(a)(1)-(2).

"[C]ommunication" means "any statement, claim, allegation in a proceeding, decision, protest, writing, argument, contention or other expression," N.Y. CIV. RIGHTS LAW § 76-a(1)(c), and "[p]ublic interest" "shall be construed broadly, and shall mean any subject other than a purely

---

[78] *Id.*

[79] Aff. In Supp. of Prop. *Amicus* Br. at 7, Ventura v. Todaro, No. 2024-10775 (N.Y. App. Div. 2d Dep't Jan. 29, 2025).

private matter." *Id.* § 76-a(1)(d). As designed, the law allows a defendant-victim to obtain dismissal of a SLAPP suit by filing a motion to dismiss demonstrating that the action involves "public petition and participation," thereby shifting the burden to the plaintiff to show the lawsuit has "a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law[.]" *Id.* § 70-a(1)(a); *see also* N.Y. C.P.L.R. 3211(g)(1).[80] If the court finds that the plaintiff failed to meet this burden, the defendant is entitled to "costs and attorney's fees [which *shall be* recovered," with compensatory and punitive damages upon a demonstration that the action "was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." N.Y. CIV. RIGHTS LAW § 70-a(1)(a)–(c) (emphasis added).

The legislative history of Senate Bill S-52A further illuminates the intention behind the law. In acknowledging that Section 76-a of the New York Civil Rights Law was enacted to protect free speech, "particularly where such rights are exercised in a public forum with respect to issues of public concern," the Sponsoring Memoranda of Senate Bill S-52A suggest that the law had been "narrowly interpreted by the courts," and in application, Section 76-a "failed to accomplish th[is] objective."[81] Noting that in practice, Section 76-a had been "strictly limited" to cases initiated by persons or business entities "embroiled in controversies over a public application or permit" in real

---

[80] Section 3211(g)(1) of the New York Civil Practice Law and Rules was also amended by Senate Bill S-52A and includes the standards for motions to dismiss in cases involving public petition and participation. As Section 70-a(1)(a) demands, the plaintiff must show "that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant preference in the hearing of such motion." N.Y. C.P.L.R. 3211(g)(1) (2022).

[81] *N.Y. Senate Sponsor's Memoranda*, N.Y. S-52A (rev. July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/S52; *see also Harris v. Am. Acct. Ass'n*, No. 20-CV-01057 (MAD) (ATB), 2021 U.S. Dist. LEXIS 226517, at *40 (N.D.N.Y. Nov. 24, 2021) (awarding costs and attorney's fees noting "[p]laintiff's attempted use of the threat of crippling legal fees to intimidate the [defendants] into complying with his demands, and his subsequent commencement of this meritless litigation, appear to be precisely the type of conduct against which New York's anti-SLAPP statute was designed to protect."); *Great Wall Med. P.C. v. Levine*, 2022 N.Y. Misc. LEXIS 988, at *8 (N.Y. Sup. Ct. Mar. 8, 2022) (awarding costs and attorney's fees in defending action after New York's anti-SLAPP statute was amended).

20

estate development matters, revising the definition of "action involving public petition and participation" would "better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law[,]" by "broadly widening the ambit of the law to include matters of 'public interest[.]'"[82]

Additionally, the Sponsor Memoranda make it clear that New York courts seldom imposed remedies to defendants of SLAPP suits evidencing a "failure to use their discretionary power to award costs and attorney's fees to a defendant found to have been victimized by actions intended only to chill free speech."[83]  Thus the additional amendments of mandatory awards of attorney's fees and costs "will protect citizens by encouraging only meritorious litigation."[84]

After signed into law, commentary provided additional context that explained the basis for why New York's amendments were enacted in the first place.[85]  New York State Senator Brad Hoylman-Sigal, a co-sponsor of the bill, commented that its passage "prevent[s] the rich and powerful from abusing our legal system to silence their critics," and the amendments to the anti-SLAPP law would align New York with other states like California that have afforded additional

---

[82] *N.Y. Senate Sponsor's Memoranda*, N.Y. S-52A.

[83] *Id.*

[84] *Id.*

[85] *See, e.g.*, Press Release, *NYCLU Statement on Signing of Anti-SLAPP Bill*, ACLU OF N.Y. (Nov. 10, 2020), https://www.nyclu.org/press-release/nyclu-statement-signing-anti-slapp-bill ("With this law in place, academics, writers, publishers, artists, critics, and commentators who speak truth to power won't be silenced by expensive litigation.  This now puts New York in line with nearly 30 other states who have updated their free speech protections for the modern era."); Bernadette Hogan, *Cuomo Signs Law Making It Harder for Rich and Powerful to File Lawsuits to Stifle Free Speech*, N.Y. POST (Nov. 10, 2020), https://nypost.com/2020/11/10/cuomo-signs-law-making-it-harder-to-file-lawsuits-to-stifle-free-speech/ (quoting N.Y. State Senator Brad Holyman "'Whether it be journalists, activists or victims of sexual harassment in the workplace, it crosses a line where a defamation suit is weaponized against a victim.'"); Theresa M. House, *New York's New and Improved Anti-SLAPP Law Effective Immediately*, ARNOLD & PORTER KAYE SCHOLER LLP (Nov. 17, 2020), https://www.arnoldporter.com/en/perspectives/advisories/2020/11/new-yorks-new-anti-slapp-law (noting that the law "dramatically expands protections afforded to defendants in lawsuits . . . and which significantly increases the risks to potential plaintiffs bringing defamation and other speech-based claims in New York" and "Companies and individuals facing speech-based claims should consider this a powerful took that will allow them greater freedom and legal certainty to engage in public speech.").

protections to victims.[86]  New York's amended law further exemplifies legislative commitment to protect victims.

### C.     Legislative Efforts Impact Victims

Both California and New York's recent statutory amendments reflect legislative efforts to statutorily protect victims from retaliatory defamation lawsuits and the importance of broad language in anti-SLAPP statutes.  These laws provide clear standards and financial relief by way of recovering attorney's fees and costs for defending against harassing litigation, which may ameliorate the significant barriers victims face when defending against burdensome and costly actions brought by their perpetrators.  The impact of these statutes can be very real.  Estimates suggest that one in three women and one in ten men experience unwanted sexual contact, and yet only one in 20 of experiences of sexual violence is actually reported.[87]  In a world with these statistics, anti-SLAPP statutes that do not provide additional protections to protect victims from meritless defamation lawsuits will continue to chill reporting.  One scholar reported the story of a victim who spoke out about her abuse by a White House staff member and was sued by her abuser for $4 million.[88]  This victim was sued in Massachusetts, a state without an anti-SLAPP statute with protectionist language like California and New York, and shared "'[m]y life has been destroyed.  I have sacrificed more than I ever imagined,'" where "[s]he sums up the threat of SLAPPs in only a few words: 'This is why abuse victims stay silent.'"[89]  It was precisely because of the chilling effects, as exemplified in this lawsuit, that the California legislature passed

---

[86] Press Release, Brad Hoylman-Sigal, *Free Speech 'SLAPPs Back: Governor Signs Hoylman/Weinstein Legislation to Crack Down on Meritless Lawsuits Used to Silence Critics*, N.Y. STATE SENATE (Nov. 10, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/free-speech-slapps-back-governor-signs.

[87] Safstrom, *supra* note 44, at 147 (footnote citations and quotations omitted).

[88] Leader, *supra* note 54, at 476.

[89] *Id.* (quoting the victim).

Section 47.1 to protect victims of sexual harassment or sexual violence who may have been afraid to come forward with their complaints.[90]

In contrast to Massachusetts, California's expansive anti-SLAPP language—even before it was amended to explicitly capture speech about sexual violence,[91] *see* CAL. CIV. PROC. CODE § 425.16—has been tested and has protected victims like indie rocker Phoebe Bridgers who was sued for defamation after she posted on her Instagram account that she "witnessed and can personally verify much of the abuse (grooming, stealing, violence) perpetuated" by her abuser, Chris Nelson.[92]  After Nelson sued for defamation, false light, intentional infliction of emotional distress, intentional interference with prospective economic relations, and negligent interference with prospective economic relations, Bridgers successfully moved to dismiss and Nelson appealed.[93]  In 2024, the California Court of Appeal affirmed both the granting of her special motion to strike and the award of attorney's fees.[94]  *Nelson v. Bridgers*, Nos. B325454, B328612, B330346, 2024 Cal. App. Unpub. LEXIS 6911, at *1 (Cal. Ct. App. Oct. 30, 2024).  In doing so, the court noted that "the post [at issue] related to public concerns, especially prevalent in light of the #MeToo movement, about men using their power to abuse women." *Id.* at *3.  Ms. Bridgers' case further exemplifies California's commitment to protecting discourse about one's individual

---

[90] *See* Beth V. West, *California Law Now Provides an Express Statutory Privilege Against Defamation Claims by Those Accused of Sexual Harassment*, WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORP. (July 16, 2018), https://www.thelelawblog.com/2018/07/articles/harassment/california-law-now-provides-an-express-statutory-privilege-against-defamation-claims-by-those-accused-of-sexual-harassment/.

[91] Despite contentions otherwise, *see* Pls.' Opp'n Mem. at 14, California's enactment of Section 47.1 codified existing California practice and application of its anti-SLAPP statute as exemplified in Ms. Bridgers' case.  *See Dababneh*, 2021 Cal. App. Unpub. LEXIS 6258, at *17–19 (applying California's anti-SLAPP statute); *see also Assembly Floor Analysis: Comments*, Cal. AB-993 at 2.

[92] Raphael Helfand, *Defamation Lawsuit Against Phoebe Bridgers Dismissed*, THE FADER (Nov. 10, 2022), https://www.thefader.com/2022/11/10/defamation-lawsuit-against-phoebe-bridgers-dismissed.

[93] *Id.*

[94] *See also* Maia Spoto, *Singer Phoebe Bridgers Defeats Defamation Suit Again on Appeal*, BLOOMBERG NEWS (Oct. 30, 2024), https://news.bloomberglaw.com/litigation/singer-phoebe-bridgers-defeats-defamation-suit-again-on-appeal.

#MeToo experience before Section 47.1 was enacted, which only underscores the significance of the legislature explicitly privileging communications about sexual violence.

New York's amended anti-SLAPP statute also protects journalists who exercise their First Amendment rights when reporting on sexual misconduct, like Michael Balter who was sued by Danielle Kurin, an archaeologist at the University of California, Santa Barbara after he did exactly that.[95]  In 2020, Mr. Balter had reported on Kurin's abuse and retaliation of her students through several posts online.[96]  In a letter to the Honorable Vincent L. Briccetti just two months after New York modified its anti-SLAPP law as described *supra*, Mr. Balter's counsel advised the Court that he intended to apply the statute in Mr. Balter's case.[97] The amended language in New York, while designed to protect women, also protects journalists who seek to share those stories because they are matters of "public interest," which was added to the law.  Again, in response to the previous anti-SLAPP statute's language, the amendments aim to provide more protection, and in turn promote more speech.[98]

Ms. Lively's statements about her workplace experience of sexual harassment, and the *New York Times*' reporting of the same, are precisely the kind of statements that the California and New York statutes protect as privileged.  Indeed, California's amendments were motivated by

---

[95] Michael Balter, *Attorneys for #MeToo Reporter, Citing New York's New Anti-SLAPP Law, Ask Federal Judge to Consider Motion for Summary Judgment*, BALTER'S BLOG (Jan. 5, 2021, 12:16 PM), https://michael-balter.blogspot.com/2021/01/attorneys-for-metoo-reporter-citing-new_5.html.

[96] *See* Michael Balter, *A Guide to My Reporting on Alleged Misconduct by UC Santa Barbara Archaeologist Danielle Kurin [Updated Aug. 10, 2022]*, BALTER'S BLOG (Nov. 16, 2020, 11:47 AM), https://michael-balter.blogspot.com/2020/11/a-guide-to-my-reporting-on-alleged.html.

[97] Def.'s Ltr. Req. Pre-Mot. Conf., Kurin v. Balter, No. 20-CV-04613 (S.D.N.Y.).

[98] *See*, *e.g.* Mot. for Leave to File *Amicus* Br. at 15, Coleman v. Grand, No. 21-800 (2d Cir. 2021), *on appeal from* 523 F. Supp. 3d 244 (E.D.N.Y. 2021) ("In this case, the lower court's decision effectuates the intent of New York's legislature to protect those speaking out against sexual misconduct and other issues of public importance.  It also provides journalists covering #MeToo issues with the breathing room necessary to share survivors' accounts and facilitate public discussion about complex issues surrounding the #MeToo Movement […] Journalists seeking to give a voice to survivors of sexual harassment and assault should be encouraged in this reporting, not punished and deterred.").

statements made to the press about a prominent figure, which is symmetrical to Ms. Lively's statements that were "communications" about her experience of workplace harassment that were then published by the *New York Times*.[99]  CAL. CIV. CODE § 47.1(d).  *Amici* are highly familiar with how reluctant victims are to come forward to confront their accusers, even in the wake of #MeToo.  The threat or reality of defamation suits further serve to silence victims.  When aware of these realities, legislative decisions to prioritize and protect certain rights must be respected. Here, that is a right to speak about one's own experience and seek legal action without fear that those statements will subject one to liability in litigation.  The statutory protections Ms. Lively has invoked under California law, which are similarly enshrined in New York law, protect her from precisely the kind of meritless claim the Wayfarer Parties have asserted in this case.  The Wayfarer Parties' attempt to undermine those statutory protections are meritless and would further serve to chill victims from reporting their harassment knowing they could be subject to civil liability.

## III.    A RULING DISMISSING THE WAYFARER PARTIES' LAWSUIT WOULD FURTHER ADVANCE THE LEGISLATIVE INTENT BEHIND RECENT ENACTMENTS

Since the rise of the #MeToo movement—which originated in the entertainment industry— sexual violence has generated widespread publicity.[100]  Disputes involving celebrities, and the resolution of their cases, carry enormous cultural impact.  As some have observed, "the impact of Me Too on Hollywood has been profound and far reaching[,]" leading to shifts in hiring practices,

---

[99] *See Assembly Floor Analysis: Comments*, Cal. AB-993 at 1.

[100] *See*, *e.g.*, *Harvey Weinstein Timeline: How the Scandal Has Unfolded*, BBC (Feb. 24, 2023), https://www.bbc.com/news/entertainment-arts-41594672; Rebecca Nicholson, *Depp v Heard Review – Amber and Johnny Make for Profoundly Depressing Television*, THE GUARDIAN (May 21, 2023), https://www.theguardian.com/tv-and-radio/2023/may/21/johnny-depp-v-amber-heard-review-profoundly-depressing-television; *Cosby's Conviction and How #MeToo Is Affecting Legal Cases*, Winston & Strawn LLP (Apr. 26, 2018), https://www.winston.com/en/insights-news/cosby-s-conviction-and-how-metoo-is-affecting-legal-cases; *see also* Julia Jacobs, *#MeToo Cases' New Legal Battleground: Defamation Lawsuits*, N.Y. TIMES (Jan. 12, 2020), https://www.nytimes.com/2020/01/12/arts/defamation-me-too.html.

stricter workplace harassment protocols, mandatory training sessions, "immediate investigations of claims and 'zero tolerance' policies for those found guilty of misconduct."[101] "The movement made these issues impossible to ignore by empowering millions of survivors to share their stories, leading to a broader understanding that sexual violence is not merely a series of isolated incidents but rather a widespread, systemic problem."[102] At the same time, #MeToo has been met with increasing backlash, including through defamation lawsuits where social media in particular has been used to attack the credibility of victims.[103] In minute-to-minute updates of ongoing court proceedings, especially in high profile cases, the public can observe first-hand and in real time how victims are second-guessed, commented on and ridiculed, which can have a chilling effect on those contemplating reporting their own experienced harm.[104]

The Court's ruling will have a broader impact beyond the entertainment industry and beyond the litigants in this action. As discussed *supra*, one of the cornerstone values of DARVO tactics is to tie up the victim's resources to force them into submission, even where the victim initially attempted to hold their perpetrator accountable. *See, e.g., Briggs v. Eden Council for Hope & Opportunity*, 969 P.2d 564, 577 (Cal. 1999) (Baxter, J., concurring and dissenting)

---

[101] *How the #MeToo Movement Changed Hollywood and Society At-Large*, LAS VEGAS SUN (Apr. 28, 2025), https://lasvegassun.com/news/2025/apr/28/how-the-metoo-movement-changed-hollywood-and-socie/.

[102] *Id.*

[103] *See* Alexandra Del Rosario, *TikTok's Impact on the Depp-Heard Trial Takes Center Stage in a New NBC Documentary*, L.A. TIMES (July 13, 2022), https://www.latimes.com/entertainment-arts/story/2022-07-13/johnny-depp-amber-heard-defamation-trial-tiktok-documentary ("When the court hearings began in April, TikTok became a hotspot for seemingly endless pro-Depp and anti-Heard memes and videos about the trial[.]"); Eliana Dockterman, *The Depp-Heard Trial Perpetuates the Myth of the Perfect Victim*, TIME (June 2, 2022), https://time.com/6183505/amber-heard-perfect-victim-myth-johnny-depp/ (discussing how TikTok videos "were cut and memed and paired with disinformation to paint Heard as a harlot, a drunk, a liar" and how a viral post on TikTok with hundreds of thousands of likes wrote over Heard's bruised face, "He could have killed you …. He had every right"); Deborah Tuerkheimer, *This Was Never About Amber Heard*, MS. (June 2, 2022), https://msmagazine.com/2022/06/02/amber-heard-sexual-abuse-domestic-violence-believe-women/ (noting how "Heard has also been widely skewered for her demeanor on the witness stand" and that victims may be perceived as not credible where they are "overly upset" or alternatively "don't show obvious signs of emotional distress").

[104] *See* Winter, *supra* note 56.

("Furthermore, retaliation against the SLAPPer may be counter-productive because it ties up the SLAPPee's resources even longer than defending the SLAPP suit itself."). This allows perpetrators to capture two audiences: recruit sympathetic supporters who believe them and condemn the victim who may not have resources to combat the perpetrator.[105] It is essential that perpetrators are not incentivized to bring sham litigation to further subject their victims to abuse.

While the litigants in this action are well-resourced, most victims are inhibited by socio-economic limitations. According to Jennifer Mondino, Senior Director of the National Women's Law Center's Times Up Legal Defense Fund, "people in all walks of life and all kinds of industries in all parts of the country fac[e] these kinds of defamation charges as a form of retaliation."[106] "Many defendant [victims] in these legal actions are not privileged and do not have access to the financial resources necessary for legal representation."[107] Beyond financial constraints to retain counsel and tie up financial resources to attack these meritless defamation cases initiated by perpetrators, access to "legal representation is further complicated for survivors experiencing intersecting forms of structural marginalization such as racism, colonialism, ableism, and homophobia."[108] In one commentary, it was reported that in a ten-month time period the Time's Up Legal Defense Fund received more than 3,500 requests for assistance from workers in more than 60 different industries, two-thirds of which came from low-income workers, 40% are women

---

[105] *See* Harsey, *et al.*, *Associations*, *supra* note 12.

[106] Diaz, *supra* note 60; *see also* Olivia Cleal, *Victim-Survivors Are Encouraged to Speak Out About Sexual Harassment. Defamation Laws Stop Them in Their Tracks*, Women's Agenda (May 17, 2024), https://womensagenda.com.au/latest/victim-survivors-are-encouraged-to-speak-out-about-sexual-harassment-defamation-laws-stop-them-in-their-tracks/ ("experts say it happens more often than not to underrepresented and disadvantaged women").

[107] *Thursday Thinkpiece: Suing for Silence: Sexual Violence and Defamation Law*, Slaw (Apr. 4, 2024), https://www.slaw.ca/2024/04/04/thursday-thinkpiece-suing-for-silence-sexual-violence-and-defamation-law/ (excerpting MANDI GRAY, SUING FOR SILENCE: SEXUAL VIOLENCE AND DEFAMATION LAW (UBC Press 2024)).

[108] *Id.*

of color, and 10% were members of the LGBTQ community.[109]  Financial, cultural, and other marginalized barriers to entry into the complex and costly legal arena counsel in favor of dismissal to indicate that meritless defamation cases should not be brought, and if they are, prompt judicial resolution will prevent further abuse of the legal system.

Dismissing meritless defamation lawsuits at an early stage is also important to encourage reporting of sexual violence or harassment since victims seldom fabricate stories.  "Less than 1% of reported rapes are false allegations."[110]  Other reports have shown that due to terminology differences or methods to evaluate data, the prevalence of false reporting is between 2-10%.[111] This is especially true when victims already underreport because, for example, 20% of victims feared retaliation, 13% believed the police would not do anything to help, 13% believed it was a private matter, and 8% believed it was not important enough to report.[112]  The law should encourage reporting, not dissuade it.

---

[109] Tina Tchen, Editorial, *#MeToo Identified a Disease That Infects Business.  We Still Have a Long Way to Go*, CNN Bus. (Oct. 15, 2018), https://www.cnn.com/2018/10/14/perspectives/metoo-anniversary/index.html.

[110] Rubery*, supra* note 55, at 925 (citing Katie Heaney, *Almost No One Is Falsely Accused of Rape*, CUT (Oct. 5, 2018), https://www.thecut.com/article/false-rape-accusations.html).

[111] *False Reporting*, NAT'L SEXUAL VIOLENCE RES. CTR. 3 (2012), https://www.nsvrc.org/sites/default/files/2012-03/Publications_NSVRC_Overview_False-Reporting.pdf (citing studies).  For example, using qualitative and quantitative analysis, a study of 812 reports of sexual assaults from 2000-2003 found just over two percent rate of false reports.  *Id.*

[112] *See* Jacey Passmore, *The Underreporting and Dismissal of Sexual Assault Cases Against Women in the United States*, BALLARD BRIEF (June 2023), https://ballardbrief.byu.edu/issue-briefs/the-underreporting-and-dismissal-of-sexual-assault-cases-against-women-in-the-united-states.

## **CONCLUSION**

The pervasive chilling effects from the use of DARVO tactics in the workplace and in litigation would be exacerbated by allowing the Wayfarer Parties' meritless defamation claim to proceed past the motion to dismiss stage in this high-profile litigation. *Amici* respectfully urge the Court to grant Ms. Lively's motion to dismiss.

Dated: June 4, 2025                                        Respectfully submitted,

                                                          /s/ *John Terzaken*

                                                          John Terzaken (*pro hac vice* pending)
                                                          SIMPSON THACHER & BARTLETT LLP
                                                          900 G. Street, N.W.
                                                          Washington, D.C. 20001
                                                          Telephone: (202) 636-5500
                                                          Facsimile: (202) 636-5502
                                                          Email: john.terzaken@stblaw.com

                                                          Sarah E. Phillips
                                                          Jacob Lundqvist
                                                          Damian P. Gallagher
                                                          SIMPSON THACHER & BARTLETT LLP
                                                          425 Lexington Avenue
                                                          New York, N.Y. 10017
                                                          Telephone: (212) 455-2000
                                                          Facsimile: (212) 455-2502
                                                          Email: sarah.phillips@stblaw.com
                                                                  jacob.lundqvist@stblaw.com
                                                                  damian.gallagher@stblaw.com

                                                          *Counsel to Amici*

**ANNEX A**
**LIST OF *AMICI***

1.      **Sanctuary for Families** is one of the nation's leading nonprofit service providers and advocates for survivors of domestic violence, sex trafficking and other related forms of gender violence.  Founded in 1984, Sanctuary for Families is committed to assisting survivors holistically to achieve legal representation, safety, economic self-sufficiency and empowerment while improving the response of systems to survivors' complex and multifaceted needs.  Each year, Sanctuary for Families helps more than 7,000 adults and children move from fear and abuse to safety and stability through comprehensive services and advocacy.

2.      The **National Organization for Women (NOW)**'s mission is to take action through intersectional grassroots activism to promote feminist ideals, lead societal change, eliminate discrimination, and achieve and protect equal rights for all women and girls in all aspects of social, political, and economic life.  Essentially, NOW aims to bring women into full participation in mainstream society, exercising all the privileges and responsibilities of citizenship in equal partnership with men.  NOW has long fought to end all forms of violence against women and girls, which we understand to be acute forms of gender discrimination, and advocated for survivors of such abuse to raise their voices in the pursuit of protection and justice.  NOW is deeply concerned about the damaging impact of DARVO on the ability of survivors to disclose abuse.

3.      The **National Organization for Women NYC** and **Women's Justice NOW (NOW)** amplify the voices of women and girls through action and accountability, creating a community where New Yorkers passionate about women's rights can unite for change.  Our mission focuses on advancing laws, promoting women in politics, fighting for reproductive justice, challenging discrimination and gender-based violence, and acting NOW.  NOW has been increasingly alarmed by the growing use of DARVO tactics that weaponize the legal system to

intimidate and silence survivors of sexual harassment and abuse and related forms of gender-based violence.

4.    **New York Cyber Abuse Task Force** is a volunteer coalition of advocates, attorneys, and survivors, fighting for better safety outcomes for victims of tech abuse at the intersection of intimate partner and gender-based violence.  The survivors that we support are deeply familiar with the DARVO effect, especially as it relates to increasingly common trend of abusers using digital platforms to create defamation and harassment campaigns targeted their victim.  Abusers often weaponize intimate information and images to cast their victim in an unsympathetic light – in direct retaliation for the victim truthfully speaking out against the abuse and abuser.  More has to be done to shine light on DARVO tactics so that survivors are strengthened and supported in holding powerful abusers to account.[113]

5.    **Herunivercity Inc.** is survivor-led and empowers young women through holistic development—mentally, professionally, financially, and spiritually--and through lifelong sisterhood.  Herunivercity is especially concerned about the negative impact of retaliatory DARVO tactic used to disempower and silence young survivors of sexual violence.

6.    **Women's Equal Justice** provides direct advocacy services to sexual assault survivors as they navigate the criminal justice process, and we partner with survivors to reform the justice system's response to sexual assault.

7.    **New York City Alliance Against Sexual Assault (The Alliance)** works to prevent sexual violence and reduce the harm it causes through education, prevention programming, advocacy for survivors, and the pursuit of legal and policy changes.  The Alliance was founded in

---

[113] *See Welcome to the New York Cyber Abuse Task Force*, N.Y. Cyber Abuse Task Force (2025), https://cyberabuse.nyc/.

1999 by rape crisis centers in New York City in order to advocate for the needs of survivors and the organizations that serve them.

8.      **Coalition Against Trafficking in Women** is one of the oldest international organizations working to end the trafficking and sexual exploitation of women and girls.  They emphatically believe that every woman and girl has a fundamental right to live a life free from discrimination, sexual exploitation, and violence.  Through an approach rooted in women's rights and human rights principles, they advocate for strong laws and policies, raise public awareness and support survivor leadership.

9.      The **National Network to End Domestic Violence (NNEDV)** represents the 56 U.S. state and territorial coalitions against domestic violence.  NNEDV was instrumental in the passage and implementation of the Violence Against Women Act. NNEDV is dedicated to creating a social, political, and economic environment in which domestic violence no longer exists, and works to make domestic violence a national priority, change the way society responds to domestic violence, and strengthen domestic violence advocacy at every level.  NNEDV has a strong interest in ensuring that anti-SLAPP laws are correctly applied in retaliatory defamation cases meant to silence current and future victims of abuse.

10.     **Esperanza United** mobilizes Latinas and Latin@ communities to end gender-based violence.  For over 40 years, we have served a highly marginalized population in culturally relevant ways that translate to greater safety, community connectedness, and self-sufficiency for Latin@s who experience domestic violence, sexual assault, and trafficking.  Our work builds and leverages the communities' strengths, cultural assets, and leadership to shift beliefs and behaviors within family and social networks, which we believe will create the conditions and solutions for thriving.

11.     **New York State Anti-Trafficking Coalition** is a group of New York State individuals and organizations joining forces to increase public awareness of human trafficking in New York communities, enact anti-trafficking laws, improve law enforcement response and increase social services to help victims escape trafficking and rebuild their lives.  The New York State Anti-Trafficking Coalition helped drive the passage of multiple momentous laws in New York State, including the New York Anti-Trafficking Law, the Safe Harbor for Exploited Youth Act, the Trafficking Victims Protection and Justice Act, and the End Child Sex Trafficking Act. The survivors whose rights and interests we work to advance experience acute sexual violence and are at grave risk of DARVO-style retaliation when they report and speak out about the trafficking and related violence they have endured.

12.     **Her Justice**.  Since 1993, Her Justice has been dedicated to making a real and lasting difference in the lives of women living in poverty in New York City, many of whom are survivors of gender-based violence, by offering them legal services designed to foster equal access to justice and an empowered approach to life. Through our pro bono first model, Her Justice trains and mentors thousands of volunteer attorneys from more than 100 premier law firms and corporations to assist women living in poverty, bringing the power of the private bar to those who need it most. Her Justice engages in this model by leveraging our team's deep expertise in family, matrimonial, and immigration law, and in the issues related to gender-based and intimate partner violence. This approach has enabled us to provide legal services to over 4,000 women every year in all five boroughs of New York City. Informed by its work, Her Justice also promotes policies that make society more responsive to the legal issues confronting the women it serves.

Her Justice has longstanding expertise on some of the issues raised in this litigation. Approximately 80% of Her Justice's clients are survivors of gender-based violence, and assisting

survivors of gender-based violence has been a substantial part of the organization's practice since its founding.  Her Justice focuses on pursuing civil court remedies that are critical to survivors of gender-based violence, including safety through Family Court orders of protection, financial support through divorce and spousal/child support cases, and family stability through custody/visitation cases.  Her Justice also specializes in assisting survivors of gender-based violence in obtaining immigration relief under the Violence Against Women Act, which entitles them to safety, stability and financial empowerment through employment authorization.  Our many years of work on behalf of women living in poverty give us particular knowledge of the systemic connection between gender-based violence and women's economic stability, and the critical role of the courts and the law in shifting power to survivors.  Her Justice is committed to advancing legal and policy protections for survivors of abuse.

13.    **Urban Resource Institute** helps transform the lives of domestic violence survivors and homeless families, with a focus on communities of color and other vulnerable populations. We have deepened our impact and become the largest provider of domestic violence shelter services in the United States.  Our holistic approach encompasses innovative prevention and intervention programs and direct services.